**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE:  U.S. OFFICE OF PERSONNEL
MANAGEMENT DATA SECURITY
BREACH LITIGATION

_____

                                           Misc. Action No. 15-1394 (ABJ)
                                           MDL Docket No. 2664

This Document Relates To:

ALL CASES

---

**DEFENDANT KEYPOINT GOVERNMENT SOLUTIONS, INC.'S**
**MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT**

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendant KeyPoint Government Solutions, Inc. ("KeyPoint") moves the Court to dismiss with

prejudice all of Plaintiffs' claims against KeyPoint.  As set forth in the accompanying

Memorandum of Law, the claims against KeyPoint in Plaintiffs' Consolidated Amended

Complaint should be dismissed because Plaintiffs lack standing to sue, KeyPoint is immune from

liability, and Plaintiffs fail to state any claim against KeyPoint upon which relief can be granted.

Accordingly, the claims against KeyPoint in Plaintiffs' Consolidated Amended Complaint

should be dismissed with prejudice.

Pursuant to Local Rule 7(f), KeyPoint respectfully requests oral argument on this motion.

Dated:   May 13, 2016                    Respectfully submitted,

                                         /s/ F. Joseph Warin
                                         F. Joseph Warin (D.C. Bar No. 235978)
                                         Jason J. Mendro (D.C. Bar No. 482040)
                                         GIBSON, DUNN & CRUTCHER LLP
                                         1050 Connecticut Avenue, N.W.
                                         Washington, D.C.  20036-5306
                                         Telephone:  (202) 955-8500
                                         Facsimile:  (202) 530-9626
                                         fwarin@gibsondunn.com
                                         jmendro@gibsondunn.com

                                         Alexander H. Southwell (N.Y. Bar No. 2923415)
                                         GIBSON, DUNN & CRUTCHER LLP
                                         200 Park Avenue
                                         New York, NY  10166-0193
                                         Telephone:  (212) 351-3981
                                         Facsimile:  (212) 351-6281
                                         asouthwell@gibsondunn.com

                                         *Counsel for Defendant KeyPoint Government
                                         Solutions, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE:  U.S. OFFICE OF PERSONNEL
MANAGEMENT DATA SECURITY
BREACH LITIGATION

Misc. Action No. 15-1394 (ABJ)
MDL Docket No. 2664

This Document Relates To:

ALL CASES

**MEMORANDUM OF LAW IN SUPPORT OF
KEYPOINT GOVERNMENT SOLUTIONS, INC.'S MOTION TO DISMISS**

TABLE OF CONTENTS

Page

**INTRODUCTION**..................................................................................................1

**STATEMENT OF FACTS**......................................................................................2

    I.      KeyPoint's Function As A Government Contractor. ............................... 2

    II.     The Alleged KeyPoint Cyber-Attack............................................. 3

    III.    The Alleged OPM Cyber-Attacks............................................... 3

    IV.    Plaintiffs And Their Purported Injuries. ..................................... 4

**ARGUMENT** ........................................................................................................6

    I.      Plaintiffs Lack Standing To Bring Claims Against KeyPoint. .............. 6

           A.      Plaintiffs Fail To Adequately Allege Injury In Fact. ..................7

           B.      Plaintiffs Have Not Alleged That KeyPoint Caused Their Injuries..........11

           C.      Plaintiffs' Allegations Fail To Adequately Plead Redressability. .............16

    II.     Government Contractor Immunity Bars Plaintiffs' Claims Against KeyPoint. ................................................................................. 17

           A.      KeyPoint Was Acting Pursuant To A Valid Contract With The Federal Government And Is Therefore Entitled To Immunity. ................17

           B.      KeyPoint Did Not Violate Federal Law Or The Government's Instructions.................................................................20

    III.    Plaintiffs Have Failed To State Any Claim. ....................................... 22

           A.      Plaintiffs' Claim Under The Fair Credit Reporting Act Is Meritless.........23

           B.      Plaintiffs Have Failed To State Claims Under Any State Consumer Protection And Unfair Business Practice Statute.....................................24

           C.      Plaintiffs Have Failed To State A Claim Under Any State Data Breach Notification Statute.......................................................29

           D.      Plaintiffs' Remaining Common Law Claims Are Meritless.....................34

**CONCLUSION** .................................................................................................44

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ackerson v. Bean Dredging LLC,*
    589 F.3d 196 (5th Cir. 2009) ............................................................................18

*In re Adobe Sys., Inc. Privacy Litig.,*
    66 F. Supp. 3d 1197 (N.D. Cal. 2014) ..............................................................33

*Aguilar v. RP MRP Wash. Harbour, LLC,*
    98 A.3d 979 (D.C. 2014) .............................................................................39, 42

*In re Anthem, Inc. Data Breach Litig.,*
    No. 15-MD-02617, 2016 WL 589760 (N.D. Cal. Feb. 14, 2016) .........................38

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) .......................................................................6, 11

\* *Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...................................................................................22, 24

*Avery v. State Farm Mut. Auto. Ins. Co.,*
    835 N.E.2d 801 (Ill. 2005) ..........................................................................26, 28

*Baba v. Hewlett-Packard Co.,*
    No. 09-05946, 2010 WL 2486353 (N.D. Cal. June 16, 2010)............................27

*Bailey v. Atl. Auto. Corp.,*
    992 F. Supp. 2d 560 (D. Md. 2014) ...................................................................7

*Barr v. Matteo,*
    360 U.S. 564 (1959)........................................................................................19

*Barry v. St. Paul Fire & Marine Ins. Co.,*
    555 F.2d 3 (1st Cir. 1977), *aff'd*, 438 U.S. 531 (1978).......................................7

*Bean v. Gutierrez,*
    980 A.2d 1090 (D.C. 2009) .............................................................................42

\* *Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................22

\* *Boyle v. United Techs. Corp.,*
    487 U.S. 500 (1988)....................................................................18, 20, 29, 30

   \*  Authorities upon which Defendant KeyPoint Government Solutions, Inc. chiefly relies are marked with an asterisk.

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Bumpers v. Cmty. Bank of N. Va.,
  747 S.E.2d 220 (N.C. 2013)..................................................................................30

Butters v. Vance Int'l, Inc.,
  225 F.3d 462 (4th Cir. 2000) ...............................................................................18

* Campbell-Ewald Co. v. Gomez,
  136 S. Ct. 663 (2016)................................................................................1, 18, 20, 21

Cent. Wesleyan Coll. v. W.R. Grace & Co.,
  6 F.3d 177 (4th Cir. 1993) .....................................................................................7

Chandler v. District of Columbia,
  404 A.2d 964 (D.C. 1979) ....................................................................................37

City of Los Angeles v. Lyons,
  461 U.S. 95 (1983)....................................................................................................7

* Clapper v. Amnesty Int'l USA,
  133 S. Ct. 1138 (2013)..................................................................................6, 7, 8, 9

CNA v. United States,
  535 F.3d 132 (3d Cir. 2008)..................................................................................19

Cobell v. Kempthorne,
  455 F.3d 301 (D.C. Cir. 2006)..............................................................................31

Dist. of Columbia v. Carlson,
  793 A.2d 1285 (D.C. 2002) ..................................................................................39

Doe v. Bernabei & Wachtel, PLLC,
  116 A.3d 1262 (D.C. 2015) ...........................................................................41, 42, 43

Dolmage v. Combined Ins. Co. of Am.,
  No. 14 C 3809, 2015 WL 292947 (N.D. Ill. Jan. 21, 2015) ...........................24, 37

Drs. Groover, Christie & Merritt, P.C. v. Burke,
  917 A.2d 1110 (D.C. 2007) ..................................................................................35

Ellis v. Candia Trailers & Snow Equip., Inc.,
  58 A.3d 1164 (N.H. 2012) ....................................................................................26

Fed. Ins. Co. v. J.K. Mfg. Co.,
  933 F. Supp. 2d 1065 (N.D. Ill. 2013) .................................................................40

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Filarsky v. Delia,*
132 S. Ct. 1657 (2012) .................................................................................................19

*Galaria v. Nationwide Mut. Ins. Co.,*
998 F. Supp. 2d 646 (S.D. Ohio 2014) ...........................................................11, 12

*Geier v. Am. Honda Motor Co.,*
529 U.S. 861 (2000)......................................................................................29, 32

*Gen. Assur. of Am., Inc. v. Overby-Seawell Co.,*
533 F. App'x 200 (4th Cir. 2013) ..................................................................35

*Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond,*
80 F.3d 895 (4th Cir.1996) ...........................................................................28

*Grigsby v. Valve Corp.,*
No. 2:12-cv-00553 (W.D. Wash. Mar. 18, 2013) ...................................................33

*Haas v. Pittsburgh Nat'l Bank,*
526 F.2d 1083 (3d Cir. 1975)...........................................................................11

*In re Hannaford Bros. Customer Data Sec. Breach Litig.,*
613 F. Supp. 2d 108 (D. Me. 2009), *aff'd in part, rev'd in part on other*
*grounds sub nom. Anderson v. Hannaford Bros.,* 659 F.3d 151 (1st Cir. 2011) ..............16, 17

*Hedgepeth v. Whitman Walker Clinic,*
22 A.3d 789 (D.C. 2011) ...............................................................................38, 40

*Henry v. Circus Circus Casinos, Inc.,*
223 F.R.D. 541 (D. Nev. 2004)...........................................................................6, 11

*Hill v. Nat'l Collegiate Athletic Ass'n,*
865 P.2d 633 (Cal. 1994) ...............................................................................46

*Holk v. Snapple Beverage Corp.,*
575 F.3d 329 (3d Cir. 2009)...........................................................................31

*In re Horizon Healthcare Servs., Inc. Data Breach Litig.,*
No. 13-7418, 2015 WL 1472483 (D.N.J. Mar. 31, 2015), *appeal docketed,*
No. 15-2309 (3d Cir.)...............................................................................15, 16

*Kearns v. Ford Motor Co.,*
567 F.3d 1120 (9th Cir. 2009) ...........................................................................27

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Kim v. Carter's Inc.*,
  598 F.3d 362 (7th Cir. 2010) ............................................................26

*Kramer Assoc., Inc. v. Ikam, Ltd.*,
  888 A.2d 247 (D.C. 2005) .................................................................44

*Lawrence v. Philip Morris USA, Inc.*,
  53 A.3d 525 (N.H. 2012) ...................................................................28

*Levine v. First Am. Title Ins. Co.*,
  682 F. Supp. 2d 442 (E.D. Pa. 2010) ...............................................28

*Lewis v. Casey*,
  518 U.S. 343 (1996) .............................................................................6

*Low v. LinkedIn Corp.*,
  900 F. Supp. 2d 1010 (N.D. Cal. 2012) ...........................................43

\* *Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..........................................................7, 11, 12, 16

*Mangold v. Analytic Servs., Inc.*,
  77 F.3d 1442 (4th Cir. 1996) .......................................................19, 21

*Martinez v. Bureau of Prisons*,
  444 F.3d 620 (D.C. Cir. 2006) ..........................................................20

*In re Maxxim Med. Grp., Inc.*,
  434 B.R. 660 (Bankr. M.D. Fla. 2010) .............................................26

*Metro. Life Ins. Co. v. Blyther*,
  964 F. Supp. 2d 61 (D.D.C. 2013) ....................................................20

*Microsoft Corp. v. #9 Software, Inc.*,
  No. 405CV106, 2005 WL 3447965 (E.D. Va. Dec. 15, 2005) ...........25

*Nabaya v. Dudeck*,
  38 F. Supp. 3d 86 (D.D.C. 2014) ......................................................22

*NASA v. Nelson*,
  562 U.S. 134 (2011) ...........................................................................19

*Nguyen v. Doak Homes, Inc.*,
  167 P.3d 1162 (Wash. App. 2007) .....................................................27

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Pai v. U.S. Citizenship & Immigr. Servs.*,
    810 F. Supp. 2d 102 (D.D.C. 2011) .......................................................................6

*Panag v. Farmers Ins. Co. of Wash.*,
    204 P.3d 885 (Wash. 2009) ................................................................................28

*Peters v. St. Joseph Servs. Corp.*,
    74 F. Supp. 3d 847 (S.D. Tex. 2015) .............................................................14, 16

*Peterson v. Cellco P'ship*,
    164 Cal. App. 4th 1583 (2008) .........................................................................28

*Picus v. Wal-Mart Stores, Inc.*,
    256 F.R.D. 651 (D. Nev. 2009).........................................................................28

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011) .............................................................................27

*Polk v. Crown Auto, Inc.*,
    228 F.3d 541 (4th Cir. 2000) .............................................................................28

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    489 F.3d 1279 (D.C. Cir. 2007).........................................................................8

*Randolph v. ING Life Ins. & Annuity Co.*,
    486 F. Supp. 2d 1 (D.D.C. 2007).......................................................................9

*Redmond v. State Farm Ins. Co.*,
    728 A.2d 1202 (D.C. 1999) ...............................................................................40

* *Reilly v. Ceridian Corp.*,
    664 F.3d 38 (3d Cir. 2011)............................................................................9, 10

*Remijas v. Neiman Marcus Grp., LLC*,
    794 F.3d 688 (7th Cir. 2015) .............................................................................11

*Rinck v. Ass'n of Reserve City Bankers*,
    676 A.2d 12 (D.C. 1996) ...................................................................................44

*Romero v. Nat'l Rifle Ass'n of Am., Inc.*,
    749 F.2d 77 (D.C. Cir. 1984).......................................................................36, 37

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
    682 F.3d 1043 (D.C. Cir. 2012).........................................................................22

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Ruiz v. Gap, Inc.*,
  380 F. App'x 689 (9th Cir. 2010) ..........................................................................43

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007)..............................................................................................23

\* *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
  45 F. Supp. 3d 14 (D.D.C. 2014) ....................................................6, 8, 9, 10, 14, 15

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976).............................................................................................11

