**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE: U.S. OFFICE OF PERSONNEL
MANAGEMENT DATA SECURITY
BREACH LITIGATION

This Document Relates To:

ALL CASES

Misc. Action No. 15-1394 (ABJ)
MDL Docket No. 2664

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR AN ORDER**
**GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND**
**PROVIDING FOR NOTICE**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ....................................................................2

    A.    The Data Breaches .............................................................................................2

    B.    Course of Litigation ..........................................................................................5

    C.    Parties' Mediation and Negotiations ................................................................6

    D.    The Settlement Agreement ...............................................................................7

        1.    Settlement Consideration ......................................................................8

        2.    The Settlement Class and Release ........................................................8

        3.    Notice to Settlement Class ...................................................................9

        4.    Claims and allocation .........................................................................10

        5.    Further settlement-related proceedings ..............................................13

ARGUMENT ...............................................................................................................................14

    I.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE. ................14

        A.    The Settlement Is the Product of Informed Adversarial Negotiations. ........15

        B.    The Payments to Class Members Under the Settlement Are Adequate
            Given the Risks of Litigation. ........................................................................16

        C.    The Settlement Fund Will Be Fairly and Equitably Distributed. ...................23

        D.    Plaintiffs and Class Counsel Support the Settlement. ...................................26

    II.    SETTLEMENT CLASS CERTIFICATION IS LIKELY. .....................................27

        A.    Rule 23(a) Is Met. .........................................................................................27

            1.    The Class Members are too numerous for their claims to be
                feasibly joined. ...................................................................................27

            2.    The Data Breaches and their consequences are common issues
                that apply to all Class Members. ........................................................27

            3.    Plaintiffs' claims are typical of the Class. .........................................28

            4.    Plaintiffs and Class Counsel are adequate representatives. ..............28

        B.    Rule 23(b) Is Met. .........................................................................................29

    III.    THE NOTICE AND NOTICE PROGRAM WILL PROVIDE CLASS
        MEMBERS THE BEST NOTICE PRACTICABLE UNDER THE
        CIRCUMSTANCES. .......................................................................................30

CONCLUSION ...........................................................................................................................33

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. RP MRP Wash. Harbour, LLC*,
   98 A.3d 979 (D.C. 2014) ................................................................. 20

*Allapattah Servs., Inc. v. Exxon Corp.*,
   454 F. Supp. 2d 1185 (S.D. Fla. 2006) .............................................. 7

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ........................................................................ 27

*Brown v. District of Columbia*,
   1991 WL 255458 (D.D.C. Nov. 15, 1991) ......................................... 29

*Brown v. District of Columbia*,
   928 F.3d 1070 (D.C. Cir. 2019) ........................................................ 27

*Brown v. Wells Fargo Bank, N.A.*,
   25 F. Supp. 3d 144 (D.D.C. 2014) ..................................................... 9

*Carlough v. Amchem Prods., Inc.*,
   158 F.R.D. 314 (E.D. Pa. 1993) ........................................................ 32

*Ceccone v. Equifax Info. Servs. LLC*,
   2016 WL 5107202 (D.D.C. Aug. 29, 2016) .................................. 17, 23

*Cobell v. Jewell*,
   802 F.3d 12 (D.C. Cir. 2015) ............................................................ 14

*Coleman v. District of Columbia*,
   306 F.R.D. 68 (D.D.C. 2015) ............................................................ 29

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ........................................................................... 27

*Dew v. Mindfinders, Inc.*,
   2021 WL 4797551 (D.D.C. Oct. 14, 2021) ......................................... 16

*FAA v. Cooper*,
   566 U.S. 284 (2012) ........................................................ 7, 11, 17, 24

*FBI v. Fazaga*,
   142 S. Ct. 1051 (2022) ..................................................................... 19

*General Dynamics Corp. v. United States*,
   563 U.S. 478 (2011) ......................................................................... 19

*Gordon v. Chipotle Mexican Grill, Inc.*,
   2019 WL 6972701 (D. Colo. Dec. 16, 2019) ...................................... 21

*Hardy v. District of Columbia*,
   283 F.R.D. 20 (D.D.C. 2012) ....................................................... 28, 29

*Hashw v. Dept. Stores Nat'l Bank*,
182 F. Supp. 3d 935 (D. Minn. 2016) ................................................................ 18

\* *Howard v. Liquidity Servs. Inc.*,
2018 WL 4853898 (D.D.C. Oct. 5, 2018) ................................................ 16, 23, 24

*Hoyte v. District of Columbia*,
325 F.R.D. 485 (D.D.C. 2017) ............................................................................ 27

*Hughes v. Kore of Ind. Enter., Inc.*,
731 F.3d 672 (7th Cir. 2013) .............................................................................. 32

*In re "Agent Orange" Prod. Liab. Litig.*,
689 F. Supp. 1250 (E.D.N.Y. 1988) .................................................................... 24

\* *In re "Agent Orange" Prod. Liab. Litig.*,
818 F.2d 145 (2d Cir. 1987) .......................................................................... 31, 32

*In re Auction Houses Antitrust Litig.*,
197 F.R.D. 71 (S.D.N.Y. 2000) ............................................................................ 7

*In re Baan Co. Sec. Litig.*,
284 F. Supp. 2d 62 (D.D.C. 2003) ...................................................................... 16

*In re Black Farmers Discrimination Litig.*,
856 F. Supp. 2d 1 (D.D.C. 2011) ........................................................................ 17

*In re Brinker Data Incident Litig.*,
2021 WL 1405508 (M.D. Fla. Apr. 14, 2021) .................................................... 22

*In re Capital One TCPA Litig.*,
80 F. Supp. 3d 781 (N.D. Ill. 2015) .................................................................... 18

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
2010 WL 3341200 (W.D. Ky. Aug. 23, 2010) ................................................ 21, 26

*In re District of Columbia*,
792 F.3d 96 (D.C. Cir. 2015) .............................................................................. 28

\* *In re Domestic Airline Travel Antitrust Litig.*,
322 F. Supp. 3d 64 (D.D.C. 2018) ................................................................ 30, 32

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ...................................................... 25

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
999 F.3d 1247 (11th Cir. 2021) .......................................................................... 29

*In re Facebook Biometric Info. Privacy Litig.*,
522 F. Supp. 3d 617 (N.D. Cal. 2021) ................................................................ 19

*In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & "ERISA" Litig.*,
4 F. Supp. 3d 94 (D.D.C. 2013) .......................................................................... 17

*In re Folding Carton Litig.*,
744 F.2d 1252 (7th Cir. 1984) ........................................................................... 26

*In re GMC Truck Fuel Tank Prods. Litig.*,
55 F.3d 768 (3d Cir. 1995) ................................................................................. 17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
327 F.R.D. 483 (S.D.N.Y. 2018) ........................................................................ 17

*In re Lorazepam & Clorazepate Antitrust Litig.*,
2003 WL 22037741 (D.D.C. June 16, 2003) ...................................................... 13

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
2022 WL 1396522 (D. Md. May 3, 2022) ........................................................... 22

*In re New Jersey Tax Sales Certificates Antitrust Litig.*,
750 F. App'x 73 (3d Cir. 2018) ........................................................................... 17

*In re NFL Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016) ............................................................................... 33

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y. 1997) ........................................................................ 27

*In re Phenylpropanolamine (PPA) Prods. Liab.*,
227 F.R.D. 553 (W.D. Wash. 2004) .................................................................... 25

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
2019 WL 3410382 (D. Or. July 29, 2019) .......................................................... 21

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
177 F.R.D. 216 (D.N.J. 1997) ............................................................................. 31

*In re Sealed Case*,
494 F.3d 139 (D.C. Cir. 2007) ............................................................................ 19

*In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*,
2016 WL 6902351 (N.D. Ga. Aug. 23, 2016) ..................................................... 21

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
138 F. Supp. 3d 1379 (J.P.M.L. 2015) ................................................................. 5

[*] *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
266 F. Supp. 3d 1 (D.D.C. 2017) ............................................................... 6, 20, 21

[*] *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
928 F.3d 42 (D.C. Cir. 2019) ...................................................................... *passim*

*In re United States*,
872 F.2d 472 (D.C. Cir. 1989) ............................................................................ 20

*In re Vitamins Antitrust Litig.*,
305 F. Supp. 2d 100 (D.D.C. 2004) ............................................................... 16, 26

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    2020 WL 4212811 (N.D. Cal. July 22, 2020) ...................................................... 23

*Jackson's Rocky Ridge Pharmacy, Inc. v. Argus Health Sys., Inc.*,
    2007 WL 9711416 (N.D. Ala. June 14, 2007) .................................................... 24

*Juris v. Inamed Corp.*,
    685 F.3d 1294 (11th Cir. 2012) ........................................................................ 31

*Karvaly v. eBay, Inc.*,
    245 F.R.D. 71 (E.D.N.Y. 2007) ........................................................................ 31

*Keegan v. Am. Honda Motor Co, Inc.*,
    2014 WL 12551213 (C.D. Cal. Jan. 21, 2014) .................................................. 25

\* *Kinard v. E. Capitol Fam. Rental, L.P.*,
    331 F.R.D. 206 (D.D.C. 2019) .................................................................... 14, 16

*Koenig v. Lime Crime, Inc.*,
    2018 WL 11358228 (C.D. Cal. Apr. 2, 2018) .................................................... 21

*Leeds v. Metro. Gas-Light Co.*,
    90 N.Y. 26 (1882) ............................................................................................. 11

*Linnins v. HAECO Ams., Inc.*,
    2018 WL 5312193 (M.D.N.C. Oct. 26, 2018) .................................................. 22

*Luevano v. Campbell*,
    93 F.R.D. 68 (D.D.C. 1981) .............................................................................. 17

