# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN RE: U.S. OFFICE OF PERSONNEL
MANAGEMENT DATA SECURITY
BREACH LITIGATION

This Document Relates To:

ALL CASES

Misc. Action No. 15-1394 (ABJ)
MDL Docket No. 2664

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL
# APPROVAL OF CLASS ACTION SETTLEMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND .......................................................2

    A.    Plaintiffs' Allegations and Case Background .................................2

    B.    The Court's Ruling on the Motions to Dismiss and Appeal ......................3

    C.    Parties' Mediation and Negotiations ...............................................3

    D.    The Settlement ...................................................................................4

        1.    The Settlement Class and Settlement Release ................................4

        2.    The Settlement Consideration ........................................................5

        3.    Notice and Administration ..............................................................5

ARGUMENT ......................................................................................................................6

    I.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE. ...................7

    A.    The Settlement Is the Product of Informed Negotiations. .............................8

    B.    The Payments to Class Members Under the Settlement Are Adequate Given the Risks of Litigation. ...........................................................9

    C.    The Plan of Allocation Is Fair, Reasonable, and Adequate. .......................10

    D.    Plaintiffs and Class Counsel Support the Settlement. ................................11

    II.    THE SETTLEMENT CLASS MEETS THE REQUIREMENTS OF RULE 23. ....11

    A.    Rule 23(a) Is Met. ......................................................................................12

        1.    The Class members are sufficiently numerous. .............................12

        2.    The commonality requirement is satisfied. ....................................12

        3.    Plaintiffs' claims are typical of the Class. .....................................12

        4.    Plaintiffs are adequate Class representatives. .................................13

    B.    Rule 23(b)(3) Is Satisfied ..........................................................................13

    III.    THE SETTLEMENT CLASS HAS RECEIVED THE BEST NOTICE PRACTICABLE UNDER THE CIRCUMSTANCES. .........................................14

CONCLUSION ................................................................................................................15

## TABLE OF AUTHORITIES

**Cases**

*Alvarez v. Keystone Plus Constr. Corp.*,
　303 F.R.D. 152 (D.D.C. 2014) ................................................................. 11, 14

*Banks v. Booth*,
　2022 WL 1091212 (D.D.C. Apr. 12, 2022) ............................................... 7

*Brown v. District of Columbia*,
　928 F.3d 1070 (D.C. Cir. 2019) ............................................................... 12

*Ceccone v. Equifax Info. Servs. LLC*,
　2016 WL 5107202 (D.D.C. Aug. 29, 2016) ............................... 9, 10, 12, 13

*FAA v. Cooper*,
　566 U.S. 284, 296 (2012) ......................................................................... 10

*Greenberg v. Colvin*,
　2015 WL 4078042 (D.D.C. July 1, 2015) ................................................. 8

*Hardy v. District of Columbia*,
　283 F.R.D. 20 (D.D.C. 2012) .................................................................... 12

*Howard v. Liquidity Servs. Inc.*,
　2018 WL 4853898 (D.D.C. Oct. 5, 2018) ...................................... 8, 10, 11

*Hoyte v. District of Columbia*,
　325 F.R.D. 485 (D.D.C. 2017) .................................................................. 12

*Hubbard v. Donahoe*,
　958 F. Supp. 2d 116 (D.D.C. 2013) .......................................................... 9

*In re APA Assessment Fee Litig.*,
　311 F.R.D. 8 (D.D.C. 2015) ................................................................ 13, 14

*In re Black Farmers Discrimination Litig.*,
　856 F. Supp. 2d 1 (D.D.C. 2011) ......................................................... 14, 15

*In re District of Columbia*,
　792 F.3d 96 (D.C. Cir. 2015) ................................................................... 12

*In re Domestic Airline Travel Antitrust Litig.*,
　378 F. Supp. 3d 10 (D.D.C. 2019) ............................................................ 8

*In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., & "ERISA" Litig.*,
　4 F. Supp. 3d 94 (D.D.C. 2013) ............................................................... 10

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
　266 F. Supp. 3d 1 (D.D.C. 2017) ............................................................. 3

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
    928 F.3d 42 (D.C. Cir. 2019) ........................................................................... 3

*Little v. Wash. Metro. Area Transit Auth.*,
    313 F. Supp. 3d 27 (D.D.C. 2018) ................................................................... 8

*Prince v. Aramark Corp.*,
    2017 WL 9471949 (D.D.C. Mar. 14, 2017) .................................................. 13