*Sims v. District of Columbia*,
  699 F. Supp. 2d 217 (D.D.C. 2010) ....................................................................34

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
  903 F. Supp. 2d 942 (S.D. Cal. 2012)..................................................................30

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
  996 F. Supp. 2d 942 (S.D. Cal. 2014)......................................................28, 33, 34

*Stollenwerk v. Tri-W. Health Care All.*,
  254 F. App'x 664 (9th Cir. 2007) ........................................................................14

*Sundberg v. TTR Realty, LLC*,
  109 A.3d 1123 (D.C. 2015) ................................................................................40

*Taylor v. McNichols*,
  243 P.3d 642 (Idaho 2010)..................................................................................26

*United States ex rel. Totten v. Bombardier Corp.*,
  286 F.3d 542 (D.C. Cir. 2002) ............................................................................27

*Townsend v. Nat'l Arbitration Forum, Inc.*,
  No. 09-9325, 2012 WL 12736 (C.D. Cal. Jan. 4, 2012) ........................................10

*Two Old Hippies, LLC v. Catch the Bus, LLC*,
  277 F.R.D. 448 (D.N.M. 2011)...........................................................................28

*In re U.S. Office Prods. Co. Sec. Litig.*,
  251 F. Supp. 2d 58 (D.D.C. 2003) .......................................................................35

*United States v. California*,
  No. 2:06-cv-2649, 2007 WL 3341670 (E.D. Cal. Nov. 8, 2007) ...........................19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Mead Corp.*,
533 U.S. 218 (2001)...........................................................................................31

*Unt v. Aerospace Corp.*,
765 F.2d 1440 (9th Cir. 1985) ..........................................................................22

*US Ecology, Inc. v. U.S. Dep't of Interior*,
231 F.3d 20 (D.C. Cir. 2000) ..............................................................................6

*Vassiliades v. Garfinckel's, Brooks Bros.*,
492 A.2d 580 (D.C. 1985) ...........................................................................42, 43

*Wash. Metro. Area Transit Auth. v. Ferguson*,
977 A.2d 375 (D.C. 2009) .................................................................................35

*Washington v. CSC Credit Servs. Inc.*,
199 F.3d 263 (5th Cir. 2000) ......................................................................23, 24

*Whalen v. Michael Stores Inc.*,
No. 14-CV-7006, 2015 WL 9462108 (E.D.N.Y. Dec. 28, 2015)......................10

*Whitmore v. Arkansas*,
495 U.S. 149 (1990).............................................................................................7

*Willingham v. Glob. Payments, Inc.*,
No. 1:12-CV-01157, 2013 WL 440702 (N.D. Ga. Feb. 5, 2013).......................24

*Wolf v. Regardie*,
553 A.2d 1213 (D.C. 1989) .........................................................................42, 43

* *Workman v. United Methodist Comm. on Relief of Gen. Bd. of Glob. Ministries of
United Methodist Church*,
320 F.3d 259 (D.C. Cir. 2003) ...........................................................................36

*Wyeth v. Levine*,
555 U.S. 555 (2009)...........................................................................................29

*Wynn's Extended Care, Inc. v. Bradley*,
No. 5:13-CV-00114, 2014 WL 2197715 (W.D. Va. May 27, 2014).....................30

* *Yearsley v. W.A. Ross Constr. Co.*,
309 U.S. 18 (1940)..................................................................................1, 17, 19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Federal Statutes**

5 U.S.C. § 552a(m) ...................................................................................20, 21

15 U.S.C. § 1681(a) ........................................................................................23

15 U.S.C. § 1681b(a) ......................................................................................23

15 U.S.C. § 1681e(a).......................................................................................23

44 U.S.C. § 3544(b) ...................................................................................30, 33

Civil Service Reform Act of 1978,
    Pub. L. No. 95-454, 92 Stat. 1111 .......................................................2, 17

Consolidated Appropriations Act of 2016,
    H.R. Res. 2029, 114th Cong., § 632 (2015-16) ........................................4

**State Statutes**

Cal. Bus. & Prof. Code § 17200 ......................................................................24

Cal. Civ. Code § 1798.80(c) ......................................................................32, 34

Cal. Civ. Code § 1798.84(b) ...........................................................................32

Cal. Civ. Code §§ 56.20-56.245 .......................................................................34

Fla. Stat. § 501.204(1).................................................................................24, 25

Ga. Code § 10-1-912 .......................................................................................32

Idaho Code § 48-608(1)...................................................................................28

Idaho Code § 48-603(18).............................................................................24, 25

815 Ill. Comp. Stat. § 505/2........................................................................24, 25

815 Ill. Comp. Stat. § 510/2........................................................................24, 25

815 Ill. Comp. Stat. § 530/20 ..........................................................................34

Kan. Stat. § 50-7a02(e) ...................................................................................32

Kan. Stat. § 50-7a02(g)....................................................................................32

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Mich. Comp. Laws § 445.72(13) ........................................................................32

N.C. Gen. Stat. § 75-65(i) ..................................................................................35

N.C. Gen. Stat. § 75-1.1(a) ..........................................................................24, 25

N.C. Gen. Stat. § 75-65(i) ..................................................................................33

N.H. Rev. Stat. § 358-A:2 ............................................................................24, 25

N.H. Rev. Stat. § 359-C:21 .................................................................................33

N.M. Stat. § 57-12-2(D) ...............................................................................24, 25

Nev. Rev. Stat. § 598.0915 ...........................................................................24, 26

Nev. Rev. Stat. § 598.0923 .................................................................................26

73 Pa. Stat. § 201-2 .............................................................................................25

73 Pa. Stat. § 201-3 .............................................................................................24

Tenn. Code § 47-18-2107(h) ........................................................................32, 33

Va. Code § 18.2-186.6(I) .....................................................................................33

Va. Code § 18.2-186.6(H) ...................................................................................32

Va. Code § 32.1-127.1 .........................................................................................34

Va. Code § 59.1-200(A) .......................................................................................24

Wash. Rev. Code § 19.86.020 ......................................................................24, 25

Wash. Rev. Code § 19.255.010(13)(a) ...............................................................33

Wis. Stat. § 134.98(4) .........................................................................................32

Wis. Stat. § 146.82 ..............................................................................................34

Wis. Stat. § 146.84 ..............................................................................................34

**Rules**

Fed. R. Civ. P. 9(b) .............................................................................................26

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Regulations**

48 C.F.R. § 52.224-2(a) ........................................................................................31

**Other Authorities**

Congressional Research Service, *Security Clearance Process: Answers to
    Frequently Asked Questions* (Sept. 9, 2013)..........................................................19

Dep't of Justice, Overview of the Privacy Act of 1974:  Government Contractors,
    *available at* https://www.justice.gov/opcl/government-contractor.........................21

Merriam-Webster Online, http://www.merriam-webster.com/dictionary/consumer...................33

Merriam-Webster Online, http://www.merriam-webster.com/dictionary/customer ...................32

National Consumer Law Center, *Consumer Protection in the United States, A 50-
    State Report on Unfair and Deceptive Acts and Practices Statutes* (2009),
    *available at* https://www.nclc.org/images/pdf/udap/report_50_states.pdf. ...........................25

OMB Memorandum M-07-16, *Safeguarding Against and Responding to the
    Breach of Personally Identifiable Information* (May 22, 2007), *available at*
    https://www.whitehouse.gov/sites/default/files/omb/memoranda/fy2007/m07-
    16.pdf ........................................................................................................30, 31

OPM, *Policy on the Protection of Personally Identifiable Information* (2012) ...........................31

OPM, *Policy on the Protection of Personally Identifiable Information* (2014) ...........................31

Restatement (Second) of Conflict of Laws § 145 ........................................................35

Restatement (Second) of Torts § 652D (1977)............................................................43

*U.S. Cybersecurity Policy and Threats: Hearing Before the S. Comm. on Armed
    Services*, 114th Cong. (2015) (statement of Sen. Ayotte), *CQ Congressional
    Transcripts, Congressional Hearings*, Sept. 29, 2015.............................................9

Victims of Identity Theft (2014), U.S. Department of Justice, Bureau of Justice
    Statistics, *available at* http://www.bjs.gov/content/pub/pdf/vit14.pdf..................................16

Defendant KeyPoint Government Solutions, Inc. ("KeyPoint") respectfully moves, under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss all claims against it with prejudice.

## INTRODUCTION

This litigation is the culmination of 20 lawsuits that seek to monetize unprecedented, criminal cyber-attacks on federal personnel records. But rather than seeking recovery from the cyber-criminals, Plaintiffs direct their claims at the target of the attacks: the U.S. Office of Personnel Management ("OPM"). And in an effort to sidestep the government's immunity from liability, Plaintiffs lodge a litany of unfounded claims against OPM's contractor, KeyPoint, ignoring that KeyPoint's only role was to act as an extension of the government in performing a quintessential governmental function—conducting background investigations on candidates for federal employment. These claims are fatally flawed for numerous reasons.

First, Plaintiffs lack standing to sue because they have incurred no cognizable injury, have not plausibly pleaded that KeyPoint caused them harm, and cannot achieve redress through litigation. Indeed, a tide of courts, including courts in this District, have now squarely rejected the same types of hypothetical inconveniences that Plaintiffs attempt to pass off as "injuries" in this case. Those courts recognize that speculation about the theoretical risk of future harm does not give rise to standing under Article III of the Constitution.

Second, KeyPoint is immune from liability. The Supreme Court has recently reaffirmed decades of precedent holding that "[w]here the Government's 'authority to carry out [a] project was validly conferred, . . . there is no liability on the part of the contractor' who simply performed as the Government directed." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016) (quoting *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940)). Here, it is clear on the face of the Consolidated Amended Complaint ("Complaint") that KeyPoint was

performing investigations of candidates for federal employment at the direction of the

government.  Plaintiffs' attempt to circumvent the government's well settled immunity by

targeting a contractor that stood in its shoes has no basis in law and clashes with a deep-seated

public policy in favor of extending the government's immunity to those that conduct its business.

Third, the Complaint fails to state any claim against KeyPoint upon which relief can be

granted.  Although Plaintiffs barrage KeyPoint with an array of kitchen-sink claims, each of

them is premised on defective applications of the law or plainly deficient allegations.  Many of

the claims rest on blatant distortions of federal and state statutes concerning credit reporting or

consumer protections that have nothing to do with this case.  Plaintiffs attempt to obscure the

irrelevancy of these laws by arguing that KeyPoint "furnished" information that was, by their

own admission, *stolen* by cyber-criminals.  The Complaint stretches to manufacture a breach of

contract claim in the stark absence of any plausible allegation of a meeting of the minds or the

exchange of bargained-for consideration (much less a written agreement).  Finally, the

Complaint peddles a host of overlapping tort theories, many of which are inapplicable as a matter

of law, and the rest of which disintegrate in the face of settled authority recognizing that

KeyPoint does not shoulder legal responsibility for the unlawful acts of third-party criminals.

Each of the claims against KeyPoint should be dismissed with prejudice.

## STATEMENT OF FACTS

## I.     KeyPoint's Function As A Government Contractor.

KeyPoint is a government contractor that conducts background investigations on

candidates for employment with the federal government, at the direction of OPM.  *See* Compl.

¶¶ 53, 60, 75.  OPM is the federal agency authorized by Congress to control and oversee "the

function of filling positions and other personnel functions in the . . . executive branch," Civil

Service Reform Act of 1978, Pub. L. No. 95-454, § 3(5), 92 Stat. 1111, 1112.  KeyPoint

performs its work for OPM pursuant to a contract with OPM. *See* Compl. ¶¶ 53, 75. Plaintiffs

have not alleged that KeyPoint was contractually obligated to prevent cyber-attacks, that OPM

ever concluded that KeyPoint failed to perform its contractual obligations, or that OPM ever

rescinded or declined to renew KeyPoint's contract.

## II.    The Alleged KeyPoint Cyber-Attack.

Plaintiffs assert that in or around December 2013, hackers breached KeyPoint's systems.

Compl. ¶ 114. According to the Complaint, the attack was "sophisticated, malicious, and carried

out to obtain sensitive data for improper use," *id.* ¶ 117, although there is no allegation that any

information was actually stolen at that point, *see id.* The Complaint refers to this cyber-attack as

the "KeyPoint Breach." *Id.* ¶ 4. Plaintiffs acknowledge that "how the KeyPoint Breach

occurred" is unknown. *Id.* ¶ 121.[1]

After that attack, "OPM did not suspend KeyPoint's investigations, rescind its contract

with KeyPoint," or "prevent or limit KeyPoint's access to OPM systems . . . ." *Id.* ¶ 119. On

April 27, 2015, OPM alerted approximately 48,000 federal employees "that their personal

information might have been exposed in the KeyPoint Breach." *Id.* ¶ 120.

## III.    The Alleged OPM Cyber-Attacks.

Plaintiffs separately assert that OPM's systems were attacked three times. First, the

Complaint claims that in November 2013, hackers infiltrated OPM's network and stole "security

system documents and electronic manuals." Compl. ¶¶ 125-26. Second, the Complaint alleges

that in May 2014, "hackers accessed OPM's network using stolen KeyPoint credentials." *Id.*

¶ 127. That breach allegedly resulted in "the theft of nearly 21.5 million background

investigation records." *Id.* ¶ 129. There are no allegations regarding when the KeyPoint

---

[1]   For purposes of this motion, KeyPoint recites the relevant facts as alleged in the
Complaint. KeyPoint nonetheless disputes the accuracy and veracity of many of the allegations.

credentials used to access OPM's systems were stolen, from whom they were stolen, or how they were used to access OPM's systems.  Third, Plaintiffs allege that "[n]o later than October 2014," hackers breached "OPM systems maintained in an Interior Department shared-services data center."  *Id.* ¶ 131.  These hackers were allegedly able to access OPM's systems "at will" for "several months," resulting in "the loss of approximately 4.2 million federal employees' personnel files."  *Id.* ¶¶ 131, 133.  Plaintiffs contend that the hackers were able to use "the stolen KeyPoint credentials" to access the system "[b]ecause OPM's systems were not shielded through multi-factor authentication or privileged access controls."  *Id.* ¶ 133.  Again, there are no allegations regarding the origin of the allegedly stolen KeyPoint credentials.  The Complaint refers to the second and third OPM cyber-attacks collectively as the "OPM Breaches."  *Id.* ¶ 6.