*NCAA Student-Athlete Concussion Injury Litig.*,
    314 F.R.D. 580 (N.D. Ill. 2016) ........................................................................ 32

*Osher v. SCA Realty I, Inc.*,
    945 F. Supp. 298 (D.D.C. 1996) .................................................................. 14, 26

*Parker v. Time Warner Ent. Co., L.P.*,
    239 F.R.D. 318 (E.D.N.Y. 2007) ...................................................................... 31

*Pigford v. Veneman*,
    355 F. Supp. 2d 148 (D.D.C. 2005) .................................................................. 31

*Radosti v. Envision EMI, LLC*,
    717 F. Supp. 2d 37 (D.D.C. 2010) .................................................................... 16

*SEC v. Bear, Stearns & Co. Inc.*,
    626 F. Supp. 2d 402 (S.D.N.Y. 2009) .............................................................. 26

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) .......................................................................... 26

*Smith v. Triad of Alabama, LLC*,
    2017 WL 1044692 (M.D. Ala. Mar. 17, 2017), *on reconsideration in part*,
    2017 WL 3816722 (M.D. Ala. Aug. 31, 2017) .................................................. 22

*Stewart v. Rubin*,
   948 F. Supp. 1077 (D.D.C. 1996) ............................................................................. 26

*Sullivan v. DB Invs., Inc.*,
   2007 WL 9705940 (D.N.J. Sept. 6, 2007), *report & rec. adopted*,
   2008 WL 8747721 (D.N.J. May 22, 2008) ................................................................. 24

*Thomas v. Albright*,
   139 F.3d 227 (D.C. Cir. 1998) .................................................................................... 14

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ................................................................................................ 23

*Trombley v. Nat'l City Bank*,
   759 F. Supp. 2d 20 (D.D.C. 2011) .............................................................................. 14

*Twelve John Does v. District of Columbia*,
   117 F.3d 571 (D.C. Cir. 1997) .................................................................................... 28

*Walker v. United States*,
   2014 WL 2505669 (M.D. Pa. June 3, 2014) ................................................................. 8

*Welborn v. IRS*,
   218 F. Supp. 3d 64 (D.D.C. 2016) .............................................................................. 21

*William Loveland Coll. v. Distance Ed. Accreditation Comm'n*,
   347 F. Supp. 3d 1 (D.D.C. 2018) ................................................................................ 20

**Statutes**

5 U.S.C. § 552a ........................................................................................................................ 5

5 U.S.C. § 552a(g)(4) ......................................................................................................... 7, 24

18 U.S.C. § 2710 ................................................................................................................... 18

28 U.S.C. § 1715 ..................................................................................................................... 9

31 U.S.C. § 3728 ..................................................................................................................... 8

**Other Authorities**

1 McLaughlin on Class Actions § 5:80 ................................................................................. 32

2 McLaughlin on Class Actions § 6:16 ................................................................................. 17

2 William B. Rubenstein, *Newberg on Class Actions* § 4:91 (5th ed.) ................................. 22

4 William B. Rubenstein, *Newberg on Class Actions* § 12:31 (5th ed.) ............................... 26

Evan Osnos, "The Future of America's Contest with China," *The New Yorker* (Jan. 6, 2020) ........ 22

*Manual for Complex Litigation, Fourth* § 21.66 ................................................................. 24

Wright & Miller, *Federal Practice & Procedure* § 1778 ..................................................... 29

**Rules**

Fed. R. Civ. P. 15(a)(2) ................................................................................................. 3

Fed. R. Civ. P. 23 ........................................................................................... 2, 31, 32

Fed. R. Civ. P. 23(a) ................................................................................................. 27

Fed. R. Civ. P. 23(a)(1) ............................................................................................ 27

Fed. R. Civ. P. 23(a)(3) ............................................................................................ 28

Fed. R. Civ. P. 23(a)(4) ............................................................................................ 28

Fed. R. Civ. P. 23(b) ................................................................................................. 27

Fed. R. Civ. P. 23(b)(2) ............................................................................................ 27

Fed. R. Civ. P. 23(b)(3) .......................................................................... 22, 27, 29, 30

Fed. R. Civ. P. 23(c)(2)(B) ......................................................................... 9, 30, 33

Fed. R. Civ. P. 23(e) ........................................................................................... 14, 15

Fed. R. Civ. P. 23(e)(2) ............................................................................................ 15

Fed. R. Civ. P. 23(e)(3) ............................................................................................ 15

Fed. R. Civ. P. 23(e)(5)(A) ...................................................................................... 13

Fed. R. Civ. P. 23(g) ................................................................................................. 28

**Regulations**

31 C.F.R. Part 256, Subpart B ................................................................................... 8

## INTRODUCTION

Plaintiffs seek preliminary approval of a $63,000,000 settlement with Defendants U.S. Office of Personnel Management and its security contractor, Peraton Risk Decision Inc. (formerly KeyPoint Government Solutions, Inc.), to compensate victims of the OPM data breaches who suffered compensable harm under the Privacy Act.  Individuals with information in the breached databases may participate by completing a simple claim form demonstrating their economic loss from the breaches.  The *minimum* payment for valid claims will be $700, which is 70% of the available statutory damages.  The settlement class is limited to individuals who experienced economic loss because only those individuals may recover under the Privacy Act, which provides the only available avenue of relief against OPM.  Those who did not experience economic loss are not members of the settlement class and will not release any claims.

The settlement is the product of a deliberate, considered settlement process, carried on under the Court's oversight, involving lengthy negotiations and the input of two veteran federal judges who assisted the parties.  The settlement payments of $700—or actual damages up to $10,000—are generous in light of the serious risks that continued prosecution would entail.  To achieve similar relief in litigation, Plaintiffs would need to overcome the Government's likely assertion of state secrets confidentiality to discover OPM's data security practices and protocols, obtain class certification despite the Privacy Act's actual-damage limitation, and confront defense arguments regarding causation and damages. This case, arising from cyber intrusions into federal databases, has always involved unique risks and challenges, and the settlement provides Class members with all or more than they reasonably could expect from the litigation.  Additionally, all breach victims remain eligible for the Government's offer of free identity protection services, and dissemination of class notice will serve as a reminder to all of the continuing availability of these services at no charge.

1

The settlement meets all criteria for preliminary approval under Rule 23. The three categories of compensable economic loss cover the types of expenditures that Class members realistically may have incurred: costs of credit monitoring, identity theft protection, or similar services; costs of accessing, freezing, or unfreezing a credit report; or money or compensable time lost as a result of an identity theft incident or responding to one. The settlement class is limited to individuals who incurred such actual damages and therefore have a viable Privacy Act claim. Notice will be sent by email to several million breach victims and publicized through a widespread publication campaign designed to maximize reach to the settlement class. Class member claims for settlement payments must be reasonably documented, just as if they were made following trial, and any unclaimed funds will appropriately escheat to the U.S. Treasury. Class Counsel will separately apply for attorneys' fees, and the fees awarded by the Court will be paid separately by the Government and will not reduce the settlement fund. Any service awards to the named plaintiffs that the Court approves will be deducted from Peraton's $3,000,000 contribution. There are no "clear-sailing" agreements.

The settlement has been carefully negotiated. Class Counsel believe it is fair, reasonable and adequate in all respects. Therefore, Plaintiffs ask the Court to initiate the settlement approval process by preliminarily approving the settlement, ordering that notice be given in accordance with the notice plan, and setting a date for the fairness hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Data Breaches

In the summer of 2015, the U.S. Office of Personnel Management announced that its electronic systems had been breached and hackers had taken the personal information of over 21 million current, former, and prospective federal employees and members of their families. (First

Amended Consolidated Complaint ("Am. Compl.") ¶¶ 2, 123-26.[1])  The compromised records showed such sensitive information as birthdates, Social Security numbers, 5.6 million sets of fingerprints, "[p]sychological and emotional health information," and personal histories of "gambling compulsions, marital troubles, and past illicit drug and alcohol use." (Am. Compl. ¶¶ 1, 129-32.)  Both before and during the intrusion, audits of OPM's data security by its Office of Inspector General found that OPM's information security practices had fundamental and material deficiencies.  (Am. Compl. ¶¶ 2, 71, 73, 76-88.)  Plaintiffs allege that hackers remained undetected within OPM's systems for many months because OPM, despite the forewarnings, recklessly failed to establish reasonable safeguards that would have prevented the intrusions.  (Am. Compl. ¶¶ 6, 117, 150.)  OPM allegedly controlled numerous electronic systems without valid authorizations, failed to implement multi-factor authentication for accessing systems, failed to patch, segment, and continuously monitor systems, and failed to implement centralized data security protocols.  (Am. Compl. ¶¶ 76-98, 119-22.)

At the time of the Data Breaches, OPM oversaw more than two million federal background and security clearance checks annually, and it contracted with Peraton (then known as KeyPoint) to perform investigative work in the field.  (Am. Compl. ¶¶ 37-38, 45, 60.)  OPM's and Peraton's systems were electronically linked: Peraton investigators used their "laptops to broker a connection with the OPM operating environment via a virtual private network (VPN)" so they could download data relevant to their investigations and upload investigative reports.  (Am. Compl. ¶ 61; OPM Answer, Dkt. # 154, ¶ 76.)

---

[1] Plaintiffs are filing the First Amended Consolidated Complaint by stipulation of the parties, as permitted by Rule 15(a)(2), including to conform the revised class definition and remove injunctive-relief and other claims.

On November 1, 2013, hackers infiltrated OPM's network and stole documents showing how its systems were structured.  (Am. Compl. ¶ 110.)  The next month hackers used the stolen information to breach Peraton's systems.  (Am. Compl. ¶¶ 4, 99.)  It is unclear whether any of the Plaintiffs' information was taken in this breach.  On May 7, 2014, hackers used Peraton log-in credentials to infiltrate OPM's electronic network.  (Am. Compl. ¶¶ 6, 112.)