*Rogers v. Lumina Solar, Inc.*,
    2020 WL 3402360 (D.D.C. June 19, 2020) ........................................... *passim*

*Stephens v. Farmers Rest. Grp.*,
    2019 WL 2550674 (D.D.C. June 20, 2019) ..................................................... 7

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) .................................................................................. 10

**Statutes**

Privacy Act of 1974, 5 U.S.C. § 552a ........................................................... 4, 11

**Rules**

Fed. R. Civ. P. 23(a) ...................................................................................... 6, 11

Fed. R. Civ. P. 23(a)(1) ....................................................................................... 12

Fed. R. Civ. P. 23(b)(2) ....................................................................................... 12

Fed. R. Civ. P. 23(b)(3) ...................................................................... 6, 11, 13, 14

Fed. R. Civ. P. 23(c)(2) ....................................................................................... 15

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................. 6, 14

Fed. R. Civ. P. 23(e) .............................................................................................. 8

Fed. R. Civ. P. 23(e)(2) ..................................................................................... 7, 8

Fed. R. Civ. P. 23(e)(2)(D) ................................................................................. 10

## INTRODUCTION

Plaintiffs respectfully request the Court grant final approval of their settlement with Defendants U.S. Office of Personnel Management and Peraton Risk Decision Inc. benefitting those who suffered pecuniary harm from the OPM data breaches. Since the Court granted preliminary approval on June 16th, the Claims Administrator has carried out the notice program, causing emails to be sent to more than 3 million victims of the breach, and implementing the publication notice campaign that will continue for several weeks. AFGE has sent notice to its membership as well. There have been 8,482 claims to date. Additionally, as of this filing, the Claims Administrator has received one objection and 32 opt-out requests. *See* Declaration of Cameron Azari ("Azari Decl."), ¶¶ 46-47. Plaintiffs will update the Court on the number of opt-outs and respond to all objections in their reply brief due September 23rd.

Because the settlement disposes of this litigation in a fair and adequate manner, the Court should grant final approval, allowing the claim process to conclude. The settlement was reached after hard-fought litigation that gave the parties a sound understanding of the facts and the strengths and weaknesses of the case. A product of lengthy negotiations assisted by two experienced judges, the settlement will compensate breach victims who suffered economic loss from the data breaches. The parties agree these individuals are eligible to pursue claims under the Privacy Act. The parties' compromise, forged over time, is fair to all concerned: those without actual damages will not be releasing their claims, and all breach victims remain eligible for the Government's offer of free identity protection services, reiterated in the notice. The current number of claims—closing in on ten thousand—suggests that while thousands of class members will participate, the fund should be adequate to pay all claims in full. Moreover, while settlements often provide only a small fraction of the potential recovery, the $700 recoveries here represent 70% of available statutory damages and

class members may also recover their actual damages up to $10,000. The terms of the settlement also fairly balance Plaintiffs' interest in facilitating claims with the parties' common concern that the settlement fund be protected from meritless or fraudulent claims. The settlement is particularly favorable considering the risks of continued litigation: Plaintiffs would have faced class certification issues and likely state secrets confidentiality barriers to evidence of OPM's data security practices and protocols, as well as risks related to the Privacy Act's actual-damage limitation, and questions of causation. Class Counsel have also applied for attorneys' fees and reimbursement of litigation expenses, but these will be paid separately by OPM and will not reduce the class recovery.

For the reasons stated further below, the Court should grant final approval of the settlement.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.      Plaintiffs' Allegations and Case Background

In the summer of 2015, OPM announced that its electronic systems had been breached and hackers had taken the personal information of over 21 million current, former, and prospective federal employees and members of their families. Am. Compl., Dkt. # 189, ¶¶ 1-2, 123-26. The hackers obtained sensitive information such as birthdates, Social Security numbers, fingerprints, personal histories, and even psychological and emotional health information. *Id*. ¶¶ 52, 129. At the time of the Data Breaches, OPM contracted with Peraton (then known as KeyPoint) to perform investigative work for federal background and security clearance checks. *Id*. ¶¶ 60-61; OPM Answer, Dkt. # 154, ¶ 76. OPM's and Peraton's systems were electronically linked. On November 1, 2013, hackers infiltrated OPM's network and stole documents showing how its systems were structured. Am. Compl. ¶¶ 61, 110. The next month, hackers used the stolen information to breach Peraton's systems—it remains unknown if any of the Plaintiffs' information was taken in this breach. *Id*. ¶ 99. Hackers then used Peraton log-in credentials to infiltrate OPM's electronic network. *Id*. ¶¶ 4, 6, 112. These intrusions affected approximately 22 million people. *Id*. ¶ 141.