OPM notified persons affected by the OPM cyber-attacks and "offered them free identity theft protection services."  *Id.* ¶¶ 138-49.  OPM spent $154 million on providing "fraud monitoring and identity theft protection, insurance, and restoration services for either 18 months or three years, depending on the amount and sensitivity of the compromised" data.  *Id.* ¶ 150.  Moreover, in the Consolidated Appropriations Act of 2016, Congress provided the individuals affected by the cyber-attacks with at least ten years of comprehensive identity monitoring services.  *See* H.R. Res. 2029, 114th Cong., Sec. 632 (2015-16) (enacted).

## IV.    Plaintiffs And Their Purported Injuries.

Twenty separate actions have been consolidated in this multidistrict litigation.[2]  The Consolidated Amended Complaint claims that "[t]he records taken in the Data Breaches are of the utmost sensitivity."  Compl. ¶ 143.  The Complaint lumps together the various alleged breaches and defines them as the "Data Breaches" generally, *id.* ¶ 7, but does not allege which

---

[2]  KeyPoint is only named as a defendant in sixteen of these actions.  Another related lawsuit has been filed in the Northern District of Alabama but not yet formally consolidated with this action.  *See Golden v. U.S. Office of Pers. Mgmt.*, No. 16-cv-656 (N.D. Ala.).

breaches resulted in the release of Plaintiffs' information.  The Complaint asserts claims on

behalf of the 38 named Plaintiffs, and purportedly on "behalf of individuals whose sensitive

personal information was compromised in the OPM Breaches or in the KeyPoint Breach."  *Id.*

¶ 10.  Plaintiffs define "sensitive personal information" as "at a minimum, Social Security

numbers and birthdates," but note that it may also include other types of "government

investigation information," or "GII."  *Id.* ¶ 10.

Named Plaintiff American Federation of Government Employees ("AFGE") is a labor

union that represents hundreds of thousands of federal employees.  *Id.* ¶ 11.  "AFGE seeks

declaratory and injunctive relief only on behalf of the Class," and it only alleges injuries to its

members from the OPM cyber-attacks.  *Id.* ¶ 12.  Thirty-six of the other named Plaintiffs are

current or former employees of the federal government (or federal government contractors or

subcontractors).  *Id.* ¶¶ 13-50.[3]  The named individual Plaintiffs claim to have incurred a variety

of supposed injuries, including time spent disputing fraudulent charges and reviewing financial

accounts, *e.g.*, *id.* ¶¶ 13, 15, 22; unauthorized credit charges, *e.g.*, *id.* ¶ 19; closing of financial

accounts, *e.g.*, *id.* ¶ 21; fear and stress resulting from the alleged exposure, *e.g.*, *id.* ¶¶ 18, 22; and

expenditures on credit and identity monitoring services, *e.g.*, *id.* ¶¶ 34, 40.  Plaintiffs have not,

however, alleged any out-of-pocket losses associated with these alleged injuries.

A common thread throughout the allegations is that no single Plaintiff is identified as a

victim of the KeyPoint cyber-attack.  Instead, the Complaint asserts that each Plaintiff's

"information has been compromised in the Data Breaches," which are defined generally to

encompass both "the KeyPoint Breach and the OPM Breaches."  *Id.* ¶ 7; *see also, e.g.*, *id.* ¶ 13.

---

[3]   There are no allegations that Plaintiff Jane Doe II was employed by the federal
government or its contractors, or that she ever applied for such employment.  *Id.* ¶ 23.  Plaintiff
Peter Uliano "applied for and was offered" a position with the Transportation Security
Administration, but there is no allegation that he actually secured such employment.  *Id.* ¶ 48.

**ARGUMENT**

**I.      Plaintiffs Lack Standing To Bring Claims Against KeyPoint.**

"[A] plaintiff's standing under Article III" is a question of subject-matter jurisdiction that "must be first determined in order to establish the jurisdiction of the Court to hear the case and reach the merits." *Pai v. U.S. Citizenship & Immigr. Servs.*, 810 F. Supp. 2d 102, 106 (D.D.C. 2011) (internal quotations omitted).  A plaintiff's failure to satisfy *any* of the three elements— injury in fact, causation, or redressability—defeats standing.  *US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24-25 (D.C. Cir. 2000).  Because it is a jurisdictional question, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 22-23 (D.D.C. 2014) (citations omitted).  And federal courts must engage in an even more rigorous review of standing when "the Judiciary has been requested to review actions of the political branches in the fields of intelligence gathering and foreign affairs." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146-47 (2013).  Although the court will "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," "'[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citation omitted).

"That a suit may be a class action . . . adds nothing to the question of standing . . . ." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotations omitted).  In a purported class action with multiple named plaintiffs and multiple named defendants, plaintiffs must show that "at least one named plaintiff [has] standing in his own right to assert a claim *against each named defendant* before he may purport to represent a class claim against that defendant." *Henry v. Circus Circus Casinos, Inc.*, 223 F.R.D. 541, 544 (D. Nev. 2004) (emphasis added); *see also*

*Barry v. St. Paul Fire & Marine Ins. Co.*, 555 F.2d 3, 13 (1st Cir. 1977) (affirming dismissal of two defendants because plaintiffs had not alleged any specific contact with those defendants), *aff'd*, 438 U.S. 531 (1978). Indeed, "in the class action context, it 'is essential that named class representatives demonstrate standing through a requisite case or controversy between themselves personally and' each defendant." *Bailey v. Atl. Auto. Corp.*, 992 F. Supp. 2d 560, 566 (D. Md. 2014) (quoting *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993)).

Plaintiffs lack standing to sue KeyPoint for three reasons. First, the injuries that Plaintiffs assert are conjectural, and not the sort of concrete or imminent injuries required by Article III. Second, Plaintiffs simply lump together the alleged cyber-attacks on KeyPoint and OPM, and thereby fail to plead that *KeyPoint* caused any of their alleged injuries. Third, many of the purported injuries have already been remedied or are not redressable by a judicial decision.[4]

### A.    Plaintiffs Fail To Adequately Allege Injury In Fact.

Injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotations omitted). "Allegations of *possible future injury* do not satisfy" this standard. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 106-07 (1983). Instead, the alleged "'threatened injury must be *certainly impending* to constitute injury in fact.'" *Clapper*, 133 S. Ct. at 1147 (quoting *Whitmore*, 495 U.S. at 158). A theory of standing "which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending." *Id.* at 1148. Moreover, the Supreme Court has rejected standing theories based on "guesswork" regarding independent third parties. *Id.* at 1150.

---

[4] KeyPoint incorporates by reference all of the standing arguments set forth by the Federal Defendants, the United States and OPM. *See* Mem. of P. & A. in Supp. of Federal Def.'s Mot. to Dismiss the Consolidated Am. Compl. ("OPM Br."), Part I.

And Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 1151.

Here, many of Plaintiffs' alleged injuries depend on the purported increased risk of future identity theft. Such risk alone does not constitute imminent injury in fact. Moreover, expenses that Plaintiffs have incurred to allegedly mitigate risks resulting from the cyber-attacks are self-inflicted and cannot manufacture standing where none otherwise exists. Finally, the remainder of Plaintiffs' purported injuries—which are based on vague allegations surrounding their loss of control over their personal information—fail to allege any concrete, cognizable injury.

### 1.    Plaintiffs' Claims Of Increased Risk Of Identity Theft Are Speculative.

Plaintiffs' allegations that they are now exposed to an increased risk of misuse of their personal information do not constitute injury in fact because they are not "certainly impending." *Clapper*, 133 S. Ct. at 1147. As explained in *SAIC*, whether there is an "increased risk of harm" is "irrelevant—instead, the question is whether the harm is *certainly impending*." *SAIC*, 45 F. Supp. 3d at 25 (emphasis added); *see also Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297-98 (D.C. Cir. 2007).

Many of Plaintiffs' allegations rely on a theory of increased risk of identity theft alone, and therefore are insufficient to establish standing. The Complaint asserts that Plaintiffs "have experienced and/or face an increased risk of experiencing the following forms of injuries." Compl. ¶ 163. Other allegations include allegedly "diminished prospects for future employment and/or promotion to positions with higher security clearances as a result of their GII having been compromised," "continuing risks from the unmasking of confidential identities," and "continuing risks to their GII and that of their family members, friends, and associates." Compl. ¶ 163. "[T]he likelihood that any individual Plaintiff will suffer harm [under these theories] remains

entirely speculative," as it relies on guesswork about the future conduct of hackers or other unknown third parties. *SAIC*, 45 F. Supp. 3d at 25; *see Clapper*, 133 S. Ct. at 1147; *see also Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 8 (D.D.C. 2007).

These allegations require this Court to assume that the hackers (or whoever may end up with the information) have the capacity to read, understand, and sift through the hacked data, intend to misuse it, and will then actually follow through. That is far too speculative to constitute injury in fact. *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011); *see also Randolph*, 486 F. Supp. 2d at 7-8. Plaintiffs will only suffer injury "*if* the hacker read, copied, and understood the hacked information, and *if* the hacker attempts to use the information, and *if* he does so successfully." *Reilly*, 664 F.3d at 43. And the hacker "would have to either misuse a particular Plaintiff's [personal information]" out of more than 20 million individuals' information, "or sell that Plaintiff's data to a willing buyer who would then abuse it." *SAIC*, 45 F. Supp. 3d at 25. Such rank speculation about future risks does not constitute injury in fact.[5]

### 2.    Alleged Mitigation Expenses Are Not Injuries.

Plaintiffs' allegations that they have spent time and incurred expenses to protect against the potential future misuse of their information fare no better, because they "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 133 S. Ct. at 1151; *see also Reilly*, 664 F.3d at 46 ("[C]osts incurred to watch for a speculative chain of future events based on hypothetical future criminal acts are no more 'actual' injuries than the alleged 'increased risk of injury.'");

---

[5]    The alleged injuries here are particularly speculative because, although the government has not publicly assigned blame for the cyber-attacks, it is widely suspected that the hackers may have been agents of a foreign government, which makes the risk of financial harm to Plaintiffs even more remote and speculative. *See, e.g.*, *U.S. Cybersecurity Policy and Threats: Hearing Before the S. Comm. on Armed Services*, 114th Cong. 31-34 (2015) (statement of Sen. Ayotte), *CQ Congressional Transcripts, Congressional Hearings*, Sept. 29, 2015.

*SAIC*, 45 F. Supp. 3d at 26 ("[P]roactive measures based on 'fears of . . . future harm that is not

certainly impending' do not create an injury in fact, even where such fears are not unfounded.").

Accordingly, all of Plaintiffs' allegations concerning (1) their review of credit reports and

other accounts and (2) their purchase of credit and identity monitoring services to protect against

future harm fail to allege a cognizable injury in fact.  *See* Compl. ¶¶ 13-22, 25-34, 36-38, 40-44,

46-50.  This particularly holds true in this case where Plaintiffs admit that the government has

already offered identity monitoring services to all affected persons.  *Id.* ¶ 150.

### 3.      Plaintiffs Remaining Injuries Are Vague And Not Cognizable.

Plaintiffs' remaining alleged injuries include:  (1) credit inquiries; (2) generalized

exposure of personal information; and (3) generalized "loss of the opportunity to control how

their [personal information] is used."  Plaintiffs do not allege that they suffered any out-of-

pocket losses in connection with any of these categories of alleged injuries.[6]  And none of these

allegations are sufficiently concrete or particular to constitute injury in fact.

It is well established that standing demands "some form of injury," which requires

"particular" harm.  *SAIC*, 45 F. Supp. 3d at 30.  With regard to credit inquiries, two Plaintiffs

allege that they discovered that "inquiries regarding [their] credit had been made."  Compl.

¶¶ 29, 31.  But an inquiry alone is not enough to constitute injury.  Granted, some courts have

held that a reduction in credit score can constitute injury, *see, e.g.*, *Townsend v. Nat'l Arbitration

Forum, Inc.*, No. 09-9325, 2012 WL 12736, at *6 (C.D. Cal. Jan. 4, 2012), but Plaintiffs here do

---

[6]   Plaintiffs also claim injury based on the (1) unauthorized use of existing accounts; (2)
opening of new accounts; and (3) filing of fraudulent tax returns.  To the extent Plaintiffs have
failed to allege any *unreimbursed* damages, they have not alleged cognizable injury in fact.  *See
Whalen v. Michael Stores Inc.*, No. 14-CV-7006, 2015 WL 9462108, at *3 (E.D.N.Y. Dec. 28,
2015); *see also* OPM Br. Part I.A.1.  Plaintiffs also cannot establish injury based on alleged
emotional harm, including stress, arising from the risk of potential misuse of their information.
*See Reilly*, 664 F.3d at 45; Compl. ¶¶ 13, 18-19, 22-25, 28, 30-31, 35, 37, 42-44, 46, 50; *see also*
OPM Br. Part I.A.6.

not allege any adverse consequences from the credit inquiries, *see* Compl. ¶¶ 29, 31.  An inquiry into one's credit, without an alleged resulting drop in credit score or related inability to use credit, simply does not constitute injury.