Once inside OPM's systems, the hackers installed malware and extracted the personal information of 19.7 million people who had undergone federal background checks, as well as the personal information of several hundred thousand of their family members and cohabitants.  (Am. Compl. ¶¶ 112-15, 125-26, 129.)  By October 2014 the intruders had also entered OPM systems maintained in an Interior Department data center, from which they exfiltrated approximately 4.2 million personnel files.  (Am. Compl. ¶¶ 116-18.)  All told, the private facts of more than 21 million people were compromised in these breaches.  (Am. Compl. ¶¶ 114, 125, 141.)

OPM discovered the breaches in the spring of 2015 and publicly disclosed them in June and July.  (Am. Compl. ¶¶ 123-25.)  OPM advised the victims to take action, including to place "a fraud alert on your credit file," obtain a credit freeze, and "immediately report any suspicious or unusual activity."  (6/4/15 OPM Press Release; Am. Compl. ¶ 137.)  In September 2015, at a cost of approximately $154 million, OPM made identity theft protection and credit monitoring and restoration services available to the breach victims.  (Am. Compl. ¶¶ 133-35; 10/27/16 Hr'g Tr., Dkt. # 98, at 35.)  Congress later extended these services through September 2026.  (Am. Compl. ¶ 136; Consolidated Appropriations Act of 2017, Pub. L. 115-31, tit. VI, sec. 633 (May 5, 2017).[2])  As of March 31, 2022, 3,222,987 people had signed up for the free identity protection services.  (*See*

---

[2] https://www.congress.gov/115/plaws/publ31/PLAW-115publ31.pdf at p. 242 of 729.

Declaration of Daniel C. Girard ("Girard Decl."), ¶ 3; Declaration of Marcus J. Glasgow ("Glasgow Decl."), ¶ 16.)

### B.   Course of Litigation

After OPM's June 2015 announcement, class actions were filed[3] asserting, *inter alia*, claims against OPM for failing to reasonably safeguard their information in violation of the Privacy Act of 1974, 5 U.S.C. § 552a, and against Peraton for negligence.  The Plaintiffs included two federal employee unions (AFGE and NTEU) and individuals whose private information was taken, several of whom experienced incidents of identity fraud during or after the period in which the Data Breaches were perpetrated.

On October 9, 2015, the Judicial Panel for Multidistrict Litigation ordered the centralization and transfer of these related cases.  *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 138 F. Supp. 3d 1379 (J.P.M.L. 2015).  After assuming control of the MDL, this Court appointed interim lead and liaison counsel along with a Plaintiffs' steering committee.  (Dkt. # 58.)  Plaintiffs filed their consolidated amended complaint on March 14, 2016.  (Dkt. # 63.)  Defendants separately moved to dismiss on May 13, 2016 (Dkt. # 70, 72), and the Court heard argument on those motions on October 31 and November 10, 2016 (Dkt. # 98, 104).

---

[3] *American Federation of Gov't Emps. v. U.S. Office of Pers. Mgmt.*, No. 1:15-cv-01015 (D.D.C. filed June 29, 2015); *National Treasury Emps. Union v. Archuleta*, No. 3:15-cv-03144-WHO (N.D. Cal. filed Jul. 8, 2015); *Woo*, No. 6:15-cv-01220-MLB-GEB (D. Kan. filed Jul. 15, 2015); *Hobbs*, No. 2:15-cv-00302-BLW (D. Idaho filed Aug. 4, 2015); *McGarry*, No. 1:15-cv-01705-JLK (D. Colo. filed Aug. 7, 2015); *Hanagan*, No. 2:15-cv-06045 (C.D. Cal. filed Aug. 10, 2015); *Krippendorf*, No. 1:15-cv-01321-ABJ (D.D.C. filed Aug. 14, 2015); *Cox*, No. 1:15-cv-02986-SCJ (N.D. Ga. filed Aug. 24, 2015); *Robbeloth*, No. 1:15-cv-01449-ABJ (D.D.C. filed Sept. 4, 2015); *Oravis*, No. 1:15-cv-01202-LO-JFA (E.D. Va. filed Sept. 18, 2015); *Sims*, No. 1:15-cv-13426-DJC (D. Mass. filed Sept. 23, 2015); *Brown*, No. 1:15-cv-01564-ABJ (D.D.C. filed Sept. 24, 2015); *Bonner*, No. 1:15-cv-01617-ABJ (D.D.C. filed Oct. 2, 2015); *Waid*, No. 1:15-cv-01653-ABJ (D.D.C. filed Oct. 8, 2015); *Cavis*, No. 1:15-cv-01810-ABJ (D.D.C. filed Oct. 26, 2015); *Smith*, No. 1:15-cv-01835-ABJ (D.D.C. filed Oct. 28, 2015).

On September 19, 2017, the Court dismissed Plaintiffs' claims for lack of Article III standing and failure to state a claim under the Privacy Act, the Administrative Procedure Act, and the Little Tucker Act, holding in further part that Plaintiffs' claims against Peraton were barred by derivative sovereign immunity. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 266 F. Supp. 3d 1 (D.D.C. 2017) ("*OPM I*"). On appeal, Plaintiffs argued that they had Article III standing and plausible Privacy Act claims for economic loss, and that Peraton's alleged noncompliance with the Government's instructions deprived it of derivative immunity. The appeal was argued and submitted on November 2, 2018. On June 21, 2019, the D.C. Circuit reversed on these three grounds, while affirming dismissal of the constitutional claim brought by NTEU and other plaintiffs, in a *per curiam* opinion. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019) ("*OPM II*"). Judge Williams filed a separate opinion concurring in part and dissenting in part, and pointing out that Peraton may also have a viable federal preemption defense. *See id.* at 75-84.

Following remand, this Court remarked that the case "cries out for ADR. . . . There are many, many reasons for both sides to be open-minded and thoughtful and to initiate this process and to start it soon." (12/3/19 Hr'g Tr., Dkt. # 163, at 17-18.) On January 27, 2020, the Court referred the litigation to private mediation to be supervised by retired federal District Judge Lawrence F. Stengel, an accomplished mediator agreed upon by the parties. (Girard Decl. ¶ 6.)

### C.     Parties' Mediation and Negotiations

The parties held separate conference calls and video sessions with Judge Stengel in 2020 to discuss their positions and potential paths forward. (Girard Decl. ¶ 7.) They exchanged relevant information under Judge Stengel's supervision, and Plaintiffs sent Defendants detailed supporting materials. (*Id.*) After the expiration of the referral to Judge Stengel, the parties continued negotiating and the Court approved extensions of time that allowed these discussions to proceed. (Girard Decl. ¶ 9.) Though further progress was slow, and at several points the parties reached what seemed to be

insurmountable impasses, they continued talking.  (*Id.*)  *See, e.g.*, *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 80 (S.D.N.Y. 2000) (discussing incentives for "investing additional time and maximizing plaintiffs' recovery."); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) (counsel performed "additional work necessary to achieve a better outcome for the class" by "[h]olding out for nine long years") (citation omitted).

While the substance of the parties' negotiations remains privileged, one practical question Plaintiffs confronted is apparent: how to fairly structure a settlement aimed at the relatively narrow class of claimants who retain the right to recover under the Privacy Act, while leaving the claims of others unaffected.  *See In re OPM II*, 928 F.3d at 65-66 (discussing case-specific categories of compensable loss).  The parties jointly requested a referral to Judge Bates, to whom this Court referred the negotiations on July 30, 2021, for consultation on several issues as to which the parties remained at impasse.  Ultimately, the parties agreed the settlement class should be limited to individuals who incurred objectively-defined forms of pecuniary loss stemming from the Data Breaches.  *See FAA v. Cooper*, 566 U.S. 284, 298-99 (2012) (holding that only those who suffered pecuniary loss may recover under 5 U.S.C. § 552a(g)(4)).  Hence, the only claims that the Settlement[4] will extinguish are those of individuals who may claim a share of the $63 million fund, who are also the only breach victims with standing to recover under the Privacy Act.

**D.    The Settlement Agreement**

The parties signed the Settlement Agreement ("SA") on May 5, 2022.  It incorporates five exhibits: the proposed Notice (Ex. 1), Claim Form (Ex. 2), Preliminary Approval Order (Ex. 3), Final Approval Order and Judgment (Ex. 4), and Notice Plan (Ex. 5).

---

[4] Unless otherwise noted, all capitalized terms have the meaning ascribed to them in the Settlement Agreement.

### 1.    Settlement Consideration

Within seven days after final approval, OPM will provide the U.S. Department of Treasury, Bureau of Fiscal Service Judgment Fund ("Judgment Fund") with all necessary forms and documentation to effect payment of $60,000,000 into the Settlement Account.  (SA § III.A.)  Within 14 days after the Judgment Fund has allocated OPM's payment, Peraton will pay an additional $3,000,000.  (SA § III.B; Girard Decl. ¶ 13.)[5]  Any service payments awarded by the Court to the Named Plaintiffs[6] will be paid out of Peraton's contribution.  (SA § VI.B.)  OPM will pay the costs of settlement notice and claims administration, and attorneys' fees as awarded by the Court, separately from the settlement fund.  (SA §§ II.B.12, V.A, VI.A.)

### 2.    The Settlement Class and Release

The Settlement Class is defined as:

> All U.S. citizens and permanent residents whose personal information was compromised as a result of the breaches of the U.S. Office of Personnel Management's electronic information systems in 2014 and 2015 or the breach of Peraton's electronic information systems in 2013 and 2014, and who, after May 7, 2014, suffered out-of-pocket expense or loss of compensable time: (1) to purchase a credit monitoring product, credit or identity theft protection product, or other product or service designed to identify or remediate the data breaches at issue in this case; (2) to access, freeze or unfreeze a credit report with a credit reporting agency; or (3) as a result of an identity theft incident or to mitigate an identity theft incident.