In September 2015, OPM made identity theft protection and credit monitoring and restoration services available to the breach victims at a cost of $154 million. *Id.* ¶¶ 134-35. Congress extended these services through September 2026. *Id.* ¶ 136. As of March 31, 2022, 3,222,987 people had signed up for the free identity protection services. *See* Declaration of Daniel C. Girard ("Girard Decl."), ¶ 6; Declaration of Marcus J. Glasgow ("Glasgow Decl."), Dkt. # 188-10, ¶ 16.

After OPM announced the data breaches in June 2015, a number of class actions were filed against OPM and Peraton. On October 9, 2015, the Judicial Panel for Multidistrict Litigation ordered the centralization of these related cases in this Court. Girard Decl. ¶ 7. On January 18, 2016, the Court appointed interim lead and liaison counsel together with a Plaintiffs' steering committee. Dkt. # 58. Plaintiffs filed their consolidated amended complaint on March 14, 2016. Dkt. # 63.

### B.      The Court's Ruling on the Motions to Dismiss and Appeal

On May 13, 2016, Defendants separately moved to dismiss Plaintiffs' claims. Dkt. # 70, 72. The Court heard argument on those motions on October 31 and November 10, 2016. Dkt. # 98, 104. On September 19, 2017, the Court dismissed Plaintiffs' claims for lack of Article III standing and failure to state a claim under the Privacy Act, the Administrative Procedure Act, and the Little Tucker Act, and also dismissed Plaintiffs' claims against Peraton as barred by derivative sovereign immunity. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 266 F. Supp. 3d 1 (D.D.C. 2017). Plaintiffs appealed, and the D.C. Circuit reversed in part in a *per curiam* decision issued June 21, 2019. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019).

### C.      Parties' Mediation and Negotiations

After remand, on January 27, 2020, the Court referred the parties to private mediation with retired federal District Judge Lawrence F. Stengel. Girard Decl. ¶ 13. The parties held separate conference calls and video sessions with Judge Stengel in 2020 to discuss their positions and exchanged relevant information under his supervision. *Id.* After the referral to Judge Stengel expired,

the parties continued negotiating and the Court approved extensions of time for these discussions to proceed. *Id*. ¶ 15. Progress was slow, and at several points the parties reached what seemed to be insurmountable impasses, but they continued talking and eventually jointly requested a referral to Judge Bates, to whom this Court referred the negotiations on July 30, 2021. *Id*. The parties ultimately agreed that the settlement class would be limited to individuals who incurred specific forms of pecuniary loss resulting from the Data Breaches, and that claimants would receive minimum payments of $700. *Id*. ¶ 16.

### D. The Settlement

#### 1. The Settlement Class and Settlement Release

On May 5, 2022, the parties signed the Settlement Agreement ("SA"). [1] The Settlement is made on behalf of:

> All U.S. citizens and permanent residents whose personal information was compromised as a result of the breaches of the U.S. Office of Personnel Management's electronic information systems in 2014 and 2015 or the breach of Peraton's electronic information systems in 2013 and 2014, and who, after May 7, 2014, suffered out-of-pocket expense or loss of compensable time: (1) to purchase a credit monitoring product, credit or identity theft protection product, or other product or service designed to identify or remediate the data breaches at issue in this case; (2) to access, freeze or unfreeze a credit report with a credit reporting agency; or (3) as a result of an identity theft incident or to mitigate an identity theft incident.

SA § II.B.2. The settlement Class is limited to individuals who incurred actual damages because only those individuals have a claim against OPM under the Privacy Act of 1974, 5 U.S.C. § 552a, the only available avenue of relief against OPM on remand. Class members will release all claims that were or could have been asserted in the case. SA § IV.B.1. Those who did not suffer economic loss from the Data Breaches are not members of the settlement Class and will not release any claims.

---

[1] Unless otherwise noted, all capitalized terms have the meaning ascribed to them in the Settlement Agreement.