Plaintiffs also assert that the mere exposure of personal information constitutes injury. *See, e.g.*, Compl. ¶¶ 19, 22, 50.  But "mere exposure" of personal information "is insufficient to confer standing." *Galaria v. Nationwide Mut. Ins. Co.*, 998 F. Supp. 2d 646, 658 (S.D. Ohio 2014).  Plaintiffs must allege some "adverse consequences" other than speculative future harms. *Id.*  Plaintiffs have made no such allegations here.  Plaintiffs also claim that they were injured as a class by "loss of the opportunity to control" how their personal information is used.  Compl. ¶ 163(K).  But that allegation, too, is insufficient to confer standing.  The Seventh Circuit has noted that injury based on loss of control of personal information is too "abstract" to confer standing.  *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 695 (7th Cir. 2015).

## B.   Plaintiffs Have Not Alleged That KeyPoint Caused Their Injuries.

The causation element of standing requires that "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'"  *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)); *see also Arpaio*, 797 F.3d at 19.  As explained above, Plaintiffs must establish standing with respect to each named defendant. *Henry*, 223 F.R.D. at 544.  "[P]laintiff may not maintain an action on behalf of a class against a specific defendant if the plaintiff is unable to assert an individual cause of action against that defendant" for lack of standing.  *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1096 n.18 (3d Cir. 1975).  Here, Plaintiffs have failed to allege that their purported injuries are traceable to any of KeyPoint's conduct.

It is speculative and insufficient under Article III for Plaintiffs to argue that because they might have been injured by the actions of one or another defendant, they therefore have standing as to both defendants.  Instead, they must allege injury that is fairly traceable to KeyPoint's conduct.  *See Lujan*, 504 U.S. at 560.  But Plaintiffs have failed to do so.  Instead, they speculate that their information was compromised "as a result of the breaches of OPM's electronic information systems in 2014 and 2015 *or* the breach of KeyPoint's electronic information systems in 2013 and 2014."  Compl. ¶ 165 (emphasis added); *see also id*. ¶ 10.  Plaintiffs' failure to allege that KeyPoint caused any of their injuries is fatal to their claims against KeyPoint.

### 1.    Plaintiffs Fail To Plead Any Allegations Tracing Their Injuries To KeyPoint.

Plaintiffs plead neither that their injuries are fairly traceable to the KeyPoint cyber-attack, nor that the OPM cyber-attacks can be traced to KeyPoint's conduct.

First, the Complaint fails to connect *any* of the injuries alleged to the KeyPoint cyber-attack.  Compl. ¶¶ 10-50.  Instead, Plaintiffs lump the "KeyPoint Breach" and the "OPM Breaches" together as constituting the "Data Breaches."  *Id.* ¶ 7.  Then, in describing each individual Plaintiff, the Complaint baldly asserts that each named Plaintiff received some sort of "notice from OPM" that his or her and/or his or her spouse's "sensitive personal information" has been "compromised in the Data Breaches."  *See id.* ¶¶ 11-50.  Nowhere in these descriptions does the Complaint allege that any individual Plaintiff received notice that his or her information was compromised in the alleged *KeyPoint* cyber-attack.[7]

Second, Plaintiffs fail to adequately allege that any injuries arising from the OPM cyber-attacks are fairly traceable to KeyPoint.  The closest Plaintiffs come to claiming a connection

---

[7]    To the contrary, the Complaint acknowledges that information may not have even been compromised in the alleged KeyPoint Breach.  *See id*. ¶ 120 ("On April 27, 2015, OPM alerted more than 48,000 federal employees that their personal information *might have been exposed* in the KeyPoint Breach.") (emphasis added).

between KeyPoint and the OPM cyber-attacks are vague assertions that "[h]ackers used

KeyPoint credentials to breach OPM's information systems in May 2014" and that "[o]n May 7,

2014, hackers accessed OPM's network using stolen KeyPoint credentials." *Id*. ¶¶ 6, 127.

Plaintiffs imply that the KeyPoint cyber-attack enabled hackers to access OPM's networks using

stolen credentials. *See id*. ¶ 228 ("KeyPoint's negligence in failing to protect and secure its user

log-in credentials was a substantial factor in causing the Data Breaches.").  But there are no

allegations of fact to support that assertion.  The chronology that Plaintiffs themselves have

alleged makes clear that OPM had suffered numerous cyber-attacks *before* KeyPoint was ever

allegedly breached.  For example, Plaintiffs allege that OPM suffered two cyber-attacks not at

issue in this suit in 2009 and 2012, well before KeyPoint was allegedly breached in December

2013.  *Id*. ¶ 78. And Plaintiffs contend that another breach of OPM's networks occurred in

November 2013, again, before any breach of KeyPoint is alleged.  *Id.* ¶ 125.

Tellingly, the Complaint discusses the "Causes of the OPM Breaches" at length, without

a mention of KeyPoint.  *Id*. ¶¶ 134-37.  There is simply no allegation of a causal link between

KeyPoint's conduct and the "stolen" credentials allegedly used to breach OPM's systems in May

2014.  The fact that a credential to access OPM's network was stolen in some unspecified

manner at some unspecified time does not tie the theft of that credential to KeyPoint's conduct.

The credential could have been stolen at any time by any number of methods from any number

of individuals, including through an earlier breach of OPM's network.  The claim that Plaintiffs'

information would not have been compromised "[b]ut for KeyPoint's wrongful and negligent

breaches of its duties of care" is a threadbare legal conclusion that fails the pleading

requirements of *Iqbal* and *Twombly*.  Accordingly, Plaintiffs cannot trace the OPM cyber-attacks to any of KeyPoint's conduct.[8]

> ### 2.   Plaintiffs Have Not Pleaded How The Allegedly Compromised Information Could Have Caused Their Injuries.

Plaintiffs also fail to plead how the cyber-attacks caused their claimed injuries.  In order for an injury to be fairly traceable to a defendant's conduct, the complaint must allege sufficient information for a plausible causal connection to be drawn.  *See, e.g.*, *SAIC*, 45 F. Supp. 3d at 31; *Peters v. St. Joseph Servs. Corp.*, 74 F. Supp. 3d 847, 857 (S.D. Tex. 2015).  An insinuation of a temporal connection alone is inadequate.  *See Stollenwerk v. Tri-W. Health Care All.*, 254 F. App'x 664, 668 (9th Cir. 2007).

The Complaint does not allege what specific information each named Plaintiff submitted to KeyPoint or OPM, what information was subsequently compromised, or how disclosure of that information could have led to the injuries they purport to have incurred.  For example, the Complaint claims that one Plaintiff, Cynthia King-Myers, "provided sensitive personal information to the federal government and received notice from OPM that such information has been compromised in the Data Breaches."  Compl. ¶ 38.  The "injury" claimed by King-Myers is that in May 2015 she "learned that unauthorized charges of approximately $658 had been incurred on her debit card account," *id.*, although there is no allegation that she was not refunded that full amount.  *See supra* Part I.A.3.  In any event, nowhere does the Complaint allege what information King-Myers submitted to the government, or how that information could have facilitated unauthorized charges on her debit card.  Even supposing, for instance, that King-Myers's Social Security number and birthdate were compromised, neither the Complaint nor

---

[8]   As discussed below, Plaintiffs also fail to explain how their alleged injuries could have been caused by KeyPoint when they were the result of the intervening actions of criminal hackers, potentially foreign agents.  *See infra* Part III.D.1.a.

common sense explain how unspecified third parties could have used that information to make fraudulent charges on an existing debit card account. *See SAIC*, 45 F. Supp. 3d at 32 (holding that allegations that name and phone number were stolen do not plausibly plead causation of unauthorized charges on existing credit or debit cards).

These assertions flunk the causation requirement of standing. *See, e.g., SAIC*, 45 F. Supp. 3d at 31 (finding a lack of causation where "[n]o one alleges that credit-card, debit-card, or bank-account information was on the stolen tapes"); *In re Horizon Healthcare Servs., Inc. Data Breach Litig.*, No. 13-7418, 2015 WL 1472483, at *9 (D.N.J. Mar. 31, 2015), *appeal docketed*, No. 15-2309 (3d Cir.). In particular, every allegation of unauthorized use of a preexisting account, Compl. ¶¶ 13, 19, 30, 38, 41, 49, 50, fails because Plaintiffs nowhere allege that specific account information was included in the information compromised, *SAIC*, 45 F. Supp. 3d at 31.[9]

Plaintiffs' failure to plead how their injuries were caused by these breaches is underscored by the fact that in this electronic age, the population as a whole faces a significant risk of identity theft. *See SAIC*, 45 F. Supp. 3d at 32. Two years ago, a court in this district explained that "[i]n a society where around 3.3% of the population will experience some form of identity theft—regardless of the source—it is not surprising that at least five people out of a group of 4.7 million happen to have experienced some form of credit or bank-account fraud." *Id.*; *see also Horizon Healthcare*, 2015 WL 1472483, at *8. The allegations of identity theft here are far less remarkable than those that were rejected in *SAIC*. Since *SAIC*, the percentage of U.S. adults experiencing identity theft has increased; in fact, in 2014, the Bureau of Justice Statistics estimated that roughly 7% of adults would become victims of identity theft. *See* Victims of

---

[9] The vague assertions that "financial" information and "histories" were compromised, *see* Compl. ¶¶ 1, 67, 129, 144, are insufficient to allege causation for each individual Plaintiff. The assertion that "[s]tolen federal job applications and investigation forms contain . . . financial records that include bank account and credit card information," *id.* ¶ 146, likewise fails as a conclusory assertion that does not link individual Plaintiffs to alleged injuries.

Identity Theft (2014), U.S. Department of Justice, Bureau of Justice Statistics, *available at* http://www.bjs.gov/content/pub/pdf/vit14.pdf.  Yet the Complaint in this case asserts that only about twenty people suffered identity theft out of a group of *more than* 20 million individuals— 1.4 million of whom were statistically likely to encounter identity theft in any event, based on the 7% estimate.  Plaintiffs' failure to plead a link between the specific information stolen from them and their purported injuries is therefore fatal to their standing.

### C.     Plaintiffs' Allegations Fail To Adequately Plead Redressability.

Plaintiffs' allegations of injury also fail to establish standing because Plaintiffs have not alleged how this Court can redress those injuries.  Redressability is a fundamental aspect of standing, which means "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 561.  Here, many of Plaintiffs' purported injuries have already been remedied, and those that remain simply are not redressable by judicial decision.

Injuries alleged as a result of a data breach that have already been remedied cannot be redressed by a favorable decision.  *See, e.g.*, *Horizon Healthcare*, 2015 WL 1472483, at *8 (finding a lack of redressability because plaintiff "admits receiving his tax refund"); *Peters*, 74 F. Supp. 3d at 857 (explaining that "some of [plaintiff's] injuries have already been remedied").  And if plaintiffs "do not claim that they have had to pay [certain] amounts or that they remain outstanding," presumably there are no longer outstanding issues to be resolved.  *In re Hannaford Bros. Customer Data Sec. Breach Litig.*, 613 F. Supp. 2d 108, 133 (D. Me. 2009), *aff'd in part, rev'd in part on other grounds sub nom. Anderson v. Hannaford Bros.*, 659 F.3d 151 (1st Cir. 2011); *see also Anderson*, 659 F.3d at 167 n.2.

In this case, many of Plaintiffs' allegations imply that their injuries have already been remedied without cost to Plaintiffs.  *See, e.g.*, *id.* ¶ 29 (acknowledging Plaintiff's efforts "to get

[disputed] charges reversed and the fraudulent account closed"); *see also id.* ¶¶ 13, 14, 17, 19,

30, 32, 38, 39, 45, 49, 50.  Although Plaintiffs complain about certain charges and delayed tax

refunds, they never "claim that they have had to pay [certain] amounts or that they remain

outstanding," *In re Hannaford Bros.*, 613 F. Supp. 2d at 133, and thus they fail to adequately

allege a redressable injury, *see* Compl. ¶¶ 21, 24, 26, 31.  Furthermore, as noted above, the

federal government has already offered extensive professional credit and identity monitoring

services to all Plaintiffs.  *Id.* ¶¶ 148-51.  If the alleged injuries have been remedied or Plaintiffs

otherwise remunerated, no remedy could be achieved through judicial review.[10]

## II.    Government Contractor Immunity Bars Plaintiffs' Claims Against KeyPoint.

Plaintiffs' claims must also be dismissed because KeyPoint is immune from liability.

Plaintiffs concede that KeyPoint is a government contractor providing services for OPM,

Compl. ¶ 75, which is the federal agency duly authorized by Congress to control and oversee

"the function of filling positions and other personnel functions in the . . . executive branch," Civil

Service Reform Act of 1978, Pub. L. No. 95-454, § 3(5), 92 Stat. 1111, 1112.  The conduct that

forms the basis of Plaintiffs' claims was carried out pursuant to KeyPoint's contract with OPM;

therefore, the claims against KeyPoint are foreclosed by government contractor immunity.

### A.    KeyPoint Was Acting Pursuant To A Valid Contract With The Federal Government And Is Therefore Entitled To Immunity.

In *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), the Supreme Court held

that a contractor cannot be held liable for conduct carried out pursuant to a contract with the

federal government.  *Id.* at 21.  If the contractor's "authority to carry out the project was validly

conferred, that is, if what was done was within the constitutional power of Congress, there is no

---

[10]    Moreover, time and effort expended in remedying unauthorized charges is not redressable by any action of this Court.  *See Anderson*, 659 F.3d at 156 (noting that "there was no way to value or compensate the time and effort that consumers spent to reverse or protect against losses").

liability on the part of the contractor for executing its will." *Id.* at 20-21.  This doctrine protects "uniquely federal interests," which are implicated by suits against contractors "getting the Government's work done." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 505 (1988) (internal quotations omitted).  Denying immunity to government contractors "would directly impede the significant governmental interest in the completion of its work . . . particularly in light of the government's unquestioned need to delegate government functions." *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000) (internal quotations omitted).

More recently, in *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), the Court reaffirmed that immunity applies to a contractor carrying out work pursuant to a contract with the government, so long as the contractor has not "exceeded his authority" and the authority was "validly conferred." *Id.* at 673.  Under these circumstances, "'there is no liability on the part of the contractor' who simply performed as the Government directed." *Id.* (citation omitted).