---

[5] The Settlement will be funded through two accounts, a qualified settlement fund maintained by the Claims Administrator (funded by Peraton's contribution) and an account maintained by the Treasury Department (funded by the Government's contribution).  (Girard Decl. ¶ 14.)  Upon the Effective Date, an amount sufficient to pay all valid claims, less any offsets required by federal law, will be disbursed from the Treasury Department to the qualified settlement fund, from which the Claims Administrator will pay claimants.  (*Id.*)  *See* 31 U.S.C. § 3728; 31 C.F.R. Part 256, Subpart B; *see also Walker v. United States*, No. 3:13-CV-0205, 2014 WL 2505669 (M.D. Pa. June 3, 2014) (discussing mandatory offset provisions).

[6] The Named Plaintiffs, as defined in the Settlement, include both the Class Representatives in the First Amended Consolidated Complaint, filed herewith, and Plaintiffs in the Consolidated Amended Complaint (Dkt. # 63) who are not members of the Settlement Class but remain eligible to apply for service awards.

Excluded from the Class are Class Counsel and their employees; any judicial officers to whom this case is assigned and their respective staffs; mediators and their respective staffs; and attorneys from the Department of Justice and the Office of Personnel Management, and their respective staffs, who worked directly and personally on this matter.

(SA § II.B.2.)  The Settlement release applies to Settlement Class members and extends to claims that were or could have been asserted in the case.  (SA § IV.B.1.)  *See Brown v. Wells Fargo Bank, N.A.*, 25 F. Supp. 3d 144, 150-51 (D.D.C. 2014) (noting that "a federal court may release not only those claims alleged in the complaint, but also a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable") (internal quotation marks and citation omitted).

### 3.    Notice to Settlement Class

The proposed Notice (SA, Ex. 1) provides all information required by Rule 23(c)(2)(B) and directs potential Class members to the dedicated Settlement Website, where they can make a claim and learn more about the Settlement and their options.  The Notice Plan lays out a multistep program for notifying Class members of the Settlement and their rights.[7]  (SA, Ex. 5.)  The approximately 3.2 million breach victims who accepted OPM's offer of free identity protection and credit restoration services will receive direct notice of the Settlement via email, based on contact information maintained by IDX, the vendor for these services.  (Girard Decl. ¶ 16.)  For emails that bounce back as undeliverable, a postcard version of the notice will be sent to the intended recipient via U.S. mail. (*Id*.)  Emails also will be sent to Class members using the listservs of the two largest federal employee unions, former plaintiffs AFGE and NTEU.  (Girard Decl. ¶¶ 2, 16.)  In addition to these individual notices, a wide-ranging publication campaign tailored to the case will employ targeted digital ads,

---

[7] Peraton will provide notice of the Settlement to the appropriate government officials under 28 U.S.C. § 1715.  (SA § IX.D.)

including on websites likely to be viewed by Class members, a press release, print and radio ads, and a dedicated Settlement website.  (Girard Decl. ¶ 17; Declaration of Cameron R. Azari ("Azari Decl."), ¶¶ 19-24, 33-54.)  The Claims Administrator's notice expert estimates that this publication notice campaign will reach at least 80% of the Class.  (Azari Decl. ¶¶ 19, 60.)  The Claims Administrator will also set up a toll-free number that potential Class members can call to speak with a live agent and get help in filing a claim.  (Azari Decl. ¶ 53.)

### 4.      Claims and allocation

Any member of the Class may submit a completed Claim Form for review by the Claims Administrator, who will have sole authority to determine the eligibility of claims for payment.  (SA § V & Ex. 2.)  The deadline for submitting a claim will be 200 days after the Settlement is preliminarily approved.  (SA § V.C.1.)

**Recoverable losses.**  The Claims Administrator will find a claim valid if it is accompanied by a Claim Form that is complete and reasonably documented.  (SA § V.C.3.)  Recoverable losses may include both unreimbursed monetary *expenses* and compensable *time* incurred during the Recovery Period (May 7, 2014 – January 31, 2022).  (SA §§ II.B.20, V.C.4.a.)

First, out-of-pocket expenditures supporting a valid claim under the Settlement may include the following losses incurred during the Recovery Period:

  i.    Out-of-pocket costs, expenses, losses or charges incurred as a result of identity theft or identity fraud, including unauthorized account openings and falsified tax returns, or other alleged misuse of a Class Member's personal information;

  ii.   Out-of-pocket costs associated with placing or removing a credit freeze on a Class Member's credit file with any credit reporting agency;

  iii.  Out-of-pocket credit monitoring costs, credit or identity theft protection costs, or the costs of other products or services designed to identify identity theft or remediate the effects of the Data Breaches; and

iv.  other miscellaneous expenses related to any out-of-pocket loss such as payments for notary or fax service, postage, copying, mileage, or long-distance telephone service.

(SA § V.C.4.b.)  *See Cooper*, 566 U.S. at 296 (stating that the Privacy Act provides compensation for "some pecuniary harm, no matter how slight").

Second, time lost by a Class member during the Recovery Period is compensable if it (a) resulted in quantifiable harm, such as taking take time off from hourly work or using paid time off from salaried work, and (b) constitutes "reasonable time spent in connection with: (1) the purchase of a credit monitoring or credit or identity theft protection product or other product or service designed to identify or remediate the effects of the data breaches at issue in this case; (2) accessing, freezing or unfreezing a credit report with a credit reporting agency; or (3) an identity theft incident or responding to such an incident."  (SA § V.C.4.c.)  *See, e.g., In re OPM II*, 928 F.3d at 66 (time "take[n] . . . off work" is pecuniary harm for Privacy Act purposes); *Leeds v. Metro. Gas-Light Co.*, 90 N.Y. 26, 27 (1882) (lost-time damages traditionally require proof of the value of the time lost).

**Reasonably documented.**  The Claims Administrator will deem a claim "Reasonably Documented" if it includes documentation sufficient to show (a) the amount of out-of-pocket loss suffered by the Claimant, and (b) that the loss is reasonably attributable to the Data Breach.  (SA § II.B.19.)  The documentation may include credit card or bank statements, emails, pay stubs, invoices, other billing records, receipts, telephone records, or photographs of the same.  (SA § II.B.19.)  Statements or affidavits may be used to provide clarification, context, or support for other documentation submitted.  (SA § II.B.19.)  Before rejecting a timely claim that is incomplete or lacks adequate documentation, the Claims Administrator will contact the claimant regarding the deficiencies and allow a reasonable cure opportunity.  (SA § V.C.3.)  The Settlement also allows

claimants to dispute the determination of their claims, with the final decision reserved to the Claims Administrator.  (SA § V.D.)

**Reasonably attributable.**  A claim based upon self-protection costs—*i.e.*, money paid for credit monitoring or similar services, or for a credit freeze—will be deemed reasonably attributable to the Data Breaches if the costs were incurred from April 22, 2015 through January 1, 2016, and if the claimant attests that the costs were incurred in response to the Data Breaches and not as a result of any other data breach.  (SA § V.C.6.)  For self-protection costs incurred during other time periods, and expenses incurred as a result of identity fraud, the Claims Administrator will determine whether the expenses are reasonably attributable to the Data Breaches by reference to the following factors:

a.   the timing of the loss, including whether credit freezes or unfreezes, credit monitoring costs, credit or identity theft protection costs, or other products or services designed to identify identity theft or remediate the effects of the data breach were incurred before or after the cyber breaches became public;

b.   whether the loss involved misuse of the type of personal information accessed in the cyber breaches, including, without limitation, the Claimant's name, Social Security number, date and place of birth, and current and former addresses;

c.   the Class Member's explanation of how the loss may have resulted from the cyber breaches;

d.   the nature of the loss and whether the Class Member acted reasonably under the circumstances; and

e.   any other factor that the Claims Administrator finds relevant.

(SA § V.C.5.)

**Payment of claims.**  Valid claims will be timely paid from the Settlement Account after the Effective Date.  (SA § V.C.2.)  Each valid claim will be paid at $700, except that if the actual amount of documented loss exceeds $700, the claim will be paid in that amount, up to $10,000.  (SA § V.C.7.)  Valid claims will be paid out of Peraton's contribution until it is exhausted, and then out of OPM's contribution.  (SA § V.C.7.)  If the balance in the Settlement Account does not cover all

valid claims, each will be reduced *pro rata* before payment.  (SA § V.C.8.)  If a balance remains in the Settlement Account after all valid claims are paid, and the Court finds that the Notice Plan has been implemented in accordance with the Preliminary Approval Order and that Class members had an opportunity to submit claims and participate in distributions under the Settlement, the remaining amount will be returned to the U.S. Treasury; however, no portion of Peraton's contribution will be returned to Peraton.  (SA § V.C.9.)  The Claims Administrator will provide a written report stating the number of claims submitted, the number determined to be valid, and the total amount of valid claims.  (SA § V.E.)

### 5.      Further settlement-related proceedings

Any Class member may opt out of the Class or object to the Settlement or to Plaintiffs' request for attorneys' fees, reimbursement of expenses, and service awards.  (SA §§ IX.C, IX.E.) Any opt-outs and objections are due no later than 35 days before the Court's fairness hearing.  (SA §§ IX.C.1, IX.E.1.)  Opt-outs must be submitted in writing to the Claims Administrator, which will compile a list of valid opt-outs for submission to the Court.  (SA § IX.C.1.)  Objections must be filed with the Court and provide the information required under Rule 23(e)(5)(A).  (SA § IX.E.1.)