### 2.        The Settlement Consideration

Under the Settlement, Defendants will pay a total of $63,000,000 into the settlement fund: OPM will pay $60,000,000 and Peraton will pay $3,000,000. SA §§ III.A, III.B. OPM also agreed to pay the costs of settlement notice and claims administration, and attorneys' fees and expenses as awarded by the Court, but these will be paid separately from the settlement fund. Peraton will not be responsible for any attorneys' fees or expenses (SA §§ II.B.12, V.A, VI.A), but any service payments awarded by the Court will be paid out of Peraton's contribution to the fund (SA § VI.B).

The minimum payment for valid claims under the Settlement will be $700, but a Class member with a documented loss exceeding $700 will be paid according to the proof submitted, up to $10,000. SA § V.C.7. The Settlement compensates Class members for their unreimbursed monetary expenses and lost compensable time between May 7, 2014 through January 31, 2022. SA §§ II.B.20, V.C.4.a. The categories of compensable harm cover the forms of "actual damage" caused by the Data Breaches: costs, expenses, losses, or charges incurred as a result of identity theft or identity fraud; costs of placing or removing a credit freeze on a Class member's credit file with any credit reporting agency; credit or identity theft protection costs; and the costs of other products or services designed to identify identity theft or remediate the effects of the Data Breaches. SA § V.C.4.c. Lost time will also be compensable if it resulted in quantifiable harm, such as taking time off from hourly work or using paid time off from salaried work, and if the lost time constitutes reasonable time spent in connection with purchasing credit monitoring or identity theft protection services, freezing or unfreezing a credit report with a credit reporting agency, or responding to an identity theft incident. *Id.*

### 3.        Notice and Administration

The Court's Preliminary Approval Order appointed Epiq Class Action & Claims Solutions, Inc. ("EPIQ") as the Claims Administrator and approved the Notice Plan. Dkt. # 193 at 6. The Notice

Plan lays out a multistep program for notifying Class members of the Settlement and their rights. The Notice provides all information required by Rule 23(c)(2)(B) and directs potential Class members to the dedicated Settlement Website, where they can make a claim and learn more about the Settlement and their options. *See* www.opmdatabreach.com.

After preliminary approval, the Claims Administrator caused the email and U.S. mail notices to be sent and implemented the publication campaign, which will run for several weeks. Azari Decl. ¶¶ 9-42. Between the 2,761,698 emails sent by IDX (the company providing credit monitoring to breach victims) and the 921,264 emails sent by EPIQ to AFGE union members, well over 3.6 million emails have been sent to potential Class members notifying them of the Settlement. *Id.* ¶¶ 9-14. Postcard notices also have been and will continue to be sent. *Id.* ¶¶ 15-18. With respect to the digital advertising campaign, the banner notices will generate more than 734 million impressions, and the sponsored search listings will continue through the December 23rd claim-filing deadline. *Id.* ¶¶ 27, 30. As of July 19th, the Settlement Website has experienced 172,713 unique visits and there have been 1,243 calls to the toll-free number, with live operators handling 385 incoming calls and 113 outbound calls. *Id.* ¶¶ 42, 44. The Claims Administrator has received 32 opt-out requests, one objection, and 8,482 claims. *Id.* ¶¶ 46-47.

## ARGUMENT

As recognized in the Preliminary Approval Order, the Settlement "confers substantial benefits upon the Class" and "is the product of non-collusive arm's-length negotiations," and is "fair, reasonable, and adequate, and in the best interest of Named Plaintiffs and Class Members[.]" Dkt. # 193 at 5. The Court further concluded that it would likely be able to certify the settlement Class under Federal Rules of Civil Procedure 23(a) and (b)(3). *Id.* at 3. Nothing has occurred since then that would change the Court's preliminary conclusions regarding the Settlement. *See Stephens*

*v. Farmers Rest. Grp.*, No. CV 17-1087 (TJK), 2019 WL 2550674, at *3 (D.D.C. June 20, 2019) (" . . . no reason to depart from the conclusion here").

The Settlement provides substantial relief beyond the Government-funded free identity protection services, and is adequate in all respects. A result of protracted negotiations, the Settlement provides minimum cash payments of $700 for Class members' compensable lost time and the out-of-pocket losses they are most likely to have incurred on account of the Data Breaches: the costs of credit monitoring or identity theft protection services, or of freezing or unfreezing a credit report, or costs incurred as a result of taking any other self-protective or identity-theft mitigating action as a result of the Data Breaches (however small the expense). The Settlement thus appropriately limits recovery to claims recognized under the Privacy Act. Claims will be paid upon a showing of economic loss from the Data Breaches sustained at any time over nearly eight years.