Here, Plaintiffs concede that KeyPoint was acting pursuant to a valid contract with the federal government.  Compl. ¶¶ 1, 53, 75.  Plaintiffs have raised no substantive allegations that KeyPoint exceeded its authority under its government contract.  Nor have Plaintiffs alleged that KeyPoint's authority to provide investigative services to OPM was not validly conferred by Congress on OPM.  Moreover, Plaintiffs affirm that "OPM did not suspend KeyPoint's investigations, rescind its contract with KeyPoint, [or] prevent or limit KeyPoint's access to OPM systems." *Id*. ¶ 119; *see also id*. ¶ 5.  Accordingly, the government contractor defense from *Yearsley* is established on the face of the Complaint, and all claims against KeyPoint must be dismissed.  *See Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 204 (5th Cir. 2009).

The purpose of government contractor immunity—the need to allow the federal government to carry out its functions—applies with particular force in this case.  The ability to

conduct background investigations on potential federal employees is an essential function of the federal government.  "The Government itself has been conducting employment investigations since the earliest days of the Republic" to "aid the Government in ensuring the security of its facilities and in employing a competent, reliable workforce." *NASA v. Nelson*, 562 U.S. 134, 149-50 (2011).  Now, "[s]tandard background investigations" are "mandatory for all candidates for the federal civil service," and many federal contract employees must also undergo investigations. *Id.* at 149-50.  The federal government receives immunity from tort challenges to its policies and practices related to background checks. *See CNA v. United States*, 535 F.3d 132 (3d Cir. 2008).  And if "immunity protects a particular governmental function, . . . it is a small step to protect that function when delegated to private contractors." *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1447-48 (4th Cir. 1996).  It would be absurd if private contractors "working alongside" and at the direction of government employees "could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." *Filarsky v. Delia*, 132 S. Ct. 1657, 1666 (2012).

OPM regularly delegates its background investigation duties to private contractors. Indeed, approximately 75% of background investigations are performed by private contractors. *See United States v. California*, No. 2:06-cv-2649, 2007 WL 3341670, at *1 (E.D. Cal. Nov. 8, 2007); *see also* Congressional Research Service, *Security Clearance Process:  Answers to Frequently Asked Questions* 7 (Sept. 9, 2013) (noting that currently almost 75% of OPM investigators are contractors).  As the Supreme Court explained more than 50 years ago, such contracting has become a "necessity" for the federal government due to the "complexities and magnitude of governmental activity." *Barr v. Matteo*, 360 U.S. 564, 572-73 (1959) (plurality opinion); *see also Mangold*, 77 F.3d at 1448.  The doctrine of contractor immunity recognizes

this necessity, which has only deepened over time.  Subjecting the government's contractors to

liabilities from which the government itself is immune would decrease the availability of

essential services and increase the cost of government operations.  *See, e.g.*, *Boyle*, 487 U.S. at

511-12 (absent immunity, "contractors will predictably raise their prices to cover, or to insure

against, contingent liability" and will pass through those costs to the government).

Notably, the Privacy Act itself underscores the governmental role played by federal

contractors with regard to background investigations.  Section 552a(m)(1) of the Privacy Act

provides that when an agency uses a contractor to operate or maintain a system of records, any

contractor or employee of a contractor "shall be considered to be an employee of [the] agency"

for purposes of liability under the Privacy Act.  5 U.S.C. § 552a(m)(1).  In other words, Congress

considers federal government contractors—when they are dealing with systems of records under

the Privacy Act—to be a part of the federal government.  The applicability of government

contractor immunity is, therefore, beyond dispute.

### B.       KeyPoint Did Not Violate Federal Law Or The Government's Instructions.

The Court in *Campbell-Ewald* recognized that government contractor immunity may not

apply where "a contractor violates both federal law and the Government's explicit instructions."

*Campbell-Ewald*, 136 S. Ct. at 672.  But Plaintiffs fail to plead that KeyPoint did either.

First, KeyPoint did not violate federal law.  Plaintiffs make a conclusory assertion that

KeyPoint "violated the Privacy Act," Compl. ¶ 123, but they do not identify any provision of the

Privacy Act that has been violated, nor do they allege how KeyPoint might have violated the

Privacy Act.  Nor could they:  "the Privacy Act does not apply to government contractors."

*Metro. Life Ins. Co. v. Blyther*, 964 F. Supp. 2d 61, 71 (D.D.C. 2013) (citing *Unt v. Aerospace*

*Corp.*, 765 F.2d 1440, 1447 (9th Cir. 1985)); *see also Martinez v. Bureau of Prisons*, 444 F.3d

620, 624 (D.C. Cir. 2006) (per curiam) (noting that the Privacy Act "concern[s] the obligations

20

of agencies").  As explained above, Section 552a(m) of the Privacy Act provides that the *agency* bears responsibility for complying with the Privacy Act, even when the agency uses a contractor. 5 U.S.C. § 552a(m)(1).  The Department of Justice has confirmed this reading of the statute, explaining that "[e]ven when subsection (m) is applicable, *the agency—not the contractor— remains the only proper party defendant* in a Privacy Act civil lawsuit."  Dep't of Justice, Overview of the Privacy Act of 1974:  Government Contractors, *available at* https://www.justice.gov/opcl/government-contractor (emphasis added).

Second, KeyPoint has not exceeded its contractual authority or otherwise acted outside the government's direction.  Although the contractor in *Campbell-Ewald* was accused of sending unauthorized text messages to non-consenting recipients in violation of its contract and the Telephone Consumer Protection Act, 136 S. Ct. at 666-67, 673-74, KeyPoint is not alleged to have taken any identified action that exceeded its authority under its contract with OPM. Instead, Plaintiffs claim that an unknown third party attacked KeyPoint's systems.

The conclusory assertions that KeyPoint "exceeded its authority" and "breached its contract" with OPM "[b]y unreasonably failing to safeguard its security credentials and Plaintiffs' [information]," Compl. ¶ 122, cannot salvage Plaintiffs' claims from dismissal. Plaintiffs fail to allege which provisions or requirements of the contract were violated.  *See id.* ¶¶ 121-24.  The Complaint avers that KeyPoint "lacked software logs to track malware entering its systems and data exiting its systems," *id.* ¶ 121, but it does not allege that this supposed lack of software logs violated the contract.  The Complaint discusses the results of audits of OPM's cyber-systems at length, including allegations that some of *OPM's* systems contained material weaknesses or operated without authorization or multifactor authentication.  *See, e.g.*, *id.* ¶¶ 78-113, 134-37, 152-57, 180, 205, 211-12.  Tellingly, none of those allegations suggests that

material weaknesses were identified with regard to *KeyPoint's* systems or practices, or that such weaknesses constituted a violation of the contract.  *Id.*  In short, the Complaint fails to plead any plausible factual allegation that KeyPoint departed from its contract or the law, and therefore government contractor immunity compels dismissal of all the claims against KeyPoint.[11]

## III.   Plaintiffs Have Failed To State Any Claim.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  Courts must not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotations omitted). Moreover, "'facts that are merely consistent with a defendant's liability' and demonstrate only a possibility, but not the plausibility, of relief fail to satisfy this standard." *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

Here, Plaintiffs have failed to state a claim under any of the scattershot of federal, state, and common law causes of action asserted in the Complaint.[12]

---

[11]   Because this defect cannot be cured, the Complaint should be dismissed with prejudice. *See, e.g.*, *Nabaya v. Dudeck*, 38 F. Supp. 3d 86, 99 (D.D.C. 2014).

[12]   To assist the Court in wading through Plaintiffs' burdensome and ill-considered litany of claims, KeyPoint has appended a table listing the deficiencies in each, with citations to relevant portions of this memorandum.  *See* App'x A to KeyPoint's Mem. of Law Supp. Mot. to Dismiss.

A.      **Plaintiffs' Claim Under The Fair Credit Reporting Act Is Meritless.**

Plaintiffs invoke the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA") for a

potential cause of action, although it is obvious that they can plead no claim under FCRA.

Plaintiffs contend that KeyPoint is a "consumer reporting agency" and that it violated FCRA by

"furnishing" consumer reports for invalid purposes and failing to maintain reasonable procedures

to limit the improper furnishing of such reports.  Compl. ¶¶ 77, 249-50.

As an initial matter, FCRA was enacted to regulate how consumer reporting agencies—

like credit bureaus—compile and disseminate credit reports.  The express purpose of FCRA was

to ameliorate harms caused by "[i]naccurate credit reports" and "unfair credit reporting

methods."  15 U.S.C. § 1681(a)(1); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52

(2007) (recognizing that FCRA was enacted "to ensure fair and accurate credit reporting,

promote efficiency in the banking system, and protect consumer privacy" with regard to credit

reporting).  FCRA, therefore, was designed to regulate how credit reports are voluntarily

disseminated, not to provide a cause of action when credit information is stolen in a cyber-attack.

Plaintiffs cite two provisions of FCRA.  Compl. ¶¶ 249-50.  Section 1681b(a) prohibits a

consumer reporting agency from "furnish[ing] a consumer report" for a purpose that is not

statutorily permitted.  And Section 1681e(a) requires "reasonable procedures" "to limit the

furnishing of consumer reports" to statutorily permitted purposes.  "[A] plaintiff bringing a claim

that a reporting agency violated the 'reasonable procedures' requirement of § 1681e must first

show that the reporting agency [furnished] the report in violation of § 1681b."  *Washington v.*

*CSC Credit Servs. Inc.*, 199 F.3d 263, 267 (5th Cir. 2000).  Accordingly, to state a claim under

either provision of FCRA cited by Plaintiffs, they must plead that KeyPoint has "furnished"

consumer reports for a non-permitted purpose.  Even assuming that KeyPoint is a consumer

reporting agency to which FCRA applies, it is obvious that when hackers allegedly stole personal

information, no reports were being "furnished."

When information is stolen, it is not "furnished" for purposes of FCRA.  *See Willingham*

*v. Glob. Payments, Inc.*, No. 1:12-CV-01157, 2013 WL 440702, at *13 (N.D. Ga. Feb. 5, 2013).

"'[F]urnish,' as used in the FCRA, involves the deliberate act of 'transmit[ting] information' to

another."  *Id.* (citation omitted); *see also Dolmage v. Combined Ins. Co. of Am.*, No. 14 C 3809,

2015 WL 292947, at *3 (N.D. Ill. Jan. 21, 2015) ("[C]ourts generally use the term to describe the

active transmission of information to a third-party rather than a failure to safeguard the data.").

This is the only reasonable interpretation of the statute.  It would be absurd to claim that when a

thief breaks into your car, you have "furnished" him with a new car stereo.  Because Plaintiffs

cannot allege that KeyPoint furnished any consumer reports, they fail to state a claim under

Section 1681b(a).  And because Plaintiffs' claim under Section 1681b(a) fails, their claim under

Section 1681e(a) must also be dismissed.  *See CSC Credit Servs. Inc.*, 199 F.3d at 267.

**B.    Plaintiffs Have Failed To State Claims Under Any State Consumer Protection And Unfair Business Practice Statute.**

Plaintiffs assert that KeyPoint violated the consumer protection and unfair business

practice statutes of eleven different states.[13]  These claims are meritless and must be dismissed.[14]

---

[13]  Cal. Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; Fla. Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204(1), *et seq.*; Idaho Consumer Protection Act, Idaho Code § 48-603(18), *et seq.*; Ill. Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 505/2, *et seq.*; Ill. Uniform Deceptive Trades Practices Act, 815 Ill. Comp. Stat. § 510/2(a)(12), *et seq.*; Nev. Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0915, *et seq.*; N.H. Consumer Protection Act, N.H. Rev. Stat. § 358-A:2, *et seq.*; N.M. Unfair Practices Act, N.M. Stat. §§ 57-12-2(D)(17) & 57-12-3, *et seq.*; N.C. Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1(a), *et seq.*; Pa. Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-2(4)(xxi) & 201-3, *et seq.*; Va. Consumer Protection Act, Va. Code § 59.1-200(A)(14), *et seq.*; Wash. Consumer Protection Act, Wash. Rev. Code § 19.86.020, *et seq.*

[14]  To the extent Plaintiffs' state consumer protection claims are based on the alleged failure to timely disclose the KeyPoint cyber-attack, those claims are preempted by federal law for the same reasons the state data breach notification claims are preempted.  *See infra* Part III.C.1.

1.     **State Consumer Protection Statutes Are Inapplicable In This Context.**

As an initial matter, Plaintiffs' allegations under state consumer protection statutes are

misplaced because these statutes were enacted to protect *consumers* from unfair, deceptive, or

fraudulent practices, and these Plaintiffs have not purchased any consumer goods or services

from KeyPoint.[15]  Eight of the cited consumer protection statutes—in Florida, Idaho, Illinois,

New Hampshire, New Mexico, North Carolina, Pennsylvania, and Washington—expressly

require that any allegedly deceptive practice occur in the *commercial* context.  For example,

Pennsylvania's Unfair Trade Practices and Consumer Protection Law applies only "in the

conduct of any trade or commerce," with "trade" and "commerce" defined as "the advertising,

offering for sale, sale or distribution of any services and any property, tangible or intangible,

real, personal or mixed, and any other article, commodity, or thing of value wherever situate."[16]

There is no question here that KeyPoint was acting as an agent of the federal government in

carrying out its duties.  *See supra* Part II.A.  KeyPoint was not advertising or offering for sale

any goods or services to Plaintiffs, thus it was not engaged in commerce.

Moreover, numerous states—including Florida, Idaho, Illinois, Nevada, New Hampshire,

Pennsylvania, and Virginia—expressly limit the application of consumer protection statutes to

*consumer transactions*.  For example, it is clear that Virginia's statute only provides a cause of

action to those "engaged in a consumer transaction."  *Microsoft Corp. v. #9 Software, Inc.*, No.