Plaintiffs will move for an award of reasonable attorneys' fees, reimbursement of litigation expenses, and approval of service awards to the Named Plaintiffs.  (SA § VI.A-B.)  Defendants may oppose that motion.  (SA § VI.A-B.)  OPM will, however, submit to the Judgment Fund for payment—separate from the Settlement Claims Amount—attorneys' fees and expenses as awarded by the Court.  (SA § VI.A.)  Peraton will have no obligation with respect to an award of attorneys' fees and expenses, but any service awards approved by the Court will be paid out of the Peraton Contribution.   (SA § VI.A-B.)  *See In re Lorazepam & Clorazepate Antitrust Litig.*, No. 99MS276(TFH), 2003 WL 22037741, at *10-11 (D.D.C. June 16, 2003) ("[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks

13

they incurred") (citation omitted); *Cobell v. Jewell*, 802 F.3d 12, 24-25 (D.C. Cir. 2015); *see, e.g.*, *Kinard v. E. Capitol Fam. Rental, L.P.*, 331 F.R.D. 206, 217 (D.D.C. 2019) (approving $5,000 service awards to plaintiffs who "participate[d] in a lengthy mediation process").

## ARGUMENT

## I.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

The parties' Settlement resolves this litigation on favorable terms for injured data breach victims and, thus, should be preliminarily approved under Rule 23(e).  The public policy in favor of settlement applies with particular force in class actions.  *See Kinard*, 331 F.R.D. at 213 (reiterating "long-standing judicial attitude favoring class action settlements") (citations omitted); *Osher v. SCA Realty I, Inc.*, 945 F. Supp. 298, 304 (D.D.C. 1996) ("In the context of class actions, settlement is particularly appropriate given the litigation expenses and judicial resources required in many such suits.").  The Court's "primary task is to evaluate the terms of the settlement in relation to the strength of the plaintiffs' case," *Thomas v. Albright*, 139 F.3d 227, 231 (D.C. Cir. 1998), and "[g]enerally, preliminary approval . . . will be granted if [the settlement] appears to fall 'within the range of possible approval' and 'does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys.'"  *Trombley v. Nat'l City Bank*, 759 F. Supp. 2d 20, 23 (D.D.C. 2011) (citations omitted).  When performing this "limited role" under Rule 23(e), *Osher*, 945 F. Supp. at 304, the Court considers whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
> > (i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

All of these factors support preliminary approval of the Settlement in this case. The Government has funded a comprehensive set of free identity protection and insurance services that remain available to all breach victims. (Girard Decl. ¶ 3.) Adding to this protection, the Settlement secures minimum cash payments of $700 for Class members who make valid claims based on time or money they lost due to the Data Breaches at any time over nearly eight years (SA § II.B.20 (recovery period extends into 2022)); and they will have ample time to make a claim (SA § V.C.1 (allowing 200 days after preliminary approval)). The Settlement is the result of extensive negotiations and accounts for the unique aspects of this litigation, including the strict limitation on recovering from the Government and the causation problems that Defendants would have argued result from the hack's attribution to a foreign state actor. Class Counsel will apply for attorneys' fees separately from the fund: there is no "clear-sailing" agreement on fees. The Settlement meets all requirements of Rule 23(e) with its substantial payments, streamlined claim procedure, and limited release. The Settlement, thus, merits approval.

A.      **The Settlement Is the Product of Informed Adversarial Negotiations.**

The Settlement is a hard-won compromise reached by experienced counsel after more than two years of negotiations. (Girard Decl. ¶¶ 7-11, 23.)[8] *See, e.g.*, *In re Vitamins Antitrust Litig.*, 305

---

[8] There is no agreement to disclose other than the Settlement. *See* Fed. R. Civ. P. 23(e)(3).

F. Supp. 2d 100, 106 (D.D.C. 2004); *Howard v. Liquidity Servs. Inc.*, No. CV 14-1183 (BAH), 2018 WL 4853898, at *4 (D.D.C. Oct. 5, 2018) ("The sophistication and experience of counsel support the arm's-length nature of the negotiations in this case, and the length and nature of the settlement negotiations further support this conclusion.").  Several case-specific factors complicated the parties' negotiations, *e.g.*, the Government's immunity, subject to the limited Privacy Act exception; which factual scenarios may make an individual eligible to recover under the Act; the evidentiary support that would be needed to recover; and whether the Government and Peraton would agree to settle on the basis of a narrowed class.  (Girard Decl. ¶ 8.)  The parties, assisted by two respected federal judges, overcame these and other challenges, fully informed of the strengths and weaknesses of the case including through scrutiny of the 231-page Congressional report,[9] supplemented by additional information exchanges under the mediator's supervision.  (Girard Decl. ¶ 7.)  *See, e.g.*, *Kinard*, 331 F.R.D. at 216 ("Both parties represent that they have now exchanged sufficient information to accurately assess the relative strengths of their claims and defenses, and the risks of continuing the litigation."); *In re Baan Co. Sec. Litig.*, 284 F. Supp. 2d 62, 67 (D.D.C. 2003) (noting "invaluable assistance of an experienced retired federal judge"); *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 43 (D.D.C. 2010); *Dew v. Mindfinders, Inc.*, No. CV 20-2930 (BAH), 2021 WL 4797551, at *5 (D.D.C. Oct. 14, 2021) (participation of "an experienced and respected mediator . . . further bolsters the arm's length nature of the negotiations") (citations omitted).

## B.     The Payments to Class Members Under the Settlement Are Adequate Given the Risks of Litigation.

The Settlement provides adequate relief when "the Court compares [its] terms . . . with the

---

[9] The investigation conducted and the ensuing report issued in late 2016 by the House Committee on Oversight and Government Reform touched on many of the key facts that formal discovery would have revealed.  https://republicans-oversight.house.gov/wp-content/uploads/2016/09/The-OPM-Data-Breach-How-the-Government-Jeopardized-Our-National-Security-for-More-than-a-Generation.pdf.

likely recovery plaintiffs would attain if the case proceeded to trial, an exercise which necessarily involves evaluating the strengths and weaknesses of plaintiffs' case." *In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & "ERISA" Litig.*, 4 F. Supp. 3d 94, 103 (D.D.C. 2013); *see also In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 26 (D.D.C. 2011) (this comparative assessment is "the most important factor").  Because "the outcome of litigation is always uncertain and inevitably time-consuming and expensive," a class settlement may be adequate even if it provides "only a fraction of the potential recovery" at trial.  *In re New Jersey Tax Sales Certificates Antitrust Litig.*, 750 F. App'x 73, 82 (3d Cir. 2018) (citing 2 McLaughlin on Class Actions § 6:16); *see, e.g., In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & "ERISA" Litig.*, 4 F. Supp. 3d at 103-04; *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 495 (S.D.N.Y. 2018) (finding no reason "why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery") (citations omitted).  The Court "must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise," *In re GMC Truck Fuel Tank Prods. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995), and "relief might well be delayed for years if this case were to be litigated, even if plaintiffs prevailed." *Luevano v. Campbell*, 93 F.R.D. 68, 89 (D.D.C. 1981).

The $63 million fund achieved in this case is a favorable result for breach victims with colorable claims against OPM.  *See Cooper*, 566 U.S. 284, 296 ("Privacy Act victims . . . are barred from any recovery unless they can first show actual—that is, pecuniary or material—harm.").  Moreover, those who suffered one of the forms of pecuniary harm in the class definition are eligible for minimum payments of $700—70% of statutory damages under the Act—even if their actual damages are minor.  *See Ceccone v. Equifax Info. Servs. LLC*, No. 13-CV-1314 KBJ, 2016 WL 5107202, at *10 (D.D.C. Aug. 29, 2016) (approving class settlement and explaining that it provided

recovery within the range of statutory damages and with the possibility of greater recovery).  Given that Class members who incurred damages less than the statutory minimum stood to recover $1,000 only if successful at trial and in further proceedings, the $700 payments reflect a very small discount for the further delay and risks they would otherwise confront.  Class Counsel believe, based on claim levels in similar cases, that the fund will be adequate to compensate all claimants (Girard Decl. ¶ 23), and in any event the Court will have additional data before it at the final approval stage to confirm the sufficiency of the recovery.

A discount this modest for claimants is exceptional in class action privacy settlements where statutory damages are available.  Class actions under the Telephone Consumer Protection Act, which provides for $500 in statutory damages, frequently settle for less than $40 per person.  *See, e.g.*, *In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781, 787 (N.D. Ill. 2015) ($34.60 to each claiming class member); *Hashw v. Dept. Stores Nat'l Bank*, 182 F. Supp. 3d 935, 940, 944-45 (D. Minn. 2016) ($33.20 to class members who received over 100 calls in violation of the TCPA).  A privacy settlement under the Drivers' Privacy Protection Act provided for a $50 million cash fund that afforded about 600,000 class members $160, out of the $2,500 to which they might have been entitled after trial.  *Kehoe v. Fidelity Fed. Bank & Tr.*, No. 03-cv-80593, Dkt. # 215 at 7 (S.D. Fla. Nov. 17, 2006).  The plaintiffs in *In re Vizio, Inc., Consumer Privacy Litigation*, No. 16-ml-02693-JLS-KES (C.D. Cal.), alleged that the defendant's smart TVs collected viewing history and transmitted that data, along with personally identifiable information, to third parties in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, which allows for recovery of $2,500, *id*. § 2710(c)(1)-(2).  From the resulting $17 million settlement, claiming class members received about $18 per television purchased.  *See In re Vizio*, Dkt. # 347-1 at 2.  Even the megafund settlement in *In re Facebook Biometric Information Privacy Litigation*, 522 F. Supp. 3d 617, 627 (N.D. Cal.

2021), returned $345—less than half the recovery for Class members here—to claimants who stood

to recover the same statutory damages of $1,000 under the Illinois biometric privacy law.