As noted above, since the Court granted preliminary approval, notice has been given to Class members via email to millions of breach victims, supplemented by union efforts and a targeted publication campaign. Azari Decl. ¶¶ 9-42. Lead Counsel have also directly advised dozens of claimants on how they can make a claim. Girard Decl. ¶ 19.

## I.      THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

"Federal Rule of Civil Procedure 23(e)(2) directs that the Court may approve a proposed class action settlement 'only after a hearing' and 'only on finding that it is fair, reasonable, and adequate[.]" *Banks v. Booth*, No. 1:20-CV-849 (CKK), 2022 WL 1091212, at *2 (D.D.C. Apr. 12, 2022); *see Kinard v. E. Capitol Fam. Rental, L.P.*, 331 F.R.D. 206, 212 (D.D.C. 2019) (discussing standard for final approval). "Whether to approve a proposed settlement agreement is ultimately within the discretion of the reviewing court" and the court's consideration should be "constrained by the 'principle of preference' favoring and encouraging settlement in appropriate cases.'" *Stephens*,

2019 WL 2550674, at *3 (quoting *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 103 (D.D.C.

2004)); *see In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 16 (D.D.C. 2019)

(noting the strong public policy in favor of settlement). "In this Circuit, there is no single test for

evaluating a proposed settlement under Rule 23(e)" but courts generally "examine[] the following

factors: (a) whether the settlement is the result of arms-length negotiations; (b) the terms of the

settlement in relation to the strength of plaintiffs' case; (c) the stage of the litigation proceedings at

the time of settlement; (d) the reaction of the class; and (e) the opinion of experienced counsel."

*Greenberg v. Colvin*, No. 13-1837 (RMC), 2015 WL 4078042, at *3 (D.D.C. July 1, 2015) (citation

omitted) (alterations in original). The Settlement satisfies all requirements of Rule 23(e).

## A.    The Settlement Is the Product of Informed Negotiations.

A presumption of "fairness, adequacy, and reasonableness" applies when a settlement

follows arm's length negotiations between experienced counsel who are fully informed of the merits

of the claims and defenses in the case. *Kinard*, 331 F.R.D. at 215 (citations omitted). The Settlement

here is the result of lengthy efforts by experienced counsel after more than two years of negotiations

assisted at times by two veteran federal judges. Girard Decl. ¶¶ 13-17; *see Little v. Wash. Metro.*

*Area Transit Auth.*, 313 F. Supp. 3d 27, 36 (D.D.C. 2018) ("The parties provided a detailed

description of the settlement negotiations, which took place over a two-year period and included

multiple days of discussions with an experienced, neutral mediator."); *Howard v. Liquidity Servs.*

*Inc.*, No. CV 14-1183 (BAH), 2018 WL 4853898, at *4 (D.D.C. Oct. 5, 2018) ("The sophistication

and experience of counsel support the arm's-length nature of the negotiations in this case, and the

length and nature of the settlement negotiations further support this conclusion."); *see also* Fed. R.

Civ. P. 23(e)(2) advisory committee's note (2018) (stating that "involvement of a neutral" in

negotiations "may bear on whether they were conducted in a manner that would protect and further

the class interests.").

8

Plaintiffs, the Government, and Peraton reached the Settlement only after being fully informed of the strengths and weaknesses of the claims and defenses in this case through analysis of the 231-page Congressional report and of information exchanges conducted under the mediator's supervision. Girard Decl. ¶ 13. The negotiations addressed the complex nature of the issues implicated by this case, such as the Government's partial immunity under the Privacy Act. *Id.* ¶¶ 14-16. Class Counsel had sufficient information to assess the risks of litigation and the probability of success and the potential range of recovery. The resulting Settlement is, therefore, reasonable. *See Hubbard v. Donahoe*, 958 F. Supp. 2d 116, 121 (D.D.C. 2013); *see, e.g.*, *Kinard*, 331 F.R.D. at 216 ("Both parties represent that they have now exchanged sufficient information to accurately assess the relative strengths of their claims and defenses, and the risks of continuing the litigation.").