405CV106, 2005 WL 3447965, at *4 (E.D. Va. Dec. 15, 2005).  Similarly, Florida's unfair trade

---

[15]   *See also* National Consumer Law Center, *Consumer Protection in the United States, A 50-State Report on Unfair and Deceptive Acts & Practices Statutes* (2009) (noting that such statutes "in each of the fifty states and the District of Columbia constitute the main lines of defense protecting consumers from predatory, deceptive, and unscrupulous business practices"), *available at* https://www.nclc.org/images/pdf/udap/report_50_states.pdf.

[16]   73 Pa. Stat. §§ 201-2, -3; *see also* Fla. Stat. § 501.204(1); Idaho Code § 48-603(18); 815 Ill. Comp. Stat. § 505/2; Ill. Uniform Deceptive Trades Practices Act, 815 Ill. Comp. Stat. § 510/2-3; N.H. Rev. Stat. § 358-A:2; N.M. Stat. § 57-12-2(D)(17); N.C. Gen. Stat. § 75-1.1(a); Wash. Rev. Code § 19.86.020.

practices act "has no application to entities complaining of tortious conduct which is not the result of a consumer transaction" (i.e., to one "engaged in the purchase of goods or services"). *In re Maxxim Med. Grp., Inc.*, 434 B.R. 660, 693 (Bankr. M.D. Fla. 2010). And the relevant provisions of Nevada's statute apply only to deceptive practices regarding "goods or services for sale or lease." Nev. Rev. Stat. §§ 598.0915, 598.0923.[17]

There is no allegation that KeyPoint has advertised, offered for sale, sold, or distributed its services to Plaintiffs; instead, Plaintiffs acknowledge that KeyPoint has sold its services to OPM. Compl. ¶¶ 75-76. In fact, it is impossible to know if any Plaintiffs had *any* connection with KeyPoint because the Complaint does not identify anyone who was the subject of a KeyPoint investigation or whose—if anyone's—information was accessed in the KeyPoint cyber-attack. Nowhere do Plaintiffs allege, nor could they, that they purchased or received any goods or services from KeyPoint. The only consumer of its services was OPM, KeyPoint's paying customer. *Id.* At a bare minimum, therefore, the state consumer protection claims under the Florida, Idaho, Illinois, Nevada, New Hampshire, New Mexico, North Carolina Pennsylvania, Virginia, and Washington statutes must be dismissed, because there is no consumer transaction at issue here.

**2.      Plaintiffs Fail To Plead Claims Sounding In Fraud With Particularity.**

Many of Plaintiffs' claims under the state consumer protection statutes sound in fraud, yet Plaintiffs have failed to plead fraud with particularity, as required under Federal Rule of Civil Procedure 9(b). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Federal courts apply the heightened pleading standard of Rule 9(b) to claims brought under unfair and

---

[17]      *See also Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010); *Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853-54 (Ill. 2005); *Ellis v. Candia Trailers & Snow Equip., Inc.*, 58 A.3d 1164, 1171 (N.H. 2012).

deceptive practices statutes that sound in fraud.  *See, e.g.*, *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011) (applying Rule 9(b) to allegations under the Illinois Consumer Fraud and Deceptive Business Practices Act); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1122 (9th Cir. 2009) (applying Rule 9(b) to the California Unfair Competition Law).  To satisfy the heightened pleading requirement, plaintiffs must plead with particularity "matters such as the 'time, place, and contents' of the false representations." *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002) (emphasis and citation omitted).

Plaintiffs' allegations of deception cannot satisfy this high bar.  Plaintiffs allege that KeyPoint's Privacy Policy contains "misleading and deceptive representations and omissions . . . regarding [KeyPoint's] ability and efforts to secure Plaintiffs' and Class members' GII."  Compl. ¶ 255(b).  Plaintiffs, however, never allege what aspects of the policy were misleading.  Similarly, the allegation that KeyPoint "failed to disclose that its data security practices and protocols were insufficient to protect Plaintiffs' and Class members' GII," *id.* ¶ 255(c), is conclusory and insufficient.[18]  The allegation that KeyPoint "failed to timely disclose the KeyPoint Breach to Plaintiffs and Class members," Compl. ¶ 255(d), is deficient because Plaintiffs do not plead when KeyPoint could and should have disclosed the breach.  *See also infra* Part III.C.  Plaintiffs' state consumer protection claims that sound in fraud should be dismissed because they are not alleged with particularity.

---

[18]   Plaintiffs' allegations of fraud based on a failure to disclose also fail under California and Washington law, because Plaintiffs have not alleged that KeyPoint had any duty to disclose information regarding its data security practices to Plaintiffs.  *See Baba v. Hewlett-Packard Co.*, No. 09-05946, 2010 WL 2486353, at *7 (N.D. Cal. June 16, 2010); *Nguyen v. Doak Homes, Inc.*, 167 P.3d 1162, 1166 (Wash. App. 2007).

### 3.   Plaintiffs Fail To Allege That KeyPoint Caused Any Injury.

Plaintiffs fail to adequately plead that the alleged misrepresentations in KeyPoint's

Privacy Policy or its failure to disclose unspecified security deficiencies *caused* any injury,

which also defeats these claims.  Plaintiffs must plead how the alleged deceptive conduct caused

the particular injury at issue.  For example, under Washington law, Plaintiffs must allege that

"but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an

injury."  *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 890, 900 (Wash. 2009) (internal

quotations omitted).[19]

Plaintiffs assert generally that they "sustained damages" as "a direct and proximate result

of KeyPoint's violations" of the cited statutes, Compl. ¶ 257, but nowhere do they allege how

any damages were *caused* by KeyPoint's supposedly deceptive, yet unspecified, acts.  Again,

Plaintiffs fail to allege that any of them actually read KeyPoint's Privacy Policy, or that any of

them would have acted differently had KeyPoint made certain unspecified disclosures about the

state of its cyber-security systems (particularly as Plaintiffs fail to allege that any of them were

subjects of KeyPoint investigations).  They similarly fail to plead that any of them *relied* on any

misrepresentation to their detriment, as is required to state a claim under the laws of California,

North Carolina, Pennsylvania, and Virginia.

Moreover, Plaintiffs' failure to allege any facts about the *timing* of KeyPoint's alleged

misrepresentations and omissions dooms any causation argument.  Plaintiffs claim that

---

[19]   *See also* Idaho Code § 48-608(1); *Polk v. Crown Auto, Inc.*, 228 F.3d 541, 543 (4th Cir.
2000) (per curiam); *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 902 (4th
Cir. 1996); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d
942, 992 (S.D. Cal. 2014); *Two Old Hippies, LLC v. Catch the Bus, LLC*, 277 F.R.D. 448, 463
(D.N.M. 2011); *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 466-67 (E.D. Pa. 2010);
*Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 657 (D. Nev. 2009); *Peterson v. Cellco P'ship*,
164 Cal. App. 4th 1583, 1590 (2008); *Avery*, 835 N.E.2d at 850; *Lawrence v. Philip Morris USA,
Inc.*, 53 A.3d 525, 530 (N.H. 2012).

KeyPoint, at the earliest, would have known about the KeyPoint cyber-attack in September 2014. Compl. ¶ 117.  Even assuming that KeyPoint should have informed each of the future subjects of its investigations about KeyPoint's alleged data security vulnerabilities, it is impossible to know whether any of these Plaintiffs were harmed because they do not allege that any of them were investigated by KeyPoint (or OPM) in or after September 2014.  In fact, even if the Complaint had identified a single Plaintiff who had his or her information compromised as a result of the KeyPoint cyber-attack (it does not), any disclosure about alleged vulnerabilities with KeyPoint's data security in September 2014 could not have aided him or her, as the KeyPoint cyber-attack allegedly occurred in December 2013.  *Id.* ¶ 117.

**C.    Plaintiffs Have Failed To State A Claim Under Any State Data Breach Notification Statute.**

Plaintiffs also assert violations of eleven different state data breach notification statutes. Compl. ¶ 262.  The cited data breach statutes address the timing of when alleged data breach victims should be notified of a breach.  Plaintiffs claim that with earlier notice, they could have taken earlier action to protect their accounts or declined a background investigation (if they had not yet been investigated, which is not alleged).  *Id.* ¶ 263.  Plaintiffs' claims should be dismissed because (1) the claims are preempted; (2) many of the statutes cited provide no private right of action; and (3) they fail to plausibly state a claim for relief.

**1.    Federal Law Preempts The State Data Breach Notification Claims.**

It is well established that federal law preempts state law claims that conflict with federal law, including federal regulations.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000); *see also Wyeth v. Levine*, 555 U.S. 555, 576 (2009).  In cases involving conflict preemption, courts examine the substance of the state-law requirements and the federal requirements to determine whether a conflict exists.  *Wyeth*, 555 U.S. at 576.  Federal law

displaces state law in cases involving areas of "uniquely federal interest[s]"—including "the civil

liabilities arising out of the performance of" federal contracts—where there is a "significant

conflict" or where application of state law would "frustrate" federal objectives.  *Boyle*, 487 U.S.

at 506, 507 (internal quotations omitted).

Here, there can be no question that a conflict exists and that allowing Plaintiffs' state data

breach notification claims would frustrate federal data breach notification policy.[20]  Plaintiffs

argue that KeyPoint was required to notify potential victims of a data breach under different state

law timelines.  *See* Compl. ¶ 262.  But the federal government has adopted a comprehensive

regulatory scheme that *prohibits* federal contractors (including KeyPoint) from notifying

potential victims of a breach.  The Federal Information Security Act ("FISMA") requires that

federal agencies "develop, document, and implement an agencywide information security

program" for the "information systems that support the operations and assets of the agency,

including those programs provided or managed by [a] contractor."  44 U.S.C. § 3544(b) (2012)

(now codified at 44 U.S.C. § 3554(b)).  Those information security programs must include

"procedures for detecting, reporting, and responding to security incidents."  *Id.* § 3544(b)(7).

Consistent with this statutory requirement, the Office of Management and Budget ("OMB") in

2007 required all federal government agencies to "develop and implement a breach notification

policy."  OMB Memorandum M-07-16, *Safeguarding Against and Responding to the Breach of*

*Personally Identifiable Information*, at 1 (May 22, 2007) ("OMB Breach Notification Memo"),

*available at* https://www.whitehouse.gov/sites/default/files/omb/memoranda/fy2007/m07-

---

[20]   In the area of federal contracting, which is of unique federal concern, the conflict
between federal policy and state law "need not be as sharp as that which must exist for ordinary
pre-emption" in areas traditionally occupied by state law.  *Boyle*, 487 U.S. at 507.

16.pdf.[21]  The OMB Breach Notification Memo provides that "[w]hen the breach involves a

Federal contractor," "the *agency* is responsible for ensuring any notification and corrective

actions are taken."  *Id.* at 16 (emphasis added).  Pursuant to this mandate, OPM established its

Policy on the Protection of Personally Identifiable Information.[22]  That policy provides that "[a]ll

notifications will conform to the required internal procedures" established by OPM, and that

"[p]ersonnel not associated with the official notification procedures should not notify or

otherwise inform the affected Subject(s) of lost PII."  OPM, *Policy on the Protection of*

*Personally Identifiable Information*, Section 7.0 (2012) (Ex. A); *see also* OPM, *Policy on the*

*Protection of Personally Identifiable Information*, Section 7.0 (2014) (Ex. B).[23]

In short, by operation of federal law, KeyPoint as a government contractor was forbidden

from notifying victims of any cyber-attack.  KeyPoint could not follow, for example,

Wisconsin's requirement that it notify victims of a cyber-attack within 45 days, because that

would have violated the federal requirements governing KeyPoint.  Plaintiffs admit that OPM—

not KeyPoint—was responsible for alerting victims of the alleged KeyPoint cyber-attack.

Compl. ¶ 120.  Due to the conflict with federal law, any state law data breach cause of action

---

[21]   FISMA is "nestled . . . within [a] multilayered statutory scheme."  *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006).  "Notably absent from FISMA is a role for the judicial branch," especially when it comes to "review[ing] the choices an agency makes in carrying out its FISMA obligations."  *Id.*; *see also* OPM Br. Part IV.B.

[22]   These federal policies further apply by operation of the Federal Acquisition Regulation, which requires that a federal contractor involved in the "design, development, or operation of a system of records on individuals . . . to accomplish an agency function" comply with "the agency rules and regulations issued under the [Privacy] Act."  48 C.F.R. § 52.224-2(a)(1).

[23]   An agency guidance document standing alone preempts state law if the guidance has the "effect of law."  *See United States v. Mead Corp.*, 533 U.S. 218, 230 (2001); *see also Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 340 (3d Cir. 2009).  Here, Section 3544(b) of FISMA makes clear that Congress intended for federal agencies to develop information security plans that are binding on agencies and their contractors.

31

against KeyPoint in its role as a government contractor is preempted.  *See Geier*, 529 U.S. at 869.[24]

### 2. Many Of The State Data Breach Notification Statutes Provide No Private Right Of Action Or A Limited Right That Is Inapplicable.

Plaintiffs' claims under the statutes of Georgia, Kansas, Michigan, and Wisconsin should be dismissed because those statutes lack or foreclose a cause of action for private individuals.[25]

Even for those state data breach notification statutes that do provide a private right of action, some require the plaintiff to be a "customer" or "consumer" of the defendant's services, which Plaintiffs are not.  The California and Tennessee statutes limit the recovery of damages under the statute to "customers" who were "injured by a violation of the statute."[26]  The Tennessee provision does not define "customer," but California defines customer as "an individual who provides personal information to a business for the purpose of purchasing or leasing a product or obtaining a service from the business."  Cal. Civ. Code § 1798.80(c).  This is consistent with the widely accepted dictionary definition, which defines a "customer" as "someone who buys goods or services from a business."  Merriam-Webster Online, http://www.merriam-webster.com/dictionary/customer.  But these Plaintiffs were employees of (or applicants for employment with) the federal government (or government contractors); they were not purchasing anything, and definitely not purchasing anything from KeyPoint.  No Plaintiff has alleged that he or she provided any information to KeyPoint whatsoever, much less that he or she provided information for the purpose of purchasing goods or services.  At most,

---

[24]   The Kansas and Virginia statutes include a safe harbor providing that compliance with federal regulations constitutes compliance under the statutory provision.  *See, e.g.*, Kan. Stat. § 50-7a02(e); Va. Code § 18.2-186.6(H).  Because Plaintiffs have not plausibly alleged that KeyPoint violated applicable regulations, the claims under the Kansas and Virginia statutes should also be dismissed under these safe harbor provisions.