The Settlement payments are especially favorable when considered in the light of the

numerous significant risks associated with continued case prosecution.   First, the Privacy Act

requires a showing of "willful or intentional conduct," which reviewing courts have interpreted to

mean agency action "so patently egregious and unlawful that anyone undertaking the conduct should

have known it unlawful."   *In re OPM II*, 928 F.3d at 63 (citation omitted).   While Plaintiffs maintain

that OPM's inaction despite its Inspector General's warnings rises to the level of willfulness, OPM

vigorously disputes this assertion and would have argued that Plaintiffs cannot demonstrate the

sophisticated hack could have been prevented.   Because OPM has exclusive access to its source code

and other technical aspects of its data security defenses, Plaintiffs would have faced an uphill battle

to overcome OPM's defenses.   An assertion of state secrets privilege, invoking national security

concerns, would have seriously threatened Plaintiffs' ability to develop the proof necessary to

establish liability.   *See* Dkt. # 140 at 9 (OPM stating that "[t]he state secrets privilege . . . would

likely be implicated with regards to any classified information about the OPM breach itself,

particularly since . . . [it] involves sensitive national security and foreign policy implications.").   As

the Supreme Court recently held, this privilege "authorizes district courts to dismiss claims on the

pleadings" and "may sometimes preclude even *in camera*, *ex parte* review of the relevant evidence."

*FBI v. Fazaga*, 142 S. Ct. 1051, 1062 (2022); *see also General Dynamics Corp. v. United States*,

563 U.S. 478, 486 (2011) (holding that, where liability depends on the validity of a plausible defense

and "full litigation of that defense would inevitably lead to the disclosure of state secrets, neither

party can obtain judicial relief.") (internal quotation marks and citation omitted); *In re Sealed Case*,

494 F.3d 139, 153 (D.C. Cir. 2007) ("If the district court determines that the subject matter of a case

is so sensitive that there is no way it can be litigated without risking national secrets, then the case

must be dismissed."); *In re United States*, 872 F.2d 472, 476 (D.C. Cir. 1989).

Plaintiffs also would have faced an uphill battle in proving their claims against Peraton.  At

the time of settlement, the Court had not yet ruled on Peraton's federal preemption defense,[10] which

applies to all of Plaintiffs' claims against it, or on its challenge to the negligence claims based on the

economic loss rule.[11]  (Dkts. # 70, 148.)  Even if Plaintiffs could have overcome these and other

legal hurdles to proceeding against Peraton, their claims against it turned on a single allegation—

hackers breached OPM's systems using Peraton security credentials—that would have required

Plaintiffs to develop proof as to how those credentials were obtained and what, if anything, could

have prevented their loss.  *See In re OPM I*, 266 F. Supp. 3d 1, 49 (finding that "these general

statements [about the Peraton credentials] do not supply any facts"); 11/10/16 Hr'g Tr., Dkt. # 104,

at 67 (Peraton's counsel arguing that "although the plaintiffs allege that a [Peraton] credential was

used in order to access OPM, there isn't any allegation that that credential was actually taken from

[Peraton].").  Plaintiffs would also have faced difficulty in tying the loss of *their* information to the

breach of Peraton's systems.  *See* 11/10/16 Hr'g Tr., Dkt. # 104, at 56-57, 68-69.

Holding Defendants liable would have been even more challenging given that the identity

theft incidents Plaintiffs experienced were perpetrated by unidentified third-party criminals using

---

[10] *See In re OPM II*, 928 F.3d at 80-81 (Williams, J., concurring in part and dissenting in part) ("Allowing 50 states to pile on and impose liability on contractors, with the financial consequences falling back on federal agencies in contract negotiations . . . might be found to upset the balance intended by Congress.").

[11] *See, e.g.*, *Aguilar v. RP MRP Wash. Harbour, LLC*, 98 A.3d 979, 982-83 (D.C. 2014) (stating that application of economic loss doctrine renders tort liability "quite limited") (citation omitted); *William Loveland Coll. v. Distance Ed. Accreditation Comm'n*, 347 F. Supp. 3d 1, 19 (D.D.C. 2018) (A. Jackson, J.) (holding that a "plaintiff who suffers only pecuniary injury as a result of the conduct of another cannot recover those losses in tort" absent a "special relationship" with the defendant—a "limited exception to the economic loss doctrine.").

data of unknown origin. "Data breach" actions thus "are particularly risky, expensive, and complex."
*Gordon v. Chipotle Mexican Grill, Inc.*, No. 17-cv-01415-CMA-SKC, 2019 WL 6972701, at *1 (D.
Colo. Dec. 16, 2019). "Beyond the novel state of the law in regards to identity theft, there are
inherent issues of causation" that would have resulted in protracted and uncertain litigation. *In re
Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 WL
3341200, at *4 (W.D. Ky. Aug. 23, 2010); *see, e.g.*, *In re OPM I*, 266 F. Supp. 3d at 37 (citing
*Welborn v. IRS*, 218 F. Supp. 3d 64, 79 (D.D.C. 2016)); *Koenig v. Lime Crime, Inc.*, No. CV 16-503
PSG (JEMx), 2018 WL 11358228, at *3 (C.D. Cal. Apr. 2, 2018) (approving data breach settlement
and finding in part that "[b]ecause of the difficulty of proving damages and causation, Plaintiffs
faced a substantial risk of losing at summary judgment or at trial."); *In re The Home Depot, Inc.,
Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, 2016 WL 6902351, at *5 (N.D. Ga.
Aug. 23, 2016) ("[E]stablishing causation . . . has been a barrier to consumer plaintiffs' success" in
data breach litigation); *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-
2633-SI, 2019 WL 3410382, at *21 (D. Or. July 29, 2019) (granting preliminary approval,
recognizing "Plaintiffs have a weaker case with respect to damages . . . and the number of Class
Members who appear to have suffered actual identity theft or out-of-pocket damages that can
reasonably be attributed to the Data Breach appears to be relatively low."). That these Data Breaches
were attributed to the Chinese government, apparently motivated by foreign policy considerations,
would have compounded the risks associated with tracing Plaintiffs' harm to Defendants' alleged
violations. *See In re OPM II*, 928 F.3d at 76 (Williams, J., concurring in part and dissenting in part)
(opining that the Data Breaches are "more likely explained as the handiwork of foreign spies looking

to harvest information about millions of federal workers for espionage or kindred purposes having nothing to do with identity theft.") (internal quotations marks and citation omitted).[12]

Furthermore, although class certification would have been required for unnamed breach victims to recover in litigation, it was by no means assured. Class Counsel have identified only three consumer data-breach classes that have been certified for trial, in *In re Marriott International, Inc., Customer Data Security Breach Litigation*, No. 19-MD-2879, 2022 WL 1396522 (D. Md. May 3, 2022), *In re Brinker Data Incident Litigation*, No. 3:18-CV-686-TJC-MCR, 2021 WL 1405508 (M.D. Fla. Apr. 14, 2021), and *Smith v. Triad of Alabama, LLC*, No. 1:14-CV-324-WKW, 2017 WL 1044692 (M.D. Ala. Mar. 17, 2017), *on reconsideration in part*, 2017 WL 3816722 (M.D. Ala. Aug. 31, 2017); *see also Linnins v. HAECO Ams., Inc.*, No. 1:16CV486, 2018 WL 5312193, at *2 (M.D.N.C. Oct. 26, 2018) (noting relative scarcity of data-breach class certifications). Because potential recoveries against OPM are limited to economic harm, Plaintiffs would have had to consider proposing bifurcated certification of their Privacy Act claims, with a class trial on the issues of liability and general causation (*i.e.*, whether OPM committed violations and, if so, whether they caused the Data Breaches), followed by individualized proceedings on specific causation and damages (whether a particular claimant was harmed by the Data Breaches and, if so, the measure of damage). As the latter set of individual issues are themselves complex, the superiority of class treatment under Rule 23(b)(3) would have been sharply contested, and the case law in these areas remains unsettled. *See* 2 William B. Rubenstein, *Newberg on Class Actions* § 4:91 (5th ed.) (discussing current uncertainty regarding use of bifurcated class certification). The Settlement

---

[12] *See also* Evan Osnos, "The Future of America's Contest with China," *The New Yorker* (Jan. 6, 2020) (reporting that in 2016, Chinese President "Xi promised Obama to curtail hacking, and it briefly died down, but China's cyberattacks have since resumed . . . ."), https://www.newyorker.com/magazine/2020/01/13/the-future-of-americas-contest-with-china.

provides for a streamlined, non-adversarial claim-in procedure that compares favorably to the individualized prove-up process that would have followed a class trial, had Plaintiffs prevailed. The procedure will treat liability and general causation as established, and provide more than two-thirds of statutory damages.

In contrast to the compensation offered under the Settlement, therefore, "further litigation would have delayed any potential recovery for the Settlement Class and would have been costly and risky." *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2020 WL 4212811, at *9 (N.D. Cal. July 22, 2020). Considering the "costs and risks, a settlement that guarantees a per-member recovery that is within the . . . range of statutory damages (and with the possibility of significantly greater recovery if a class member files a valid claim) is fair, reasonable, and adequate." *Ceccone*, 2016 WL 5107202, at *10.

## C.     The Settlement Fund Will Be Fairly and Equitably Distributed.

The Settlement's claims and allocation provisions treat all class members equitably relative to each other, Fed. R. Civ. P. 23(e)(2)(D), further weighing in favor of approval. A plan for distributing a settlement fund is "sufficient"—as here—if "there is 'a rough correlation' between the settlement distribution and the relative amounts of damages recoverable by Class Members." *Howard*, 2018 WL 4853898, at *7 (citations and alteration omitted).