**B.    The Payments to Class Members Under the Settlement Are Adequate Given the Risks of Litigation.**

The "most important factor in evaluating a proposed class settlement" is consideration of its terms in relation to the strength and weakness of the plaintiffs' case. *Ceccon*, 2016 WL 5107202, at *9; *Rogers v. Lumina Solar, Inc.*, No. 18-CV-2128 (KBJ), 2020 WL 3402360, at *9 (D.D.C. June 19, 2020). Only a handful of data breach class actions have been certified for trial, and Plaintiffs confronted risks associated with proving liability and damages at trial and in any post-trial appeal. This Court recognized the obstacles Plaintiffs would need to overcome in order to gain any recovery, noting that this case "is different in marked ways from the kinds of cases" involving more common data breaches. Indeed, even if Plaintiffs could prevail on the question of Article III standing, that still would not "necessarily mean a monetary injury at the end of the day." Dkt. # 57, 1/28/2016 Hr'g Tr. at 29:11-17. Significant hurdles are raised by the Privacy Act's requirement of establishing "willful or intentional conduct" and by OPM's defenses, including its possible assertion of state secrets privilege. Prevailing against Peraton would have required overcoming its contractor preemption

defense, the economic loss rule, and difficulties with showing causation given the circumstances. Dkts. # 70, 148. Although a settlement may be reasonable even if it provides a small fraction of total damages, the $63 million fund provides a minimum payment of 70% of available statutory damages for valid claims, as well as payment of claimants' actual damages up to $10,000. *See Rogers*, 2020 WL 3402360, at *9 (approving settlement even though it provided only a small percentage of possible damages); *Howard*, 2018 WL 4853898, at *5 (granting final approval of settlement providing "approximately 4 percent to 14 percent of potentially recoverable damages"). Additionally, while the claims period is ongoing, all indications based on the early claims data are that the fund will be adequate to compensate all claimants in the agreed amounts. Girard Decl. ¶ 29.

Comparing the risks with the rewards thus weighs in favor of the settlement. *See Ceccone*, 2016 WL 5107202, at *10 (granting final approval of settlement and noting that class members were eligible to receive $717.60, which was at the high end of statutory damages).

**C.      The Plan of Allocation Is Fair, Reasonable, and Adequate.**

The Settlement treats all Class members equitably relative to each other under Federal Rule of Civil Procedure 23(e)(2)(D). "As with settlement agreements, courts consider whether distribution plans are fair, reasonable, and adequate"—such a plan need not be "perfect." *In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., & "ERISA" Litig.*, 4 F. Supp. 3d 94, 107 (D.D.C. 2013) (citations omitted). A plan for distributing a settlement fund is "sufficient," as here, if "there is 'a rough correlation' between the settlement distribution and the relative amounts of damages recoverable by Class Members." *Howard*, 2018 WL 4853898, at *7 (citations and alteration omitted).

Under the plan of allocation, only individuals with standing against OPM can make a claim. *See FAA v. Cooper*, 566 U.S. 284, 296 (2012) (requiring a pecuniary loss for recovery under Privacy Act); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (only class members with standing may recover). The Settlement's payment provisions balance the need for a straightforward

claim process that uses understandable, objective criteria with the obligation to protect the fund from meritless claims. SA § V. Valid claims for economic loss will be paid at $700, but claimants whose documented damages are greater will receive the actual amount (up to $10,000). SA § V.C.7. In the event the total claims exceed the available settlement funds, they will be reduced *pro rata* with no Class member obtaining any greater relative benefit over another. SA § V.C.8. This allocation structure "correlat[es]" with the Privacy Act's damage provision, 5 U.S.C. § 552a(g)(4)(A), and accordingly is fair, reasonable, and adequate. *Howard*, 2018 WL 4853898, at *7.

### D. Plaintiffs and Class Counsel Support the Settlement.

The "reaction of the class" and the "opinion of experienced counsel" should also factor into the Court's determination of the Settlement's reasonableness. *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 105. All Plaintiffs support the Settlement. *See Howard*, 2018 WL 4853898, at *6 (noting that all the class representatives fully supported the settlement). EPIQ carried out the Notice Plan and, as of July 19th, has received only one objection. Azari Decl. ¶ 46; Dkt. # 195. Class members have until September 9th to opt out or object. Dkt. # 193 at 2. Class Counsel will respond to objections and update the Court on the number of opt-outs and objections in their reply due September 23rd. *Id.* at 3.

Further, it is "well established that the opinion of experienced counsel should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement." *Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 164 (D.D.C. 2014) (citation omitted). Because Class Counsel—who are experienced in data breach and other complex litigation—support the Settlement, "this factor also weighs in favor of approval." *Id.* at 165.