[25]   Ga. Code § 10-1-912; Kan. Stat. § 50-7a02(g); Mich. Comp. Laws § 445.72(13); Wis. Stat. § 134.98(4).

[26]   Cal. Civ. Code § 1798.84(b); Tenn. Code § 47-18-2107(h).

they would have provided information to KeyPoint as a consequence of their duty to provide information to OPM as part of the background investigation process.  They are "customers" of KeyPoint in the same sense that a witness being interviewed by a police officer is a "customer" of the officer.

The Washington statute similarly limits recovery of damages to "consumers" who were "injured by a violation" of the statute.  Wash. Rev. Code § 19.255.010(13)(a).  The provision does not define "consumer," but for the same reasons Plaintiffs were not "customers" of KeyPoint, they were also not "consumers."  The commonly accepted definition of a "consumer" is "a person who buys goods and services."  Merriam-Webster Online, http://www.merriam-webster.com/dictionary/consumer.  Thus, the claims under the California, Tennessee, and Washington statutes should be dismissed for this independent reason.

### 3. Plaintiffs Fail To Adequately Allege Injury And Causation.

The state data breach notification claims also fail because Plaintiffs have not plausibly alleged injury and causation.  To state a claim, Plaintiffs must plead that the alleged *delay* in notification caused particular injury distinct from the alleged breach itself.[27]  Plaintiffs fall short of this requirement.  As discussed above, Plaintiffs fail to plead any cognizable injury at all.  *See supra* Part I.A.  The allegations of injury merely from the alleged *delay in notification* are conclusory.  Plaintiffs surmise that they could have taken steps like "plac[ing] freezes and/or fraud alerts on their credit, [and] cancel[ing] compromised accounts," and that "those whom

---

[27] *See In re Sony Gaming Networks*, 996 F. Supp. 2d at 1010 (explaining that under the California statute, "[p]laintiffs have failed to allege how the ten-day delay caused [plaintiff] to incur expenses for credit monitoring services, when these credit monitoring services were purchased, [and] how the loss of use and value of Sony Online Services and Third Party Services were caused by the delay (and not the intrusion)"); *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1218 (N.D. Cal. 2014); *Grigsby v. Valve Corp.*, No. 2:12-cv-00553 (W.D. Wash. Mar. 18, 2013), ECF No. 51 at 12:5-17; *see also* N.H. Rev. Stat. § 359-C:21; N.C. Gen. Stat. § 75-65(i); Tenn. Code § 47-18-2107(h); Va. Code § 18.2-186.6(I).

KeyPoint began to investigate after its systems had been breached could have declined to provide their sensitive information to KeyPoint." Compl. ¶ 263. Although they imagine what they *might* have done differently, Plaintiffs fail to plead any injuries that were caused by the supposed delay.

Furthermore, Plaintiffs fail to allege that any of them even received notice of the KeyPoint cyber-attack or *when*. *See In re Sony Gaming Networks*, 996 F. Supp. 2d at 1010. Plaintiffs cannot state a claim for an unreasonable delay in notification without even pleading when notification occurred.[28]

### D.    Plaintiffs' Remaining Common Law Claims Are Meritless.

Plaintiffs lob in numerous common law claims that are obviously inapplicable to the alleged conduct here. These frivolous claims should be dismissed.[29]

### 1.    Plaintiffs Have Failed To Plead Negligence (Fifth Claim For Relief).

To state a claim for negligence under D.C. law, a plaintiff must plausibly allege that "there was 'a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach.'" *Sims v. Dist. of Columbia*, 699 F. Supp. 2d 217, 227 (D.D.C. 2010) (quoting *Wash. Metro. Area*

---

[28]    Plaintiffs cite additional state statutory provisions at the end of their Tenth Claim for Relief, but these allegations are entirely conclusory and they, too, must be dismissed. Plaintiffs' separate claim under Cal. Civ. Code § 1798.80, *et seq.*, for failure to implement and maintain security measures, *see* Compl. ¶ 264, fails because Plaintiffs are not "customers" of KeyPoint and they have not adequately alleged injury or causation. *See supra* Parts I, III.C.2. The claim under Cal. Civ. Code § 56.20-56.245, *et seq.* fails for many reasons, not the least of which is that it applies to the safekeeping of sensitive medical information by employers, and Plaintiffs have not alleged that KeyPoint violated any statutory obligations as an employer, or that KeyPoint received any medical information covered by the statute. Similarly, Plaintiffs allege that KeyPoint "violated Wis. Stat. §§ 146.82 and 146.84 and Va. Code § 32.1-127.1:03(3) by disclosing Plaintiffs' and Class members' medical records without specific authorization or other justification." Compl. ¶ 265. But again, Plaintiffs do not allege that KeyPoint received any medical records. These statutes address the circumstances under which patient health care records may be released; they do not create liability for companies victimized by cyber-attacks.

[29]    To the extent that any of Plaintiffs' remaining common law claims rely on KeyPoint's alleged failure to timely notify victims of the KeyPoint cyber-attack, those claims are preempted by federal law and should be dismissed. *See supra* Part III.C.1.

*Transit Auth. v. Ferguson*, 977 A.2d 375, 377 (D.C. 2009)).[30]  Plaintiffs have failed to plead

negligence here for at least four reasons:  (a) cyber-attacks by third-party criminals on OPM's

networks were not foreseeable by KeyPoint; (b) Plaintiffs have not alleged that KeyPoint

breached a duty of care; (c) Plaintiffs have not pled any injury that was proximately caused as a

result of KeyPoint's alleged negligence; and (d) the economic loss rule bars recovery for

Plaintiffs' alleged injuries, which are purely economic.

---

[30]  Plaintiffs do not specify the state law under which they bring their common law causes of action, but regardless, they fail to state a valid claim for relief under the laws of D.C. or any other potentially applicable jurisdiction.  Because this case was transferred under 28 U.S.C. § 1407, the choice of law principles of D.C. and the other transferor districts apply.  *See In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 58, 68 (D.D.C. 2003).

    Regardless of which state's choice of law principles apply, this Court should apply D.C. tort law to Plaintiffs' claims.  *See, e.g.*, *Drs. Groover, Christie & Merritt, P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007) (explaining that D.C. choice of law principles consider factors under the Restatement (Second) of Conflict of Laws § 145, including "a) the place where the injury occurred; b) the place where the conduct causing the injury occurred; c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and d) the place where the relationship is centered"); *Gen. Assur. of Am., Inc. v. Overby-Seawell Co.*, 533 F. App'x 200, 206 (4th Cir. 2013) (per curiam) (explaining that Virginia choice of law principles employ the doctrine of *lex loci delicti* and examine "the place where the wrong occurred," which is "the place where 'the last event necessary to make an [actor] liable for an alleged tort takes place'") (citation omitted).

    Plaintiffs' claims are centered around D.C.:  the original and institutional Plaintiff AFGE is headquartered here, Compl. ¶ 11, OPM is headquartered here, *id.* ¶ 56, "KeyPoint . . . conducts significant business in the District of Columbia," *id.* ¶ 57, and "much of the relevant conduct" and a "substantial part of the events and omissions giving rise to [Plaintiffs'] claims occurred" here, *id.* ¶¶ 57-58.  The gravamen of Plaintiffs' complaint revolves around OPM's systems and the alleged breach of those systems, and OPM is based in Washington, D.C.  *Id.* ¶ 52.

    Some Plaintiffs have acknowledged that their claims are centered around D.C.  *See* J.P.M.L. Case No. 2664, ECF No. 26 at 2 (arguing that "the federal defendants in the Related Actions are headquartered in Washington D.C., many events giving rise to the claims occurred in D.C., and a significant number of government employees and contractors affected by the breach reside and work in D.C."); ECF No. 28 at 3 (arguing that "the Defendant OPM is located in the District of Columbia . . . the majority of the conduct alleged in the Related Actions occurred within the District of Columbia, and most of the relevant witnesses are located in the District of Columbia"); ECF No. 29 at 3 (arguing that the "alleged wrongful acts occurred" in D.C.).

a.      **KeyPoint Owes No Duty To Safeguard Against The Criminal Acts Of Third-Party Hackers.**

Plaintiffs' negligence claim fails because they have not plausibly alleged that KeyPoint could have foreseen the intervening criminal acts alleged here, and a defendant has no ordinary duty to defend against intervening criminal acts. *See, e.g.*, *Workman v. United Methodist Comm. on Relief of Gen. Bd. of Glob. Ministries of United Methodist Church*, 320 F.3d 259, 265 (D.C. Cir. 2003). "[C]ivil liability for the intervening, independent criminal acts of third parties is extraordinary, and District of Columbia courts, in their development of common-law tort rules, have imposed especially stringent requirements to support it." *Romero v. Nat'l Rifle Ass'n of Am., Inc.*, 749 F.2d 77, 83 (D.C. Cir. 1984) (Scalia, J.) (holding that it was not foreseeable that a gun discovered by a criminal during a break-in would be used to commit a later crime). "[A] defendant may be liable for harm caused by the criminal act of another only if the crime was *particularly foreseeable*." *Workman*, 320 F.3d at 262 (emphasis added). The "'heightened showing'" requirement "is a 'demanding' one," and "[f]oreseeability cannot be predicated upon 'generic information' such as crime rates or evidence that the defendant's employees worked in a 'criminally active environment.'" *Id.* (citations omitted). One factor courts will consider is the relationship between the parties; specifically, whether the parties had a "special relationship" or whether the defendant controlled the intervening criminal actor. *Id.* at 263-65.

Plaintiffs fail to plead plausible allegations that meet this heightened standard. Plaintiffs make no allegation that the cyber-attacks were "particularly foreseeable." *Id.* at 262. Plaintiffs assert that it "was reasonably foreseeable to KeyPoint that a breach of *its* information systems could occur and cause harm by compromising the GII of current, former, and prospective federal government employees." Compl. ¶ 217 (emphasis added). But this claim does not suffice to show that it was particularly foreseeable that an attack against KeyPoint would affect individuals

associated with data stored and controlled by a *completely separate organization*—OPM.[31]  And

Plaintiffs do not explain how KeyPoint could have particularly foreseen that criminals—perhaps

working in connection with a foreign sovereign—would invade KeyPoint's systems and then

invade OPM's separate systems (and they have not alleged that the invasion of KeyPoint's

system somehow enabled the attacks on OPM, *see supra* Part I.B).  This extraordinary series of

events was not foreseeable.  *See Romero*, 749 F.2d at 80-81.

Nor have Plaintiffs alleged that the relationship between KeyPoint and Plaintiffs or the

criminal hackers somehow alters the analysis.  Plaintiffs make the conclusory statement that

there was a "special relationship between KeyPoint and those who entrusted it with their

sensitive personal information."  Compl. ¶ 221.  But that assertion is unfounded.  D.C. law has

never recognized a "special relationship" between a contractor conducting background

investigations for the government and the subjects of the government's investigation.  In

applying for federal jobs and submitting to background investigations, Plaintiffs were primarily

dealing with OPM.  To the extent they had any interaction with KeyPoint—which is not

alleged—it was with KeyPoint acting as OPM's agent.  *Cf. Chandler v. Dist. of Columbia*, 404

A.2d 964, 967 (D.C. 1979) (recognizing that government may have duty of care when a "special

relationship develops between an agent of the government and a private individual").  And

Plaintiffs make no allegation that KeyPoint somehow controlled the intervening criminal

actors—potentially agents of a foreign sovereign—in carrying out the cyber-attacks.[32]

---

[31]    Although Plaintiffs assert that "KeyPoint's and OPM's electronic systems were linked, shared, and overlapping," Compl. ¶ 217, they do not allege that KeyPoint had any control over the operation of OPM's cyber systems or defenses.  In fact, the Complaint devotes pages to the discussion of OPM's weaknesses without a mention of KeyPoint.

[32]    Although the D.C. Court of Appeals has not ruled on the issue, a number of other states have held that there is no general duty for a company to safeguard personal information from cyber-attack.  *See, e.g.*, *Dolmage*, 2015 WL 292947, at *5 (noting that Illinois "declined to recognize a new common law duty to safeguard information") (internal quotations omitted); *In*

**b.** **Plaintiffs Have Not Alleged That KeyPoint Breached A Standard Of Care.**

To state a claim for negligence, Plaintiffs must allege that KeyPoint actually breached a duty by failing to comply with a standard of care. *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011). Plaintiffs have failed to do so. Plaintiffs contend generally that KeyPoint was required to "adequately protect" their personal information, "exercise due and reasonable care" in protecting that information, and comply with "recognized . . . industry standards." Compl. ¶ 218. But the threadbare allegations that KeyPoint should have acted "reasonably" or satisfied "industry standards" do not suffice to plead a duty of care. *Id.*; *see also id.* ¶ 223.

Further, Plaintiffs have not alleged that a duty was breached. Plaintiffs allege that OPM's networks are "the subject of at least 10 million unauthorized electronic intrusion attempts every month." *Id.* ¶ 79. Plaintiffs also recognize that there have been at least "several successful cyberattacks against other federal agencies and government institutions." *Id.* ¶ 80. Considering that attempted cyber-attacks are commonplace and that such attacks are frequently "successful," Plaintiffs cannot reasonably assume that the cyber-attacks at issue were the result of some breach of duty. Plaintiffs cannot plead a breach of duty by simply claiming that something that happens with great frequency happened again. *See also supra* pp. 22-23.[33]

---

*re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617, 2016 WL 589760, at *10 (N.D. Cal. Feb. 14, 2016) (noting the same for Indiana).