All breach victims will have the same opportunity to file a claim based upon one of the forms of expenditure set out in the class definition. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (holding that members of a class must have standing to recover out of a class-wide judgment). Further, the same standards will apply to the determination and payment of claims. Any Class member may qualify for the conclusive presumption that self-protection costs incurred in the months after (and as a result of) the Government's announcement are reasonably attributable to the breach (SA § V.C.6), and the Claims Administrator will likewise assess other claims under uniform

23

standards crafted to fit the circumstances of this case (SA § V.C.5).  All valid claims for economic

loss, "no matter how slight," *Cooper*, 566 U.S. at 296, will be paid at $700, unless the actual damages

are greater, in which case the claim will be paid in its actual amount up to $10,000 (SA § V.C.7),[13]

a payment structure that "correlat[es]" with the Privacy Act's damage provision, 5 U.S.C.

§ 552a(g)(4)(A).  *Howard*, 2018 WL 4853898, at *7.  If the total claims exceed the available

settlement funds, they will be reduced *pro rata* with no Class member obtaining any greater relative

benefit over another.  (SA § V.C.8.)

This is not a situation where a defendant's records suffice to demonstrate injury to certain

individuals, and class members "must usually file claims forms providing details about their claims

and other information needed to administer the settlement." *Manual for Complex Litigation, Fourth*

§ 21.66 at p. 331 ("*MCL*").  The instructions on the Claim Form are straightforward and the Claims

Administrator will follow up with any claimant whose claim is not adequately documented.  (SA

§ V.C.3 & Ex. 2.)  The Settlement's requirement of reasonable documentation (SA § II.B.19)

requires no more—and likely less—than what would be required of claimants on a post-trial posture.

*See MCL* § 21.66 at p. 331 ("Verification of claims forms by oath or affirmation . . . may be required,

and it may be appropriate to require substantiation of the claims (e.g., through invoices,

confirmations, or brokers' records)."); *Jackson's Rocky Ridge Pharmacy, Inc. v. Argus Health Sys.,*

*Inc.*, No. 2:05-CV-0702-UWC, 2007 WL 9711416, at *2 (N.D. Ala. June 14, 2007) (overruling

---

[13] Class members are not likely to have suffered actual damage in excess of $10,000, and this cap
on recovery will also protect the fund against excessive depletion.  *See, e.g.*, *Sullivan v. DB Invs.,*
*Inc.*, No. CV 04-02819, 2007 WL 9705940, at *14 (D.N.J. Sept. 6, 2007), *report & rec. adopted*,
2008 WL 8747721 (D.N.J. May 22, 2008) (approving settlement allocation plan using thresholds
"designed to minimize the filing of fraudulent claims."); *In re "Agent Orange" Prod. Liab. Litig.*,
689 F. Supp. 1250, 1277 (E.D.N.Y. 1988) (describing steps "to ensure that all of the settlement
fund is adequately protected").  Class members who claim damages in excess of $10,000 or based
on unique circumstances retain the right to opt out.

objections to substantiation "requirement [that] is no more onerous than that to which each of the class members would have been subjected had they filed a separate lawsuit . . . and prevailed"). Thus, settlements often require class members to submit records or other documentary evidence to qualify for payment, particularly when payments are substantial.  *See, e.g.*, *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *30 (N.D. Ga. Mar. 17, 2020), *aff'd in relevant part*, 999 F.3d 1247 (11th Cir. 2021), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431 (2021), *and cert. denied sub nom. Watkins v. Spector*, 142 S. Ct. 765 (2022) (rejecting objections to "completion and documentation of the claim form," which "procedures are routinely required in other settlements."); *Keegan v. Am. Honda Motor Co, Inc.*, No. 10-cv-09508 MMM (AJWx), 2014 WL 12551213, at *15 (C.D. Cal. Jan. 21, 2014) ("Courts frequently approve settlements that require class members to submit receipts or other documentation" and "find that such a requirement is reasonable and fair") (citing cases); *In re Phenylpropanolamine (PPA) Prods. Liab.*, 227 F.R.D. 553 (W.D. Wash. 2004) (incorporating extensive settlement claim questionnaires requiring supporting documentation).

While the Privacy Act mandates proof of actual damage, Class Counsel have ensured that the Settlement notice and claim procedures include a series of coordinated measures to facilitate claims.  The continuing notice efforts through social media, federal employee union, and other channels will lead to increased awareness of the settlement over time; correspondingly, the claim period will extend for longer than usual—until 200 days after preliminary approval.  (Girard Decl. ¶ 18.)  The claim form has been carefully designed, in consultation with the experienced Claims Administrator, for ease of understanding and use.  (*Id.*)  Class members can conveniently file online and call live agents toll-free with questions or for help with filing a claim, and Class Counsel will also be available to assist claimants and answer their questions.  (*Id.*)

Finally, OPM's payment under the Settlement will be funded by taxpayer dollars, and even in a class settlement with a private defendant, "escheat to the government" may be a suitable means of disposing of unclaimed funds. *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990). The Settlement's residual-funds provision (SA § V.C.9) does not apply to Peraton and is reasonable, including because, as compared with a charity, "government may be a better provider of services in behalf of the class's interests" in data protection. 4 William B. Rubenstein, *Newberg on Class Actions* § 12:31 (5th ed.) (citations omitted). The parties' agreed-on approach to residual settlement funds also is consistent with cases such as *In re Motor Fuel Temperature Sales Practices Litigation*, where Judge Vratil preliminarily approved a settlement providing for escheat in the absence of a suitable *cy pres* recipient. No. 07-MD-1840-KHV, 2012 WL 5876558, at *6 & n.11 (D. Kan. Nov. 20, 2012); *see also, e.g.*, *In re Folding Carton Litig.*, 744 F.2d 1252, 1254-55 (7th Cir. 1984) (rejecting *cy pres* and mandating escheat of settlement funds); *SEC v. Bear, Stearns & Co. Inc.*, 626 F. Supp. 2d 402, 420 (S.D.N.Y. 2009) (ordering that any unclaimed funds in settlement benefiting investors be transferred to the Treasury Department).

**D.      Plaintiffs and Class Counsel Support the Settlement.**

The "reaction of the class" and the "opinion of experienced counsel" also factor into the Court's determination of the Settlement's reasonableness. *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 105. While it is too soon to gauge the response of the Class, the Settlement is supported by all of the Named Plaintiffs and Class Representatives, as well as by Class Counsel. (Girard Decl. ¶ 23.) *See, e.g.*, *Stewart v. Rubin*, 948 F. Supp. 1077, 1087 (D.D.C. 1996) ("A court should defer to the judgment of experienced counsel who have competently evaluated the strength of the proof."); *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 106; *Osher*, 945 F. Supp. at 304; *see also In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 WL 3341200, at *7 (approving settlement: "Class counsel . . . are experienced in the area of class actions and theft of private

26

information."); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("'[G]reat weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts") (citations omitted).

For these reasons, the Settlement falls well within the range of possible approval and should be preliminarily approved by the Court.

## II.   SETTLEMENT CLASS CERTIFICATION IS LIKELY.

The Settlement Class is cohesive, objectively defined, and likely to be certified upon entry of judgment. *See* Fed. R. Civ. 23(e)(1). Class certification is appropriate if all Rule 23(a) subdivisions and at least one Rule 23(b) subdivision are satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Plaintiffs seek class certification under Rule 23(b)(3) for settlement purposes only. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

### A.   Rule 23(a) Is Met.

#### 1.   The Class Members are too numerous for their claims to be feasibly joined.

Numerosity under Rule 23(a)(1) is satisfied because the Data Breaches exposed the personal information of approximately 22 million individuals (Glasgow Decl. ¶ 9), giving rise to an inference that there are at least thousands of Class members. *See Hoyte v. District of Columbia*, 325 F.R.D. 485, 490 (D.D.C. 2017) (numerosity may be presumed if there are 40 class members, and "can be satisfied so long as there is a reasonable basis for the estimate provided.") (emphasis and citation omitted).

#### 2.   The Data Breaches and their consequences are common issues that apply to all Class Members.

The commonality requirement of Rule 23(b)(2) also is met. *See Brown v. District of Columbia*, 928 F.3d 1070, 1080 (D.C. Cir. 2019) (requiring a "common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that

is central to the validity of each one of the claims in one stroke.") (citation omitted); *In re District of Columbia*, 792 F.3d 96, 100 (D.C. Cir. 2015) (even a single common question may suffice). Questions common to all Class members are at the heart of Plaintiffs' claims and include whether OPM violated the Privacy Act's safeguards provision, whether Peraton committed actionable state-law violations, and whether the harm that Class members allegedly experienced was caused by such violations.

### 3.    Plaintiffs' claims are typical of the Class.

Similarly, Plaintiffs' claims are typical of the Class under Rule 23(a)(3) because they arise from the same cyber intrusions and course of conduct—Defendants' alleged gross negligence in failing to secure sensitive data—and assert the same legal theories. *See Hardy v. District of Columbia*, 283 F.R.D. 20, 25 (D.D.C. 2012) (a claim is "typical if it arises from the same event or practice or course of conduct that gives rise to a claim of another class member's where his or her claims are based on the same legal theory.") (citation omitted).

### 4.    Plaintiffs and Class Counsel are adequate representatives.

As Rule 23(a)(4) requires, Plaintiffs adequately represent the Class.  Their interests in this litigation do not conflict with those of any Class member.  They vigorously pursued the class claims, communicated with their attorneys, provided evidence, and evaluated settlement terms. *See Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997).  All Plaintiffs support the Settlement, whether or not they are eligible to make a claim or the Court approves any service awards.  (Girard Decl. ¶ 23.)