For these reasons, the Settlement satisfies Rule 23(e) and should be granted final approval.

## II. THE SETTLEMENT CLASS MEETS THE REQUIREMENTS OF RULE 23.

The requirements of Rule 23(a) and Rule 23(b)(3) are satisfied for settlement purposes.

11

### A.    Rule 23(a) Is Met.

#### 1.    The Class members are sufficiently numerous.

The numerosity requirement under Rule 23(a)(1) is met because the Data Breaches exposed

the personal information of approximately 22 million individuals (Glasgow Decl. ¶ 9), raising an

inference that there are at least thousands of Class members. *See Hoyte v. District of Columbia*, 325

F.R.D. 485, 490 (D.D.C. 2017); *Ceccone*, 2016 WL 5107202, at *4 (finding "little doubt that the

joinder of so many members would be impracticable, and that the interests of judicial economy

would best be served by allowing these thousands of consumers to receive relief via a single action").

#### 2.    The commonality requirement is satisfied.

Commonality requires a "common contention . . . capable of classwide resolution—which

means that determination of its truth or falsity will resolve an issue that is central to the validity of

each one of the claims in one stroke." *Brown v. District of Columbia*, 928 F.3d 1070, 1080 (D.C.

Cir. 2019) (citation omitted); *see In re District of Columbia*, 792 F.3d 96, 100 (D.C. Cir. 2015) (a

single common question may suffice). In this case, the commonality requirement of Rule 23(a)(2) is

met because questions common to all Class members, such as whether OPM violated the Privacy

Act's safeguards provision, and whether Peraton committed actionable state-law violations, rest at

the heart of Plaintiffs' claims and a class-wide proceeding can generate common answers. *See*

*Ceccone*, 2016 WL 5107202, at *5 (commonality met because "[t]he class members' possible

avenues of recovery all arise from the basic questions of fact . . . and law").

#### 3.    Plaintiffs' claims are typical of the Class.

Under Rule 23(a)(3), a claim is "typical if it arises from the same event or practice or course

of conduct that gives rise to a claim of another class member's where his or her claims are based on

the same legal theory." *Hardy v. District of Columbia*, 283 F.R.D. 20, 25 (D.D.C. 2012) (citation

omitted). Plaintiffs' claims are typical of the Class members' claims with all arising from the Data

Breaches and from Defendants' common course of conduct and involving the same legal theories.
*See Ceccone*, 2016 WL 5107202, at *5 (finding typicality met because the plaintiffs' claims were
based on the same legal theory as other class members); *Kinard*, 331 F.R.D. at 214 (similar).

### 4. Plaintiffs are adequate Class representatives.

"Two criteria for determining the adequacy of representation are generally recognized: 1) the
named representative must not have antagonistic or conflicting interests with the unnamed members
of the class, and 2) the representative must appear able to vigorously prosecute the interests of the
class through qualified counsel." *Prince v. Aramark Corp.*, No. 16-CV-1477 (CKK), 2017 WL
9471949, at *3 (D.D.C. Mar. 14, 2017). Both criteria of Rule 23(a)(4) are met here. First, Plaintiffs
will adequately represent the Class as they have no antagonistic or conflicting interest with other
Class members. *See Rogers*, 2020 WL 3402360, at *4 (plaintiffs were adequate class representatives
where there was "no indicia in the record in this matter that there are any conflicts of interest between
the named plaintiff and the other members of the class"). All Plaintiffs support the Settlement,
regardless of whether they are eligible to make a claim or the Court approves their service awards.
Girard Decl. ¶ 32. Second, Class Counsel are experienced in data breach and other complex litigation
and have demonstrated their skills, creativity, and commitment to pursuing the Class members' best
interests for seven years, including by negotiating a fair and adequate resolution of their claims and
holding out against OPM's initial settlement offers. *In re APA Assessment Fee Litig.*, 311 F.R.D. 8,
15 (D.D.C. 2015) ("[T]he Court has no concerns about the quality or vigor of class counsel, who
have an extensive background in complex litigation and class actions, and have been appointed class
counsel in prior cases."); *Rogers*, 2020 WL 3402360, at *6 (similar).

### B. Rule 23(b)(3) Is Satisfied.

The predominance and superiority requirements of Rule 23(b)(3) are satisfied as well.