[33] Plaintiffs also assert that KeyPoint "breached its duties to Plaintiffs" by "failing to cause them to be promptly notified that their GII had been compromised." Compl. ¶ 224. This conclusory claim is preempted for the same reason Plaintiffs' state data breach notification claims are preempted. *See supra* Part III.C.1. Moreover, Plaintiffs fail to allege that KeyPoint had or breached a duty to all Plaintiffs to notify them of a cyber-attack on KeyPoint's systems, particularly since the Complaint does not identify a single individual who was subject to a KeyPoint investigation or who received notice of the alleged KeyPoint cyber-attack.

###### c.   Plaintiffs Have Alleged No Plausible Injury Proximately Caused By KeyPoint.

The Complaint also fails to sufficiently allege that KeyPoint proximately caused any injury.  "Proximate cause has two components:  'cause-in-fact' and a 'policy element' which limits a defendant's liability when the chain of events leading to the plaintiff's injury is unforeseeable or "highly extraordinary in retrospect.'"  *Dist. of Columbia v. Carlson*, 793 A.2d 1285, 1288 (D.C. 2002) (citation omitted).  The D.C. Court of Appeals "has adopted the 'substantial factor' test set out in the Restatement of Torts for determining whether a negligent act or omission is the cause-in-fact of a plaintiff's injury."  *Id.*  As discussed above, Plaintiffs have simply failed to establish that Plaintiffs suffered any cognizable injuries that were caused by KeyPoint.  *See supra* Part I.A-B.  And even if they had, those injuries were caused by intervening criminals, not KeyPoint.  *See id.*

###### d.   The Economic Loss Rule Independently Bars Plaintiffs' Negligence Claims.

The economic loss rule provides that "a plaintiff who suffers only pecuniary injury as a result of the conduct of another cannot recover those losses" under a negligence cause of action. *Aguilar v. RP MRP Wash. Harbour, LLC*, 98 A.3d 979, 982 (D.C. 2014) (citation omitted). "[A]s a matter of longstanding policy in courts around the country, where pure economic loss is at issue, not connected with any injury to one's body or property . . . the reach of legal liability is quite limited."  *Id.* at 983 (internal quotations omitted).

Here, Plaintiffs' speculative claims of injury are purely economic, if anything, and therefore not recoverable under the economic loss doctrine.  *See* Compl. ¶¶ 225-29.  Although none of the injuries asserted by Plaintiffs are concrete and caused by KeyPoint, *see supra* Part I.A-B, it is nonetheless clear Plaintiffs do not claim bodily harm or property damage.  For example, Plaintiffs complain of unauthorized charges on their existing financial accounts, the

opening of new financial accounts, as well as the costs associated with remedying and preventing

alleged fraud.  *See supra* Part I; Compl. ¶ 163(A)-(M).  Indeed, the majority of Plaintiffs' injury

allegations can be characterized as seeking compensation for "money and time" lost or

expended, *see, e.g.*, Compl. ¶ 163(A), (B), (E), (F), (H), or "lost opportunity costs," *see, e.g.*, *id.*

¶ 163(C), (I), (K).  None of these are personal injuries or property damage.[34]

### 2. Plaintiffs Cannot State A Claim For Negligent Misrepresentation Or Omission (Sixth Claim For Relief).

Plaintiffs claim that KeyPoint negligently misrepresented that its electronic systems were

secure or, alternatively, that KeyPoint omitted material facts about the security of its systems.

Compl. ¶¶ 231-38.  To state a claim for negligent misrepresentation or omission, a plaintiff must

allege that:  (1) defendant made a false statement or omitted a fact that he had a duty to disclose;

(2) the misrepresentation or omission was material; and (3) the plaintiff reasonably relied on the

misrepresentation or omission to his detriment.  *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202,

1207 (D.C. 1999).  Plaintiffs have failed to plead these elements.

Plaintiffs have failed to plead the central element of a negligent misrepresentation claim:

that anyone "reasonably relied upon [a] false statement or omission to his detriment."  *Sundberg*

*v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015) (internal quotations omitted).  Plaintiffs

make the conclusory assertion that KeyPoint's representations or omissions "induced [them] to

provide KeyPoint with their sensitive personal information or to permit KeyPoint to access their

sensitive personal information," Compl. ¶ 237, but they plead no facts to support this claim.

---

[34]   Although D.C. has not specifically addressed the issue, "lost time" is generally considered a purely economic loss.  *See, e.g.*, *Fed. Ins. Co. v. J.K. Mfg. Co.*, 933 F. Supp. 2d 1065, 1073 (N.D. Ill. 2013).  To the extent that Plaintiffs argue that "stress" induced by the loss of their information or fear of having their information publicized is a bodily injury, they also fail to state a claim.  Absent physical injury, a plaintiff cannot state a negligence claim for emotional distress unless he was in the "zone of physical danger" or had a "relationship or undertaking" with defendant "that necessarily implicates the plaintiff's well-being."  *Hedgepeth*, 22 A.3d at 814-16.  There are no such allegations here.

Plaintiffs allude to KeyPoint's Privacy Policy that is available on the Internet, *id.* ¶¶ 77, 236, but nowhere does the Complaint allege that a single Plaintiff (or any person, for that matter) viewed and relied upon the statements in that Privacy Policy. The only documents that Plaintiffs claim to have actually read are the Standard Forms 85, 85P, and 86. *See, e.g.*, *id.* ¶¶ 13, 17, 66-70. But those forms are generated by the federal government—not KeyPoint—and thus cannot form the basis of any allegations of reliance against KeyPoint. *Id.* ¶¶ 66, 69, 188-90 (characterizing the forms as "contracts with OPM"). Indeed, Plaintiffs have not even alleged that they were ever even aware of the entity KeyPoint and its involvement in OPM's background investigations.

Moreover, Plaintiffs claim that KeyPoint "knew or should have known that its information security systems did not reasonably or effectively protect" Plaintiffs' personal information. *Id.* ¶ 233. But even accepting Plaintiffs' version of events, Plaintiffs only allege that KeyPoint detected the cyber-attack on its systems nine months after it had occurred. *Id.* ¶ 117. Plaintiffs could not have relied on any misrepresentation or omission regarding KeyPoint's security when the attack was detected, because at that point, their information had already allegedly been accessed.

### 3.   Plaintiffs Cannot Establish That KeyPoint Was Responsible For Any Invasion Of Privacy (Seventh Claim For Relief).

Plaintiffs also claim that KeyPoint invaded their privacy. Compl. ¶¶ 239-44. This claim is frivolous. Under D.C. law, the tort of invasion of privacy is comprised of four separate torts, including (1) intrusion upon solitude or seclusion; (2) public disclosure of private facts; (3) publicity that places one in a false light; and (4) appropriating one's name or likeness. *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1266 (D.C. 2015). Plaintiffs have not even attempted to allege that KeyPoint placed them in a false light, nor do they allege that KeyPoint has appropriated their names or likenesses.

41

With regard to intrusion upon solitude, D.C. law requires a "physical intrusion, by use of a defendant's sense of sight or hearing, or by some use of some other form of investigation or examination" "into a place where the plaintiff has secluded himself." *Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989).  It is obvious here that there has been no physical intrusion by KeyPoint into any place where Plaintiffs had secluded themselves.  Indeed, the D.C. Court of Appeals has explained that "[t]he types of invasion intrinsic in the tort of intrusion upon seclusion are those such as harassment; peeping through windows or into other locations in which a plaintiff has chosen to seclude himself; opening personal mail; eavesdropping on private conversations; entering a plaintiff's home without permission or searching his or her belongings; examining a plaintiff's private bank account; or other invasions of that nature." *Id.* at 1217-18 (internal citations omitted).  The allegations against KeyPoint are a far cry from any intrusion upon seclusion.  Moreover, it is clear that any personal information that KeyPoint may have possessed was voluntarily offered to KeyPoint as part of the background investigation process.

Similarly, with regard to the tort of public disclosure of private facts, Plaintiffs fail to plead (1) publicity (2) absent any waiver or privilege (3) given to private facts (4) in which the public has no legitimate concern, (5) and which would be highly offensive to a reasonable person of ordinary sensibilities. *Bernabei & Wachtel*, 116 A.3d at 1267.  "Publicity" generally means widespread dissemination to a large audience. *Bean v. Gutierrez*, 980 A.2d 1090, 1095 (D.C. 2009); *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 588 (D.C. 1985) (finding publicity where information "was broadcast on television and to a large audience").  Plaintiffs have not alleged that KeyPoint affirmatively disclosed any of Plaintiffs' information.  To the extent Plaintiffs' information was disclosed to anyone, that was because the information was stolen by criminal hackers.  Moreover, Plaintiffs have not alleged that their personal information

was "publicized" to a large audience, such as through a television broadcast or radio publication. Even if their information was maliciously stolen by criminal actors, there is no allegation that the information has been broadly disseminated by those criminals (or anyone else).

Moreover, the type of personal information at issue here does not qualify as the sort of information that is "highly offensive to a reasonable person." Indeed, the D.C. Court of Appeals has noted that obtaining a person's hospital records from a third party, or releasing a list of telephone numbers dialed by a person, is not actionable as highly offensive publicity. *Wolf*, 553 A.2d at 1220; *see also Vassiliades*, 492 A.2d at 588 (requiring that the information disclosed be "uncomplimentary or unsavory"). The offensiveness is to be judged "relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens." *Bernabei & Wachtel*, 116 A.3d at 1267 (quoting Restatement (Second) of Torts § 652D, cmt. c (1977)). By contrast, Plaintiffs here complain about the disclosure of Social Security numbers, their birthdates, addresses, and similar information that is regularly requested by employers and landlords, in some cases may already be publicly available (or posted on social networks), and which in any case falls far short of offending a reasonable person. Accordingly, any claim of invasion of privacy must be dismissed.[35]

### 4.      Plaintiffs Had No Contract With KeyPoint And Cannot Allege A Breach (Eleventh Claim For Relief).

Plaintiffs also make a frivolous breach of contract claim that must be dismissed. Compl. ¶¶ 267-75. Under D.C. law, and "virtually everywhere else," the existence of an enforceable contract requires "both (1) agreement as to all material terms, and (2) intention of the parties to

---

[35]      Plaintiffs also assert a privacy claim under the California Constitution. Compl. ¶ 243. Plaintiffs have not alleged that KeyPoint's conduct "constitut[ed] a serious invasion of privacy," and thus the claim must be dismissed. *Ruiz v. Gap, Inc.*, 380 F. App'x 689, 692-93 (9th Cir. 2010) (explaining that allegedly negligent conduct leading to a data breach is not "conduct . . . constituting a serious invasion of privacy") (internal quotations omitted); *see also Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012).

be bound." *Kramer Assoc., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 251 (D.C. 2005) (internal

quotations omitted).  And bargained-for consideration is an indispensable element of a valid

agreement.  *See Rinck v. Ass'n of Reserve City Bankers*, 676 A.2d 12, 16-17 (D.C. 1996).  Aside

from conclusory assertions, there are no allegations in the Complaint that KeyPoint and Plaintiffs

agreed to be bound by any understanding at all.  Although Plaintiffs baldly assert that "Plaintiffs

and KeyPoint Subclass members entered into valid and binding contracts with KeyPoint,"

Compl. ¶ 269, that claim has no basis.  Plaintiffs fail to allege any written contract between

KeyPoint and Plaintiffs.  To the contrary, they assert that the only written forms that are relevant

to their claims were somehow "contracts with OPM."  *Id.* ¶¶ 188-90.  Nor do Plaintiffs plead

they and KeyPoint ever exchanged bargained-for consideration.  That KeyPoint may have

conducted background investigations on some Plaintiffs (although that is not alleged) or stored

some of their information (which also is not alleged) cannot establish a binding contract between

KeyPoint and all subjects of such investigations.[36]

## CONCLUSION

The Court should dismiss all claims against KeyPoint with prejudice.

Dated:  May 13, 2016

Respectfully submitted,

 /s/ F. Joseph Warin
F. Joseph Warin (D.C. Bar No. 235978)
Jason J. Mendro (D.C. Bar No. 482040)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:  (202) 955-8500
Facsimile:  (202) 530-9626
fwarin@gibsondunn.com
jmendro@gibsondunn.com

---

[36]   Because all of Plaintiffs' claims against KeyPoint are meritless, the Fourth Claim for
Relief for declaratory and injunctive relief against KeyPoint must also be dismissed.  And
because Plaintiff AFGE seeks only declaratory and injunctive relief, Compl. ¶ 12, this Court
should dismiss all of AFGE's claims against KeyPoint.

Alexander H. Southwell (N.Y. Bar No. 2923415)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone:  (212) 351-3981
Facsimile:  (212) 351-6281
asouthwell@gibsondunn.com

*Counsel for Defendant KeyPoint Government
Solutions, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of May, 2016, I caused the foregoing Motion to Dismiss Plaintiffs' Consolidated Amended Complaint, and related documents, to be filed and served via the Court's CM/ECF filing system.  Copies of the foregoing will also be sent via first class mail to:

David Pastor
Pastor Law Office, LLP
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110

Preston W. Leonard
Leonard Law Office, PC
63 Atlantic Avenue, 3d Floor
Boston, MA 02110

*Counsel for Plaintiff Derrick Sims*

Adedeji Shamonda
P.O. Box 881773
San Francisco, CA 94188-1773

*Pro Se Plaintiff*

Adebiyi K. Shamonda
3120 Shelter Creek Lane
San Bruno, CA 94066

*Pro Se Plaintiff*

 /s/ F. Joseph Warin
F. Joseph Warin (D.C. Bar No. 235978)