The Court previously appointed Interim Class Counsel and a Plaintiffs' Steering Committee (Dkt. # 58), who are experienced and have demonstrated their skills and commitment to pursuing the Class members' best interests, including by negotiating a fair and adequate resolution of their claims.  As such, the Court should appoint these attorneys as Class Counsel under Rule 23(g). *See,*

*e.g.*, *Hardy*, 283 F.R.D. at 25 ("The Court is satisfied that Plaintiffs and counsel have met the adequacy requirement.").

**B.      Rule 23(b) Is Met.**

The predominance and superiority requirements of Rule 23(b)(3) are met as well.  All Class members had information in the breached databases, and the information security practices at issue did not vary from person to person.  *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1275 (11th Cir. 2021) (affirming settlement class certification where "all . . . claims arise out of the same unifying event, Equifax's data privacy breach.").   The key issues of the Government's willful conduct and Peraton's negligence are the same for each Class member and predominate.  *See, e.g.*, *Coleman v. District of Columbia*, 306 F.R.D. 68, 85-86 (D.D.C. 2015).  As this Court noted, "everybody put their data in the same box.  The box was either protected or unprotected in accordance with the necessary statutes or reasonable man standards"—so "[w]hether there was a breach of a duty isn't different from plaintiff A and plaintiff B."  (12/3/19 Hr'g Tr., Dkt. # 163, at 37-38.)  Thus, because these common questions "represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis."  *Brown v. District of Columbia*, No. CIV. A. 91-0132, 1991 WL 255458, at *3 (D.D.C. Nov. 15, 1991) (citing Wright & Miller, *Federal Practice & Procedure* § 1778).

Moreover, because the potential individual recoveries are relatively small, most breach victims lack incentive to retain counsel to assert individual claims.  *See Coleman*, 306 F.R.D. at 87-88 (superiority is "often found when use of the class action device would enable vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.  In such circumstances, multiple lawsuits would be costly and inefficient") (quotation marks, citations and alterations omitted).  Thus, a class action is a superior

means of resolving this controversy given the efficiencies and other benefits to be gained by resolving claims relating to the Data Breaches in a single proceeding.

## III.   THE NOTICE AND NOTICE PROGRAM WILL PROVIDE CLASS MEMBERS THE BEST NOTICE PRACTICABLE UNDER THE CIRCUMSTANCES.

The proposed Notice and Notice Plan meet all applicable requirements.  (*See* Azari Decl. ¶¶ 18-24, 59-63.)  The Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  "Notice need only be reasonably calculated to reach the class in order to satisfy due process."  *In re Domestic Airline Travel Antitrust Litig.*, 322 F. Supp. 3d 64, 68 (D.D.C. 2018).  Members of a class certified under Rule 23(b)(3) are entitled to the best notice that is practicable under the circumstances, including individual notice to members who can be identified through reasonable effort.  Fed. R. Civ. P. 23(c)(2)(B).  Such notice may accomplished via "electronic means, or other appropriate means."  Fed. R. Civ. P. 23(c)(2)(B). The Court's assessment of what is "the best notice . . . practicable" may be informed by the cost of providing different forms of notice and the availability and accuracy of records identifying class members.  *See In re Domestic Airline Travel*, 322 F. Supp. 3d at 70-72.

In this case, the Settlement Class members are presently unknown.  The Class comprising breach victims who experienced economic loss is far narrower than the group of 22 million victims, and attempting to mail notice to that entire group would result in notice expenses significantly out of proportion to the settlement fund.  (Glasgow Decl. ¶ 14; Azari Decl. ¶ 58.)  *See In re Domestic Airline Travel*, 322 F. Supp. 3d at 72 (approving notice plan in view of "large size of the class and the disproportionately higher cost of providing notification by direct mail . . . and considering that the e-mail notification will be supplemented by publication").  The Notice Plan consequently provides for individual notice by email to the 3,222,987 breach victims who signed up for the free credit monitoring—and whose demonstrated interest in self-protection makes them more likely to

be Class members—and to hundreds of thousands of others via AFGE's and NTEU's email listservs, with postcard notices used as backup.  (Girard Decl. ¶ 16; Azari Decl. ¶¶ 25-32; *see* Glasgow Decl. ¶¶ 13-15 (explaining that it is infeasible to obtain and securely use an email list for the entire federal workforce); Declaration of Michael V. Sorrento ("Sorrento Decl."), ¶ 2 (the Department of Defense database with records on Data Breach victims does not contain email addresses).)

"Receipt of actual notice by all class members is required neither by Rule 23 nor the Constitution."  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 232 (D.N.J. 1997) (citations omitted); *accord Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012). Direct notice is required to all class members whose names and addresses can be ascertained through reasonable effort.  *See, e.g.*, *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 92-93 (E.D.N.Y. 2007) (denying preliminary approval in part because notice plan failed to provide for mailed notice to the defendant's "easily accessible" class list); *Parker v. Time Warner Ent. Co., L.P.*, 239 F.R.D. 318, 335-36 (E.D.N.Y. 2007) (denying final approval where settlement did not provide for individual notice to former-subscriber class members whose outdated addresses could be updated at a cost that evidence suggested was "not prohibitively expensive" "in terms of the overall litigation").  But "[w]hen all class members *cannot* be identified . . . practical issues of effectuating notice arise and other methods, such as publication in newspapers or periodicals, are deemed sufficient."  *Pigford v. Veneman*, 355 F. Supp. 2d 148, 162 (D.D.C. 2005) (emphasis added).

Here, no amount of effort can identify the individuals who are Settlement Class members, as only they know if they incurred one of the defined forms of economic loss.  That makes this case analogous to *In re Agent Orange Product Liability Litigation*, 818 F.2d 145 (2d Cir. 1987), where the court deemed it unnecessary to send "overbroad" mailed notices to all 2.4 million Vietnam veterans since "far fewer . . . were exposed to Agent Orange.  A requirement that notice be given to

all Vietnam veterans would thus have been considerably overbroad." *Id*. at 169.  Nor is overly broad

mailed notice required in this case when attempting such a campaign would pose logistical and

security challenges related to highly confidential records maintained by DOD (Sorrento Decl. ¶¶ 2-

3; Glasgow Decl. ¶¶ 12-14) and would cost one-quarter of the settlement consideration (Azari Decl.

¶ 58), jeopardizing the parties' agreement, and where reasonable alternatives for reaching the Class

exist.  The *Agent Orange* principle therefore applies: "In striking the balance between protecting the

rights of absent class members and making Rule 23 workable, courts have held that it is not necessary

to send individual notices to an overinclusive group of people simply because that group contains

some additional class members whose identities are unknown." *Carlough v. Amchem Prods., Inc.*,

158 F.R.D. 314, 327 (E.D. Pa. 1993); *see also* 1 McLaughlin on Class Actions § 5:80; *Hughes v.

Kore of Ind. Enter., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013) (defining "*reasonable* effort" as "effort

commensurate with the stakes" and recognizing that "[w]hen reasonable effort would not suffice to

identify the class members, notice by publication, imperfect though it is, may be substituted.").

The several million individual notices to potential Class members will be supplemented by

a publication campaign that will extend for several weeks and include digital ads algorithmically

targeted based on the demographic composition of the federal workforce; digital ads on social media

platforms and other websites that Class members are likely to visit, such as federalsoup.com; a press

release; radio ads; and print ads in such publications as *Stars and Stripes*, the news outlet serving the

American military.  (Girard Decl. ¶ 17; Azari Decl. ¶¶ 33-54.)  The notice administrator estimates

that at least 80% of the Class will be reached and apprised of the Settlement through these publication

notice efforts.  (Azari Decl. ¶¶ 19, 60.)  *See, e.g.*, *NCAA Student-Athlete Concussion Injury Litig.*,

314 F.R.D. 580, 603 (N.D. Ill. 2016) (reach of 80% is "well within an acceptable range for class

actions."); *In re Domestic Airline Travel*, 322 F. Supp. 3d at 70-72.

The proposed Notice (SA, Ex. 1) directs potential Class members to the Settlement Website, where they can make a claim and read more about the Settlement, the litigation, and their options. The Notice is based on the Federal Judicial Center models.  (Azari Decl. ¶ 55.)  It provides all information required by Rule 23(c)(2)(B), including the nature of the action and the claims at issue, the class definition, the settlement benefits, Class members' rights to opt out or object to the Settlement, the binding effect of a class judgment, the date of the fairness hearing, and other relevant information for Class members to make informed decisions with respect to the Settlement.  *See In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 435 (3d Cir. 2016) ("[N]otice should contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights") (citation omitted).

The Notice Plan will provide the best notice practicable, and the Notice includes all required content.  Accordingly, the Notice and Notice Plan should be approved together with the Settlement.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the proposed order granting preliminary approval and authorizing the settlement notice and claim process.

DATED: May 6, 2022

Respectfully submitted,

**GIRARD SHARP LLP**

By:  /s/ *Daniel C. Girard*

Daniel C. Girard
Jordan Elias
Simon S. Grille
601 California Street
Suite 1400
San Francisco, CA 94108
(415) 981-4800
dgirard@girardsharp.com

*Interim Lead Class Counsel*

33

David H. Thompson
Peter A. Patterson
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036

Tina Wolfson
Theodore Maya
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue
Suite 500
Burbank, CA 91505

John Yanchunis
Marcio W. Valladares
Patrick A. Barthle II
**MORGAN & MORGAN COMPLEX
 LITIGATION GROUP**
201 North Franklin Street
7th Floor
Tampa, FL 33602

*Plaintiffs' Steering Committee*

Gary E. Mason
**MASON LLP**
5101 Wisconsin Avenue, N.W.
Suite 305
Washington, D.C. 20016

*Liaison Counsel*

Norman E. Siegel
Austin Moore
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road
Suite 200
Kansas City, MO 64112

*Additional Plaintiffs' Counsel*