Generally, "predominance is met when there exists generalized evidence which proves or

13

disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." *Alvarez*, 303 F.R.D. at 162 (citation omitted). In this case, "everybody put their data in the same box," the Court observed, and "[t]he box was either protected or unprotected in accordance with the necessary statutes or reasonable man standards"— so "[w]hether there was a breach of a duty isn't different from plaintiff A and plaintiff B." 12/3/19 Hr'g Tr., Dkt. # 163, at 37-38. Thus, because all Class members had information in the breached databases, and the information security practices at issue did not vary from person to person, key liability questions in the case are the same for each Class member and predominate. *See Rogers*, 2020 WL 3402360, at *7 ("Given this unified course of conduct and singular legal theory, there is no need to examine the claims of each and every class member . . . .").

A class action is superior because the potential recovery for any individual Class member is relatively small and, as a result, each lacks incentive to retain separate counsel to pursue claims individually against the federal government. In sum, "the size of the class, the uniformity of issues regarding defendants' liability, and the impracticability—as a matter of cost versus reward—of individualized prosecution of these claims all weigh in favor of finding that class action adjudication is superior to other forms of adjudication." *In re APA*, 311 F.R.D. at 18.

## III. THE SETTLEMENT CLASS HAS RECEIVED THE BEST NOTICE PRACTICABLE UNDER THE CIRCUMSTANCES.

Any class certified under Rule 23(b)(3) is entitled to the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The notice must "clearly and concisely state in plain, easily understood language" several components of the action and the settlement. Fed. R. Civ. P. 23(c)(2)(B); *see In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 28 (D.D.C. 2011) ("When a class is certified and a settlement is proposed, the parties are required to provide class

14

members with the best notice practicable under the circumstances.") (quotation marks omitted).

The Court previously found the Notice Plan sufficient to apprise Class members of the proposed Settlement and their rights. Dkt. # 193 at 6. Following the Court's approval, EPIQ carried out the plan and estimates that at least 80% of the Class will be reached and apprised of the Settlement through these notice efforts. Azari Decl. ¶¶ 8, 52. Faced with national security and other practical limitations that prevented notifying all 22 million victims, the parties in consultation with EPIQ crafted a robust plan of notice with a large direct-notice effort. Girard Decl. ¶¶ 24-25. The notice has now been emailed or mailed to 2,761,983 people who signed up for the Government's free credit monitoring services, whose emails are known and whose interest in self-protection makes them more likely to be Class members. Azari Decl. ¶ 9. Notice has also been directly emailed to almost a million people using AFGE's email listserv. *Id*. ¶ 11; Girard Decl. ¶ 25. These direct notices are being supplemented by digital ads algorithmically targeted based upon the demographic composition of the federal workforce, including on social media platforms and other websites that Class members are likely to visit, as well as a press release, radio ads, and print ads. Azari Decl. ¶¶ 19-45; Girard Decl. ¶ 26. The Settlement Website, www.opmdatabreach.com, has hosted 172,713 unique visits, and the call center has received 1,243 calls. Azari Decl. ¶¶ 42, 44.

Class members have received the best notice practicable under the circumstances. *See In re Black Farmers*, 856 F. Supp. 2d at 28; *Rogers*, 2020 WL 3402360, at *8 (granting final approval after concluding that the class notice met requirements of Rule 23(c)(2)).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant final approval of the Settlement and enter the [Proposed] Final Approval Order and Judgment, submitted herewith, which is Exhibit 4 to the Settlement Agreement.

DATED: July 21, 2022

Respectfully submitted,

**GIRARD SHARP LLP**

/s/ *Daniel C. Girard*

Daniel C. Girard
Jordan Elias
Simon S. Grille
601 California Street
Suite 1400
San Francisco, CA 94108
(415) 981-4800
dgirard@girardsharp.com

*Lead Class Counsel*

David H. Thompson
Peter A. Patterson
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036

Tina Wolfson
Theodore Maya
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue
Suite 500
Burbank, CA 91505

John Yanchunis
Marcio W. Valladares
Patrick A. Barthle II
**MORGAN & MORGAN COMPLEX**
 **LITIGATION GROUP**
201 North Franklin Street
7th Floor
Tampa, FL 33602

*Plaintiffs' Steering Committee*

Gary E. Mason
**MASON LLP**
5101 Wisconsin Avenue, N.W.
Suite 305
Washington, D.C. 20016

*Liaison Counsel*

16

Norman E. Siegel
Austin Moore
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road
Suite 200
Kansas City, MO 64112

*Additional Plaintiffs' Counsel*