**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: U.S. OFFICE OF PERSONNEL MANAGEMENT DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To:<br>ALL CASES | Misc. Action No. 15-1394 (ABJ)<br>MDL Docket No. 2664 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS**

## TABLE OF CONTENTS


INTRODUCTION ..........1

OVERVIEW OF WORK PERFORMED BY CLASS COUNSEL ..........4

A. Initial Proceedings and Early Case Management ..........4

B. The Motions to Dismiss and Appeal ..........6

C. Settlement Negotiations and Approval ..........8

ARGUMENT ..........12

I. THE REQUESTED FEE IS REASONABLE AND SHOULD BE AWARDED. ..........12

A. The Court Should Calculate the Lodestar Using Class Counsel's Reasonable and Customary Hourly Rates in the Relevant Legal Markets. ..........14

B. A Comparison of the Risks of Continued Litigation to the Result Obtained Demonstrates the Reasonableness of the Requested Fee. ..........18

C. *Laffey* Does Not Apply. ..........20

D. Even if the *Laffey* Matrix Were to Apply, the Extended Delay and Risks Would Warrant Enhancing Its Rates. ..........25

E. The Court Should Use Class Counsel's Current Rates to Compensate for the Lengthy Delay in Payment. ..........26

F. The Number of Hours Class Counsel Devoted to This Litigation Is Reasonable. ..........28

G. A Percentage Cross-Check Confirms That the Requested Fee is Reasonable. ..........31

II. THE LITIGATION EXPENSES ARE REASONABLE AND SHOULD BE REIMBURSED. ..........32

III. THE COURT SHOULD GRANT SERVICE AWARDS TO PLAINTIFFS FOR THEIR YEARS OF SERVICE TO THE CLASS. ..........33

CONCLUSION ..........36

## TABLE OF AUTHORITIES

### Cases

*Action on Smoking & Health v. C.A.B.*,
724 F.2d 211 (D.C. Cir. 1984) ........ 27

*Adolph Coors Co. v. Truck Ins. Exch.*,
383 F. Supp. 2d 93 (D.D.C. 2005) ........ 25

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ........ 20

*Al-Quraan v. 4115 8th St. NW, LLC*,
123 F. Supp. 3d 1 (D.D.C. 2015) ........ 21

*American Immigration Council v. DHS*,
82 F. Supp. 3d 396 (D.D.C. 2015) ........ 25

*B.J. v. D.C.*,
2020 WL 8512639 (D.D.C. Nov. 9, 2020) ........ 25

*Berry v. Schulman*,
807 F.3d 600 (4th Cir. 2015) ........ 33

*Blum v. Stenson*,
465 U.S. 886 (1984) ........ 16, 17, 24

*Boeing v. Van Gemert*,
444 U.S. 472 (1980) ........ 31

*Bolden v. J & R Inc.*,
135 F. Supp. 2d 177 (D.D.C. 2001) ........ 24

*Borum v. Brentwood Vill., LLC*,
2020 WL 5291982 (D.D.C. Sept. 4, 2020) ........ 25

*Brady v. Air Line Pilots Ass'n*,
627 F. App'x 142 (3d Cir. 2015) ........ 33

*Brown v. Phillips Petroleum Co.*,
838 F.2d 451 (10th Cir. 1988) ........ 18

*Citizens for Responsibility & Ethics in Wash. v. DOJ*,
80 F. Supp. 3d 1 (D.D.C. 2015) ........ 25

*City of Riverside v. Rivera*,
477 U.S. 561 (1986) ........ 29

*Cobell v. Jewell*,
802 F.3d 12 (D.C. Cir. 2015) ........ 33, 36

*Cobell v. Norton*,
231 F. Supp. 2d 295 (D.D.C. 2002) ........ 14, 22

*Cook v. Niedert*,
142 F.3d 1004 (7th Cir. 1998) ........ 34

*Copeland v. Marshall*,
641 F.2d 880 (D.C. Cir. 1980) ........ 3, 27, 29, 32

*Covington v. D.C.*,
57 F.3d 1101 (D.C. Cir. 1995) ........ 13, 16, 21

*Craig v. D.C.*,
197 F. Supp. 3d 268 (D.D.C. 2016) ........ 28

*Craig v. Mnuchin*,
2018 WL 6079512 (D.D.C. Nov. 21, 2018) ........ 29

**DL v. D.C.*,
924 F.3d 585 (D.C. Cir. 2019) ........ *passim*

*Doe v. Prudential Ins. Co. of Am.*,
258 F. Supp. 3d 1089 (C.D. Cal. 2017) ........ 28

*Elec. Priv. Info. Ctr. v. DHS*,
218 F. Supp. 3d 27 (D.D.C. 2016) ........ 24

*Elec. Transaction Sys. Corp. v. Prodigy Partners Ltd., Inc.*,
2009 WL 3273920 (D.D.C. Oct. 9, 2009) ........ 24

*Eley v. D.C.*,
793 F.3d 97 (D.C. Cir. 2015) ........ 3, 21, 22

*Equal Rights Ctr. v. Washington Metro. Area Transit Auth.*,
573 F. Supp. 2d 205 (D.D.C. 2008) ........ 13

*FAA v. Cooper*,
566 U.S. 284 (2012) ........ 9

*FBI v. Fazaga*,
142 S. Ct. 1051 (2022) ........ 19

*Feld v. Fireman's Fund Ins. Co.*,
2020 WL 1140673 (D.D.C. Mar. 9, 2020) ........ 25

**Fox v. Vice*,
563 U.S. 826 (2011) ........ 2

*General Dynamics Corp. v. United States*,
563 U.S. 478 (2011) ........ 19

*Glasser v. Volkswagen of Am., Inc.*,
645 F.3d 1084 (9th Cir. 2011) .......... 31

*Gordon v. Chipotle Mexican Grill, Inc.*,
2019 WL 6972701 (D. Colo. Dec. 16, 2019) .......... 18

*Grice v. Pepsi Beverages Co.*,
363 F. Supp. 3d 401 (S.D.N.Y. 2019) .......... 34

*Hausfeld v. Cohen Milstein Sellers & Toll, PLLC*,
2009 WL 4798155 (E.D. Penn. Nov. 30, 2009) .......... 31

*Hawkins v. Ctr. for Spinal Surgery*,
2017 WL 6389679 (M.D. Tenn. June 21, 2017) .......... 29

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) .......... 18

*Hope Med. Enters., Inc. v. Fagron Compounding Serv., LLC*,
2022 WL 826903 (C.D. Cal. Mar. 14, 2022) .......... 17

*Howard v. Achievement Prep. Acad. Pub. Charter Sch.*,
2016 WL 1212409 (D.D.C. Mar. 8, 2016) .......... 13

*Howard v. Liquidity Servs. Inc.*,
2018 WL 4853898 (D.D.C. Oct. 5, 2018) .......... 33

*In re Anthem, Inc. Data Breach Litig.*,
2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) .......... 30

*In re Auction Houses Antitrust Litig.*,
197 F.R.D. 71 (S.D.N.Y. 2000) .......... 20

*In re Auto. Parts Antitrust Litig.*,
2019 WL 13090127 (E.D. Mich. Dec. 29, 2019) .......... 15, 22

*In re Black Farmers Discrimination Litig.*,
953 F. Supp. 2d 82 (D.D.C. 2013) .......... 30, 31

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
2010 WL 3341200 (W.D. Ky. Aug. 23, 2010) .......... 18, 30

*In re Domestic Airline Travel Antitrust Litig.,*
2019 WL 5135424 (D.D.C. May 14, 2019) .......... 33

*In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig.*,
2018 WL 2722458 (D.N.J. May 10, 2018) .......... 35

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
4 F. Supp. 3d 94 (D.D.C. 2013) .......... 32

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) .......... 31

[*] *In re Home Depot Inc.*,
931 F.3d 1065 (11th Cir. 2019) .......... *passim*

*In re Lidoderm Antitrust Litig.*,
2018 WL 4620695 (N.D. Cal. Sept. 20, 2018) .......... 15

[*] *In re Lorazepam & Clorazepate Antitrust Litig.*,
2003 WL 22037741 (D.D.C. June 16, 2003) .......... 33, 36

*In re Lorazepam & Clorazepate Antitrust Litig.*,
205 F.R.D. 369 (D.D.C. 2002) .......... 29

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) .......... 33

*In re Sealed Case*,
494 F.3d 139 (D.C. Cir. 2007) .......... 19

*In re SmithKline Beckman Corp. Sec. Litig.*
751 F.Supp. 525 (E.D. Pa. 1990) .......... 12

*In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*,
2016 WL 6902351 (N.D. Ga. Aug. 23, 2016) .......... 18

*In re TransPerfect Glob., Inc.*,
2021 WL 1711797 (Del. Ch. Apr. 30, 2021) .......... 16

*In re U.S. Bancorp Litig.*,
291 F.3d 1035 (8th Cir. 2002) .......... 33

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
138 F. Supp. 3d 1379 (J.P.M.L. 2015) .......... 5

[*] *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
266 F. Supp. 3d 1 (D.D.C. 2017) .......... 8, 19

[*] *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
928 F.3d 42 (D.C. Cir. 2019) .......... 8, 19

*In re United States*,
872 F.2d 472 (D.C. Cir. 1989) .......... 19

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
746 F. App'x 655 (9th Cir. 2018) .......... 31

*Jackson v. Wells Fargo Bank, N.A.*,
136 F. Supp. 3d 687 (W.D. Pa. 2015) .......... 32

*James v. D.C.*,
302 F. Supp. 3d 213 (D.D.C. 2018) ..... 28

*Johnson v. Georgia Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974) ..... 18

*Johnson v. NPAS Sols., LLC*,
975 F.3d 1244 (11th Cir. 2020) ..... 33

*Judicial Watch, Inc. v. DOJ*,
774 F. Supp. 2d 225 (D.D.C. 2011) ..... 24

*Karraker v. Rent-A-Ctr., Inc.*,
492 F.3d 896 (7th Cir. 2007) ..... 35

*Kattan by Thomas v. D.C.*,
995 F.2d 274 (D.C. Cir. 1993) ..... 14, 21, 22

*Keepseagle v. Perdue*,
334 F. Supp. 3d 58 (D.D.C. 2018) ..... 14

*Keepseagle v. Perdue*,
856 F.3d 1039 (D.C. Cir. 2017) ..... 33

*Kinard v. E. Capitol Fam. Rental, L.P.*,
331 F.R.D. 206 (D.D.C. 2019) ..... 34, 35

*Laffey v. Nw. Airlines, Inc.*,
572 F. Supp. 354 (D.D.C. 1983) ..... 3

*Laffey v. Nw. Airlines, Inc.*,
746 F.2d 4 (D.C. Cir. 1984) ..... 3, 24

*LeBlanc-Sternberg v. Fletcher*,
143 F.3d 748 (2d Cir. 1998) ..... 27

*Low v. Trump Univ., LLC*,
246 F. Supp. 3d 1295 (S.D. Cal. 2017) ..... 35

*Makray v. Perez*,
159 F. Supp. 3d 25 (D.D.C. 2016) ..... 25

*Mattachine Soc'y of Wash., D.C. v. DOJ*,
406 F. Supp. 3d 64 (D.D.C. 2019) ..... 25

*McDonough v. Toys R Us, Inc.*,
80 F. Supp. 3d 626 (E.D. Pa. 2015) ..... 32

*McGee v. Ann's Choice, Inc.*,
2014 WL 2514582 (E.D. Pa. June 4, 2014) ..... 34

*Melito v. Experian Mktg. Sols., Inc.*,
923 F.3d 85 (2d Cir. 2019) ... 33

*Merrick v. D.C.*,
134 F. Supp. 3d 328 (D.D.C. 2015) ... 17

*Mills v. Electric Auto-Lite Co.*,
396 U.S. 375 (1970) ... 32

*Missouri v. Jenkins*,
491 U.S. 274 (1989) ... 27

*Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*,
675 F.2d 1319 (D.C. Cir. 1982) ... 14, 28

*Newport News Shipbuilding & Dry Dock Co. v. Holiday*,
591 F.3d 219 (4th Cir. 2009) ... 24

[*] *Perdue v. Kenny A. ex rel. Winn*,
559 U.S. 542 (2010) ... 22, 26, 28

*Petrovic v. Amoco Oil Co.*,
200 F.3d 1140 (8th Cir. 1999) ... 18

*Phillips v. Asset Acceptance, LLC*,
736 F.3d 1076 (7th Cir. 2013) ... 33

*Pickett v. Sheridan Health Care Ctr.*,
664 F.3d 632 (7th Cir. 2011) ... 23

*Planned Parenthood Sw. Ohio Region v. Dewine*,
931 F.3d 530 (6th Cir. 2019) ... 27

*Pleitez v. Carney*,
594 F. Supp. 2d 47 (D.D.C. 2009) ... 14, 24

*Prison Legal News v. Schwarzenegger*,
608 F.3d 446 (9th Cir. 2010) ... 23

*Radosti v. Envision EMI, LLC*,
760 F. Supp. 2d 73 (D.D.C. 2011) ... 34

*Reiter v. MTA New York City Transit Auth.*,
457 F.3d 224 (2d Cir. 2006) ... 27

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
2003 WL 21136726 (S.D.N.Y. May 15, 2003) ... 33

*Roberts v. City of Honolulu*,
938 F.3d 1020 (9th Cir. 2019) ... 24

*Rodriguez ex rel. Fogel v. City of Chicago*,
2013 WL 5348307 (N.D. Ill. Sept. 24, 2013)............................................................... 28

*Rodriguez v. HHS*,
91 Fed. Cl. 453 (2010), *aff'd*, 632 F.3d 1381 (Fed. Cir. 2011) ............................................ 21

*Rogers v. Lumina Solar, Inc.*,
2020 WL 3402360 (D.D.C. June 19, 2020)................................................................. 30

*Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*,
2021 WL 5174088 (Del. Ch. Nov. 8, 2021)................................................... 3, 17, 21

**Salazar ex rel. Salazar v. D.C.*,
809 F.3d 58 (D.C. Cir. 2015)........................................................................ 13, 17

*Save Our Cumberland Mountains, Inc. v. Hodel (SOCM)*,
857 F.2d 1516 (D.C. Cir. 1988)....................................................................... 3, 24

*Scott v. JPMorgan Chase Bank, N.A.*,
2018 WL 11409985 (D.D.C. Aug. 17, 2018) .............................................................. 33

*Stephens v. U.S. Airways Grp., Inc.*,
102 F. Supp. 3d 222 (D.D.C. 2015).......................................................................... 31

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
2021 WL 1851404 (D. Vt. May 10, 2021)..................................................................... 32

*Swedish Hosp. Corp. v. Shalala*,
1 F.3d 1261 (D.C. Cir. 1993)................................................................... 13, 22, 32

*Thomas v. Moreland*,
2022 WL 2168109 (D.D.C. June 16, 2022)................................................... 21, 22, 25

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)............................................................................................ 35

*Trombley v. Nat'l City Bank*,
826 F. Supp. 2d 179 (D.D.C. 2011).................................................................... 30, 34

*Vista Outdoor Inc. v. Reeves Fam. Tr.*,
2018 WL 3104631 (S.D.N.Y. May 24, 2018) ............................................................ 17, 22

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ............................................................................... 32

*Welborn v. IRS*,
218 F. Supp. 3d 64 (D.D.C. 2016).......................................................................... 18

**West v. Potter*,
717 F.3d 1030 (D.C. Cir. 2013)................................................................... 3, 26, 27

*Williams v. Gen. Elec. Cap. Auto Lease*,
1995 WL 765266 (N.D. Ill. Dec. 26, 1995) .......... 12

*Willner v. Manpower Inc.*,
2015 WL 3863625 (N.D. Cal. June 22, 2015) .......... 34

*Willson v. City of Bel-Nor, Mo.*,
2021 WL 2255003 (E.D. Mo. June 3, 2021) .......... 30

*Woburn Ret. Sys. v. Salix Pharms., Ltd.*,
2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017) .......... 32

*Woodland v. Viacom Inc.*,
255 F.R.D. 278 (D.D.C. 2008) .......... 25

**Other Authorities**

Andrew Maloney, *Aggressive Billing Rate Increases Appear Likely, but Can Clients Stomach It?* (The American Lawyer, Jan. 24, 2022) .......... 3, 15, 16

Charles Silver, *Due Process and the Lodestar Method: You Can't Get There from Here* 74 Tul. L. Rev. 1809 (2000) .......... 32

*David Boies Bills $1,950 Hourly in Google Case, Court Filing Shows* (Bankruptcy Court Decisions Weekly News & Comments, Vol. 71, Issue 15, June 20, 2022) .......... 3, 16

Roy Strom, *Big Law Rates Topping $2000 Leave Value "In Eye of Beholder"* (Bloomberg, June 9, 2022) .......... 3, 15, 16

## INTRODUCTION

After seven years of litigation and negotiation, Class Counsel secured a $63,000,000 settlement with Defendants U.S. Office of Personnel Management ("OPM") and Peraton Risk Decision Inc. ("Peraton") to compensate the victims of the OPM data breaches who suffered economic loss under the Privacy Act. Settlement Class members can receive payments of $700—70% of statutory damages—and up to $10,000 in actual damages. The Settlement is the result of Class Counsel's efforts, which included extensive briefing on Defendants' motions to dismiss, an appeal to the D.C. Circuit, and protracted negotiations that lasted over two years.

Class Counsel seek an award of $8,545,537.35 in attorneys' fees, which is their current lodestar. As of this filing, OPM has not taken a position on this request,[1] but regardless of its position, the Court should grant the requested fee as reasonable. Class Counsel have crafted a fair and creative resolution that provides generous payments to those with standing to sue the Government. Class counsel bore very real and substantial risks in order to obtain this significant relief for the class. Beyond the causation and standing questions presented in any data breach class action, the case involved risks arising from application of state secrets privilege to preclude access to key evidence and from the strict Privacy Act limitation on recovery. The reported link to China as a source of the breach further complicated the issues. Class Counsel overcame these obstacles and persisted through difficult negotiations to achieve the $63 million settlement, and they should be reasonably compensated for their professional time spent on this case.

[1] Consistent with the Court's recommendation that the parties explore resolution of the attorney fee application, Plaintiffs provided the Government with their detailed time entries and support for their expense reimbursement requests, and received initial feedback from the Government. Plaintiffs will continue these efforts to reach agreement with Government. *See* Declaration of Daniel C. Girard ("Girard Decl."), ¶ 64.

Lead Counsel fulfilled their duties to class members, advising them throughout the case, prosecuting the appeal, refusing to accept the Government's initial proposals, and marshaling the expertise and knowledge of a first-rate team of nationally recognized data breach attorneys—Tina Wolfson, John Yanchunis, Norman Siegel, and Gary Mason. Lead Counsel were aided further by David Thompson and Peter Patterson, experienced advocates in cases against the Government.[2] Lead Counsel thereby followed the Court's directive to "call upon the talent and expertise of the many other extremely well-qualified attorneys in the case . . . to aid in the many important tasks" of this litigation. Dkt. # 58. Class Counsel's work—which included framing the pleadings, developing legal strategies, consulting with experts, litigating motions,[3] obtaining the reversal, and negotiating the settlement, while also continuing to advise breach victims over the seven years—involved 10,750 hours of professional time and precluded other paying work. Girard Decl. ¶¶ 35, 63. These hours were reasonably spent on non-duplicative tasks and reflect appropriate staffing. Lead Counsel also continue to advise class members on a daily basis and perform other compensable work. As a result, their lodestar will continue to increase over time. *Id.* ¶¶ 19, 53.

The lodestar method applies to Class Counsel's request because the settlement agreement provides that fees will be determined separately from the fund. In calculating the lodestar, the Court should use Class Counsel's regular hourly rates—which are presumptively reasonable, have

[2] The team effort was apparent in our review of the daily timesheets, which Lead Counsel audited and submitted to the Government for further review and audit. Girard Decl. ¶ 61. These records will be provided *in camera* upon request, *id*., though Class Counsel do not believe it is necessary for the Court to perform its own further audit where the hours expended on the case appear objectively reasonable. *See Fox v. Vice*, 563 U.S. 826, 838 (2011) (holding that "[t]he essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection" and "trial courts need not, and indeed should not, become green-eyeshade accountants.").

[3] In addition to opposing Defendants' motions to dismiss (Dkt. # 83, 95, 103), on remand Class Counsel prepared a motion to maintain certain Plaintiffs' use of pseudonyms (Dkt. # 149), and responded to Peraton's preemption and other legal arguments (Dkt. # 156).

been approved by courts as reasonable, are currently being paid by hourly clients, and reflect their professional reputations and the skill necessary to bring this case to a successful conclusion. Class Counsel's rates are lower than the hourly rates being charged by other experienced counsel in their legal service markets, including the law firm representing Peraton.[4] The long contingency delay and high rate of inflation further support applying counsel's current market rates.

Hourly clients are paying in excess of $1,000 per hour for Class Counsel's legal services.[5] The Court should decline to apply the *Laffey* matrix given this disparity between its fixed rates and the market value of counsel's work. *Laffey* itself counsels in favor of applying Class Counsel's market rates by explaining that, "[f]or private law firms, the prevailing market rate for the firm's services is presumptively found in the firm's customary billing rates." *Laffey v. Nw. Airlines, Inc.*,

[4] Gibson Dunn's billing rates are referenced, for example, in *Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*, No. CV 2019-0585-PAF, 2021 WL 5174088 (Del. Ch. Nov. 8, 2021), where the court approved a partner's rate of $1,645 and cited recent decisions "finding partner rates ranging from $1,225 to $1,775 and associate rates of $695 to $1,120 to be reasonable." *Id*. at *5-6.

[5] *See* Girard Decl., Ex. A (Declaration of Corali Lopez-Castro ("Lopez-Castro Decl."), ¶ 5 (attesting that Girard Sharp's rates are currently being paid by an hourly client)). "Big Law" billing rates now consistently exceed $1,500. *See* Girard Decl., Ex. B (Roy Strom, *Big Law Rates Topping $2000 Leave Value "In Eye of Beholder"* (Bloomberg, June 9, 2022) (reporting that after "a two-year burst in demand," many partners at large law firms charge hourly rates of $2,000 or more)); Ex. C (Andrew Maloney, *Aggressive Billing Rate Increases Appear Likely, but Can Clients Stomach It?* (The American Lawyer, Jan. 24, 2022) (noting continued trend of "aggressive . . . increases" by large law firms as inflation "surges")); Ex. D (*David Boies Bills $1,950 Hourly in Google Case, Court Filing Shows* (Bankruptcy Court Decisions Weekly News & Comments, Vol. 71, Issue 15, June 20, 2022) (identifying partner rates of $2,465, $1,950, and $1,824); *see also infra* Section I.A (citing recent cases). The Court should apply Class Counsel's current rates to all work in the case given these conditions in the legal marketplace and the delay in payment. *See West v. Potter*, 717 F.3d 1030, 1034 (D.C. Cir. 2013); *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C. Cir. 1980).

746 F.2d 4, 24 (D.C. Cir. 1984).[6] Hence the *Laffey* matrix for D.C. public interest lawyers does not apply when the fee applicants, like Class Counsel, are private practitioners with paying clients.

The fee request is not only fully supported under the lodestar method but also confirmed by a percentage of the fund cross-check: If $8,545,537.35 in attorneys' fees and the $63 million settlement fund were treated as a constructive common fund, the fee would represent a 12% recovery for counsel working on contingency. Class Counsel also seek reimbursement of $174,481.88 in litigation expenses they advanced that were necessary to the prosecution of the case, and individual service award payments of $5,000 to each of the named Plaintiffs. Each Plaintiff has spent substantial time on the case, from the initial interviews to retrieving confidential records and filling out detailed questionnaires. Each Plaintiff dedicated time to communicating with Class Counsel throughout this litigation, and took a risk by stepping forward to represent the class following the massive breach of OPM's systems.

For the reasons set out further below, Plaintiffs respectfully request that the Court grant the requested attorneys' fees, expense reimbursements, and service awards.

## OVERVIEW OF WORK PERFORMED BY CLASS COUNSEL

### A. Initial Proceedings and Early Case Management

In June 2015, OPM announced that its electronic systems had been breached and hackers had taken the personal information of over 21 million current, former, and prospective federal employees and members of their families. This information included birthdates, Social Security numbers, fingerprints, psychological and emotional health information, and even personal

[6] *See Eley v. D.C.*, 793 F.3d 97, 100 (D.C. Cir. 2015) (describing history and limitations of the *Laffey* matrix) (citing *Laffey v. Northwest Airlines, Inc. (Laffey I)*, 572 F. Supp. 354, 371 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, *Laffey v. Nw. Airlines, Inc. (Laffey II)*, 746 F.2d 4 (D.C. Cir. 1984), *overruled in part on other grounds, Save Our Cumberland Mountains, Inc. v. Hodel (SOCM)*, 857 F.2d 1516, 1516 (D.C. Cir. 1988)).

histories of any gambling compulsions, marital troubles, and past illicit drug and alcohol use. OPM contracted with Peraton (then known as KeyPoint) to perform investigative work and their systems were electronically linked. Am. Compl., Dkt. # 189, ¶¶ 60-61; OPM Answer, Dkt. # 154, ¶ 76.

After OPM's announcement, class actions were filed around the country against OPM and Peraton. The Plaintiffs included two federal employee unions (AFGE and NTEU) and individuals whose private information was taken. Lead Counsel filed the first of these class actions on behalf of the largest federal employee union, AFGE, and two individual Plaintiffs. *See AFGE et al. v. U.S. Office of Personnel Management*, No. 1:15-cv-01015 (D.D.C. filed June 29, 2015). To prepare the complaint, Lead Counsel worked closely with the clients to develop the factual allegations and ensure their accuracy, and examined reports from the Office of Inspector General that identified OPM system vulnerabilities leading up to the breach. Girard Decl. ¶ 3. After filing the complaint, Lead Counsel in 2015 interviewed and advised more than 450 federal employees and job applicants who contacted them seeking legal advice concerning the breach, the litigation, and their rights and potential remedies. *Id.* ¶ 4.

On July 29, 2015, OPM filed a motion with the Judicial Panel on Multidistrict Litigation to centralize and transfer the related cases to this Court for pretrial proceedings. Lead Counsel filed a memorandum with the Panel supporting centralization and transfer to this Court and appeared before the Panel on October 1, 2015. *Id.* ¶ 7. On October 9, 2015, the Panel ordered the centralization and transfer of these related cases to this Court. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 138 F. Supp. 3d 1379 (J.P.M.L. 2015). In November 2015, Lead Counsel led preparation of the first draft of the joint case management conference statement per this Court's initial pretrial Order. Girard Decl. ¶ 8. Also in November and December 2015, Lead Counsel

actively coordinated among all Plaintiffs' counsel and Defendants' counsel to develop common positions in the joint statement and at the December 15, 2015 status conference. *Id*.

On January 28, 2016, after a hearing, the Court appointed Daniel C. Girard of Girard Sharp LLP (then Girard Gibbs LLP) as interim lead counsel, Gary E. Mason, then of Whitfield Bryon & Mason LLP, as liaison counsel, and a Plaintiffs' steering committee of attorneys at Morgan & Morgan Complex Litigation Group, Ahdoot & Wolfson, PC, and Cooper & Kirk, PLLC. Dkt. # 58. After being appointed, Lead Counsel continued to investigate the claims based on facts learned through interviews and correspondence with breach victims and through consultations with data security experts. Girard Decl. ¶ 9. Further, Lead Counsel monitored continuing reports relating to the Data Breaches and analyzed the sufficiency of the steps taken by the Government to mitigate the damage caused. *Id*. We also continued regularly providing information to AFGE and hundreds of its members regarding the litigation. *Id*. And, to better understand the impact of the Data Breaches and the factual circumstances and concerns of class members, we consulted with and interviewed a large sampling of AFGE members. *Id*.

In early 2016, Lead Counsel led a sustained effort to interview and vet potential plaintiffs for the consolidated amended complaint, working closely with co-counsel firms. *Id*. ¶ 10. At the same time, following the Court's appointment Order, Lead Counsel researched and prepared that complaint. *Id*. In doing so, Lead Counsel verified allegations regarding breach victims included as Plaintiffs and incorporated other comments from executive committee firms. *Id*. Plaintiffs filed their 275-paragraph consolidated amended complaint on March 14, 2016. Dkt. # 63.

**B. The Motions to Dismiss and Appeal**

Defendants separately moved to dismiss on May 13, 2016, raising a series of legal arguments. Dkt. # 70, 72. OPM argued that Plaintiffs lacked Article III standing and that their alleged injuries—such as fraudulent activity on their financial accounts, misuse of their Social

Security numbers, and increased risk of future harm—were insufficient to establish an actual or imminent injury that was fairly traceable to OPM's conduct. Dkt. # 72-1 at 16-36. OPM further argued that even if Plaintiffs did have standing, their claims under the Privacy Act, Little Tucker Act, and the Administrative Procedure Act ("APA") nevertheless failed. As to the Privacy Act claim, OPM argued that Plaintiffs did not suffer pecuniary loss or show that OPM engaged in the intentional and willful conduct necessary to meet the high standards for liability under the Privacy Act. *Id.* at 37-48. OPM also asserted that it could not be held liable under the Little Tucker Act because the questionnaires Plaintiffs submitted to the Government did not constitute binding legal contracts and Plaintiffs had not identified an unequivocally expressed waiver of sovereign immunity. *Id.* at 63-69. OPM further argued that Plaintiffs could not pursue injunctive and declaratory relief under the APA because the Privacy Act precludes such relief and OPM's compliance with data security standards was committed to its discretion and therefore is not subject to review under the APA. *Id.* at 69-81.

In moving to dismiss, Peraton likewise argued that Plaintiffs lacked standing, contending that Plaintiffs' injuries were merely conjectural and in any event they could not show that Peraton caused the alleged harm, and the Court could not redress any such harm because the Government had already provided credit and identity monitoring services to all Plaintiffs. Dkt. # 70 at 20-31. Peraton also asserted that it was immune from liability as a government contractor because the conduct underlying Plaintiffs' claims against Peraton occurred pursuant to a valid contract with the Government and Peraton never exceeded its contractual authority. *Id.* at 17-36. Peraton further argued that Plaintiffs failed to state a negligence claim by application of the economic loss rule and because it did not owe them a duty to safeguard their information against third-party criminals. *Id.* at 48-54. And Peraton contested Plaintiffs' other claims as well, arguing in part that it is not a

"consumer reporting agency" and did not "furnish" consumer information under the FCRA, that state consumer protection laws were inapplicable because it did not offer services to consumers, and that federal law preempts state data breach notification laws. *Id.* at 37-48.

To address these arguments, Lead Counsel led and coordinated the research and drafting of a 110-page opposition brief with supporting materials, filed on June 30, 2016. Dkt. # 82; Girard Decl. ¶ 11. The Court heard argument on Defendants' motions on October 31 and November 10, 2016. Dkt. # 98, 104. On September 19, 2017, the Court dismissed Plaintiffs' claims for lack of Article III standing and failure to state a claim under the Privacy Act, the APA, and the Little Tucker Act, and also held that Plaintiffs' claims against Peraton were barred by derivative sovereign immunity. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 266 F. Supp. 3d 1 (D.D.C. 2017) ("*OPM I*").

Plaintiffs appealed. Lead Counsel developed an advocacy strategy in the D.C. Circuit, framed three issues for appeal, and researched and drafted the opening and reply briefs. Girard Decl. ¶ 12. At Lead Counsel's request, Mr. Patterson of Cooper & Kirk argued the appeal. *Id.* Plaintiffs argued on appeal that they had Article III standing and plausible Privacy Act claims for economic loss, and that Peraton's alleged noncompliance with the Government's instructions deprived it of derivative immunity. On June 21, 2019, the D.C. Circuit reversed on these grounds, while affirming dismissal of the constitutional claim brought by NTEU and other plaintiffs. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019) ("*OPM II*"). Judge Williams filed a separate opinion concurring in part and dissenting in part, and pointing out that Peraton may also have a viable federal preemption defense. *See id.* at 75-84.

### C. Settlement Negotiations and Approval

On remand Lead Counsel prepared a discovery plan and requests for production of documents. Girard Decl. ¶ 13. The Court held a case management conference at which it suggested

this case was a good candidate for ADR, advising of "many reasons for both sides to be open-minded and thoughtful and to initiate this process and to start it soon." 12/3/19 Hr'g Tr., Dkt. # 163 at 17-18. The parties agreed to mediate the case before retired federal District Judge Lawrence F. Stengel, to whom the Court referred the litigation on January 27, 2020. Girard Decl. ¶ 13. The parties communicated at length with Judge Stengel to discuss their positions and potential paths forward in the negotiations. *Id*. While the substance of the negotiations remains confidential, Lead Counsel as assisted by other Plaintiffs' counsel[7] prepared mediation briefs, demand letters, bench memos for Judge Stengel on discrete issues, and detailed charts showing categories of compensable loss under the Privacy Act with corresponding damages. *Id*. ¶ 13. Class Counsel participated in an all-day video session with Judge Stengel in March 2020. *Id*. Plaintiffs exchanged information with the Government and examined Peraton's relevant liability insurance policies under Judge Stengel's supervision. *Id*. The parties were fully informed of the strengths and weaknesses of the case, including through scrutiny of the report issued September 7, 2016 by the House Committee on Oversight and Government Reform. *Id*.

With Judge Stengel's assistance, the parties made progress in negotiating a framework for a potential class-wide resolution. *Id*. ¶ 14. Several factors complicated the negotiations, however, including OPM's immunity, subject to the Privacy Act exception described in *FAA v. Cooper*, 566 U.S. 284 (2012); the question of which factual scenarios would make an individual eligible to

[7] Without limiting the scope of work performed by supporting counsel, in the interests of efficiency, throughout the litigation and negotiations, Tina Wolfson of Ahdoot & Wolfson was tasked with responsibility for class certification issues, John Yanchunis of Morgan & Morgan assisted in developing models for damage recovery, David Thompson and Peter Patterson of Cooper & Kirk were charged with briefing and advising on issues surrounding litigation against the Government, Gary Mason performed various administrative duties in his role as Liaison Counsel, and Norman Siegel of Stueve Siegel Hanson provided continuing support on issues surrounding negotiation strategy and mediation preparation. Girard Decl. ¶ 60.

recover under the Act; the evidentiary support that would be needed to recover; and whether the Government and Peraton would agree to settle on the basis of a narrowed class. Girard Decl. ¶ 14. By the middle of 2020, the negotiations had broken down, and the Government allowed the referral to Judge Stengel to expire. *Id*. ¶ 15. Lead Counsel continued to engage with counsel for Defendants, but further progress was slow. *Id*. When it became clear that the parties were at an impasse on several issues, including continuing disputes over the scope of the release, the class definition, eligible categories of compensable loss, and the amount of individual payments to claimants, Lead Counsel proposed and the Court in July 2021 granted a joint request for referral to Senior District Judge John D. Bates. *Id*.

After discussions with Judge Bates, the parties were able to agree on a settlement class limited to individuals who incurred objectively-defined forms of pecuniary loss resulting from the Data Breaches—the only breach victims with a potential right to recover under the Privacy Act—and a settlement release limited to the claims of individuals who may be entitled to a share of the $63 million fund. *Id*. ¶ 16. The parties also negotiated the key settlement term providing for individual payments to claimants of $700. *Id*. In 2022, the parties turned to drafting and negotiating the details of settlement documentation, including the agreement as well as the notice and notice plan, proposed approval orders, and claim form. *Id*. During the spring of 2022, the parties also held a series of joint video conferences with the Claims Administrator, Epiq Class Action & Claims Solutions, Inc. ("EPIQ"), to plan for notice and claims administration. *Id*. ¶ 17. The parties executed their Settlement Agreement ("SA") on May 5, 2022.

Under the settlement, OPM will pay $60,000,000 into the settlement fund while Peraton will pay an additional $3,000,000. Settlement Agreement ("SA"), Dkt. # 188-2, §§ III.A, III.B. The settlement class is limited to individuals who incurred actual damages because only those

individuals have a claim against OPM under the Privacy Act, the only available avenue of relief against OPM. The minimum payment for valid claims will be $700—the equivalent of 70% of the available statutory damages—but if the documented loss of a settlement class member exceeds $700, the claim will be paid in that amount, up to $10,000. SA § V.C.7.

In addition to paying the costs of settlement notice and claims administration, OPM has agreed to pay—apart from the settlement fund—Plaintiffs' reasonable attorneys' fees and litigation expenses as determined by the Court. SA §§ II.B.12, V.A, VI.A. If the Court awards service payments to any of the Named Plaintiffs, they will be paid out of Peraton's contribution to the settlement fund, but Peraton will have no obligation with respect to an award of attorneys' fees and expenses. SA § VI.A-B.

Lead Counsel prepared the preliminary approval motion and supporting papers, and argued the motion on June 3, 2022. Girard Decl. ¶¶ 17-18. On June 7, the Court granted preliminary approval of the Settlement, setting the Fairness Hearing for October 14. Dkt. # 193. Since the Court's Order, Lead Counsel have supervised the dissemination of the notice, audited all time and expense records after providing instructions to all co-counsel firms, furnished detailed time and expense information to the Government, and prepared Plaintiffs' motions for final approval and for attorneys' fees, expenses and service awards. Girard Decl. ¶ 19. Moreover, Lead Counsel have communicated directly with dozens of claimants who called or emailed with questions about the settlement or making a claim. *Id*. Lead Counsel have answered questions about the scope of the settlement, the documentation required to make a claim, including for lost time, and why the settlement is limited to claims of economic loss. *Id*. Many callers have expressed continuing concern about being exposed to various threats because of the Data Breaches, and many have expressed their thanks to Class Counsel for their representation of the Class and the result achieved. *Id*.

## ARGUMENT

Class Counsel should be awarded a reasonable market fee as provided under the settlement. Class Counsel should be compensated at their customary hourly rates because they are attorneys in private practice whose rates are paid by hourly-billable clients, and these rates best reflect their reputations and the skill require to prosecute this case. Rates should be based on fair market value to ensure fair compensation for services rendered. The *Laffey* matrix, however, has not adequately adjusted to inflation and does not reflect the current market rates in complex civil litigation. Its rigidity has led the D.C. Circuit to remark that "the *Laffey* matrix may well . . . be losing its shine." *DL v. D.C.*, 924 F.3d 585, 594 (D.C. Cir. 2019). Even if *Laffey* were to apply, the fee requested here should be granted by enhancing those rates, in light of Class Counsel's actual billing rates and the length of time needed to bring this case to a conclusion. Class Counsel's current rates likewise should be applied to all work performed in this case to compensate for the seven-year delay in payment, especially given the high inflation rates. Class Counsel's work on this case precluded other paying work, and the number of hours they devoted to it is reasonable considering the novel subject matter, difficult defenses, and protracted negotiations. The Court should also approve reimbursement of Class Counsel's litigation expenses and grant service awards to the named Plaintiffs, in recognition of their contributions.

## I. THE REQUESTED FEE IS REASONABLE AND SHOULD BE AWARDED.

"A large segment of the public might be denied a remedy for violations" if court-awarded attorneys' fees "did not fairly compensate counsel for the services provided and the risks undertaken." *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 534 (E.D. Pa. 1990) (citation omitted); *see also Williams v. Gen. Elec. Cap. Auto Lease*, No. 94 C 7410, 1995 WL 765266, at *10 (N.D. Ill. Dec. 26, 1995) ("Without significant counsel fees to encourage the pursuit of these claims, the public policy to induce compliance with the law would be disserved."). The

reasonableness of attorneys' fees "is ultimately subject to the court's discretion, based on the facts and circumstances unique to each case." *Equal Rights Ctr. v. Washington Metro. Area Transit Auth.*, 573 F. Supp. 2d 205, 215 (D.D.C. 2008) (citing *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1267-68 (D.C. Cir. 1993)). The lodestar method applies in this case because the settlement agreement provides that the fee will be negotiated and addressed separately from the fund created for class members. *See In re Home Depot Inc.*, 931 F.3d 1065 (11th Cir. 2019). The D.C. Circuit has prescribed a three-part analysis for determining fee awards in such lodestar cases. *Salazar ex rel. Salazar v. D.C.*, 809 F.3d 58, 61 (D.C. Cir. 2015). Under this analysis, the Court "must: (1) determine the 'number of hours reasonably expended in litigation'; (2) set the 'reasonable hourly rate'; and (3) use multipliers as 'warranted.'" *Id.* (quoting *Covington v. D.C.*, 57 F.3d 1101, 1107-08 (D.C. Cir. 1995)). If the fee applicant demonstrates its entitlement to an award and justifies the reasonableness of its rates, "the claimed fee is presumed to be the reasonable fee . . . and the burden shifts to the defendant to present equally specific countervailing evidence if it seeks a different (presumably lower) rate." *DL*, 924 F.3d at 588-89 (quotation marks and citation omitted); *see also Howard v. Achievement Prep. Acad. Pub. Charter Sch.*, No. 15-CV-199 (CKK/GMH), 2016 WL 1212409, at *10 (D.D.C. Mar. 8, 2016) ("Upon a proper showing as to these elements, a presumption arises that the number of hours billed and the hourly rates are reasonable.").[8]

The record before the Court and the cases cited below show that Class Counsel's hourly rates are consistent with the rates charged by attorneys of similar skill and experience. Counsel's rates have been repeatedly approved by federal courts and are currently being paid by hourly

[8] In fee-shifting cases, professional time spent on fee-related proceedings is also compensable. *See In re Home Depot Inc.*, 931 F.3d at 1093. Of further relevance, "fees should be neither lower, nor calculated differently" when the Government is paying the fee. *Salazar ex rel. Salazar v. D.C.*, 809 F.3d 58, 65 (D.C. Cir. 2015).

clients. Further, the hours that Class Counsel devoted (and continue to devote)[9] to this case were reasonable and necessary to its successful resolution, notwithstanding the substantial risks and delay. Counsel's lodestar-based fee should, therefore, be awarded.

### A. The Court Should Calculate the Lodestar Using Class Counsel's Reasonable and Customary Hourly Rates in the Relevant Legal Markets.

A reasonable rate is determined based upon counsel's "(1) billing practices; (2) skill, experience and reputation; and (3) prevailing market rates in the relevant community." *Keepseagle v. Perdue*, 334 F. Supp. 3d 58, 64 (D.D.C. 2018). Counsel's "regular billing rate is presumptively reasonable as long as it reflects, among other things, the level of skill necessary to conduct the case and the attorney's reputation." *Pleitez v. Carney*, 594 F. Supp. 2d 47, 53 (D.D.C. 2009) (alterations and quotation marks omitted); *see Kattan by Thomas v. D.C.*, 995 F.2d 274, 278 (D.C. Cir. 1993); *Cobell v. Norton*, 231 F. Supp. 2d 295, 302-03 (D.D.C. 2002) ("There is no better indication of what the market will bear than what the lawyer in fact charges for his services and what his clients pay. . . . Therefore, [the attorney] will be compensated at the rate that he charges for his services to plaintiffs.") (quotation marks and citation omitted). Class Counsel's standard billing rates are presumptively—and actually—reasonable, reflecting their reputations and the skill needed to obtain the settlement benefits for the class. Consequently, the Court should use the rates Class Counsel charge their clients in assessing the lodestar. *See Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1326 (D.C. Cir. 1982) ("[T]he actual rate that applicant's counsel can command in the market is itself highly relevant proof of the prevailing community rate.").

For purposes of determining a reasonable fee, "[n]o particular type of evidence can be considered gospel; evidence of the prevailing market rate can take many forms." *DL*, 924 F.3d at

[9] Class Counsel have reserved the right to apply for reimbursement of attorneys' fees and expenses attributable to services provided after the date of this application. Girard Decl. ¶ 53; SA § VI.A.

589 (citation omitted). Class Counsel's requested hourly rates have been approved by courts in MDLs and other complex cases. *See, e.g.*, *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2018 WL 4620695, at *2 (N.D. Cal. Sept. 20, 2018) (approving Girard Sharp's rates as reasonable, noting they "range from $350 to $1,050 for partners and senior counsel, $300 to $675 for associates, and $100 to $400 for paralegals"); Girard Decl., Ex. E (declarations from other Class Counsel firms citing judicial decisions that approved their billing rates). Counsel's rates used in the lodestar calculation are the same rates currently being paid by fee-paying clients in other complex litigation matters. *See* Girard Decl., Ex. A (Lopez-Castro Decl. ¶ 5 (attesting that Lead Counsel are being paid their current rates by hourly client in a complex arbitration)).

Counsel's rates are further supported by current market surveys and reports showing a large increase in hourly rates across the country due to rising inflation and increasing demand for legal services. *See* Girard Decl., Ex. B (Roy Strom, *Big Law Rates Topping $2000 Leave Value "In Eye of Beholder"* (Bloomberg, June 9, 2022) (finding that partners at large law firms are charging hourly rates of $2,000 or more)); Ex. C (Andrew Maloney, *Aggressive Billing Rate Increases Appear Likely, but Can Clients Stomach It?* (The American Lawyer, Jan. 24, 2022). An MDL judge in Detroit took note of these higher rates in 2019:

> In national markets, "partners routinely charge between $1,200 and $1,300 an hour, with top rates at several large law firms exceeding $1,400." In specialties such as "antitrust and high-stakes litigation and appeals for lawyers at the very top of those fields, hourly rates can hit $1,800 or even $1,950." Some "difference makers" in the most complex fields, including antitrust litigation, even charge $2,000 an hour. This Court has recognized that rates in this matter "are well in line with the market, with recent reports explaining that senior lawyers at top law firms routinely charge well over $1,000."

*In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2019 WL 13090127, at *3 (E.D. Mich. Dec. 29, 2019) (citations and alterations omitted).

Class Counsel's billing rates are similar to the rates other "attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." *Covington*, 57 F.3d at 1109; *see Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). Evidence shows that partners at large law firms—against whom Class Counsel typically litigate, including in this case—routinely charge rates of $1,500 per hour or more. *See* Girard Decl., Ex. D (*David Boies Bills $1,950 Hourly in Google Case, Court Filing Shows* (Bankruptcy Court Decisions Weekly News & Comments, Vol. 71, Issue 15, June 20, 2022) (identifying individual litigation partners charging hourly rates of $2,465, $1,950, and $1,824). In 2021 alone, "Am Law 100 firms" raised billing rates by well over 5% and rates have continued to increase "aggressive[ly]" in 2022. Girard Decl., Ex. C (Andrew Maloney, *Aggressive Billing Rate Increases Appear Likely, but Can Clients Stomach It?* (The American Lawyer, Jan. 24, 2022). Other surveys have shown that while large law firms' rates increased about 3% a year between 2007 and 2020, their rates went up by 6% in 2020 and at least 5.6% in 2021. *See id.*; Girard Decl., Ex. B (Roy Strom, *Big Law Rates Topping $2000* (Bloomberg, June 9, 2022) (noting these increases "occurred during a once-in-a-decade surge in demand for law services.").

These increases are appropriately reflected in the rates charged by Class Counsel and their counterparts at "Big Law." *See Covington*, 57 F.3d at 1109 (reasonableness analysis considers rates being charged by attorneys with "comparable qualifications handling similar cases."). One court approved Skadden Arps' 2019 and 2020 litigation partner rates ranging from $1,225 to $1,775 and associate rates ranging from $695 to $1,120. *In re TransPerfect Glob., Inc.*, No. CV 10449-CB, 2021 WL 1711797, at *23-24 (Del. Ch. Apr. 30, 2021). A federal court in California recently found "billing rates of $895 to $1,295 per hour for partners and counsel, and between

$565 and $985 for associates is reasonable within the legal community of Los Angeles for attorneys of similar skill." *Hope Med. Enters., Inc. v. Fagron Compounding Serv., LLC*, No. 2:19-CV-07748-CAS (PLAx), 2022 WL 826903, at *3 (C.D. Cal. Mar. 14, 2022).

Class Counsel's rates for complex litigation services compare favorably to the rates approved for partners and associates at Gibson Dunn, the law firm representing Defendant Peraton. *See, e.g.*, *Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*, No. CV 2019-0585-PAF, 2021 WL 5174088, at *5-6 (Del. Ch. Nov. 8, 2021) (approving Gibson Dunn partner's hourly rate of $1,645, as being "in line with those of other experienced litigators appearing in this court, which have been held to be reasonable"); *Vista Outdoor Inc. v. Reeves Fam. Tr.*, No. 16 CIV. 5766, 2018 WL 3104631, at *6 (S.D.N.Y. May 24, 2018) (approving rates for Gibson partners of up to $1,260).

Class Counsel's rates, albeit somewhat lower, are also "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation" and should be approved as reasonable. *Blum*, 465 U.S. at 895 n.11; *see Salazar*, 809 F.3d at 64-65 (plaintiffs submitted sufficient evidence to support their rates); *Merrick v. D.C.*, 134 F. Supp. 3d 328, 340 (D.D.C. 2015) (plaintiff demonstrated prevailing market rate based in part on counsel's experience and complexity of the case). The expertise and value delivered by counsel is reflected in their successful resolution of this challenging and unique case.

Lead Counsel called upon some of the most experienced data breach attorneys in the country, including Tina Wolfson, Norman E. Siegel, and John A. Yanchunis, who have served as lead or co-lead counsel in most of the largest data breach class actions—Equifax, Yahoo, Capital One, Marriott, Premera, Home Depot, Experian, etc.—resulting in hundreds of millions of dollars in recoveries for consumers. Girard Decl. ¶ 60; *see also id.*, Ex. E (Declaration of Tina Wolfson, ¶¶ 3-5). Together, these attorneys brought decades of experience from litigating data and privacy-

related matters. Girard Decl. ¶ 60. Class members also benefitted from the considerable skill and expertise of the attorneys at Cooper & Kirk. *Id.* Absent the coordinated and effective efforts of Class Counsel, the class might have received nothing from this litigation.

Class Counsel's normal rates should therefore be used in determining a reasonable fee.

### B. A Comparison of the Risks of Continued Litigation to the Result Obtained Demonstrates the Reasonableness of the Requested Fee.

Comparing the results obtained to the risks of litigation is a key metric for assessing the performance of counsel and, in turn, the amount of a reasonable fee. *See Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("[T]he most critical factor is the degree of success obtained."); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-56 (10th Cir. 1988) (of several factors generally used to determine a reasonable fee, "amount involved and the results obtained" may merit "greater weight" where "recovery was highly contingent") (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) ("most important" factor on settlement posture is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement"). By this measure, the $8,545,537 fee requested by Class Counsel can only be seen as reasonable.

Data breach class actions "are particularly risky, expensive, and complex," *Gordon v. Chipotle Mexican Grill, Inc.*, No. 17-cv-01415-CMA-SKC, 2019 WL 6972701, at *1 (D. Colo. Dec. 16, 2019), and involve "novel" issues of law, including with regard to causation. *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 WL 3341200, at *4 (W.D. Ky. Aug. 23, 2010); *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, 2016 WL 6902351, at *5 (N.D. Ga. Aug. 23, 2016). This case concerned highly technical data security issues, relating to source code and other aspects of OPM's systems and security architecture, and the attribution of the Data Breaches to the Chinese

government took the complexity to a further level. *See In re OPM II*, 928 F.3d at 76 (Williams, J., concurring in part and dissenting in part) (opining that the hack likely was motivated by espionage). Hence, this was "not just a data breach case, but . . . a data breach arising out of a particular sort of cyberattack against the United States." *OPM I*, 266 F. Supp. 3d at 9.

Class Counsel had to overcome many obstacles to secure the substantial settlement for breach victims with standing to sue the Government. As this Court observed early on, this case "is different in marked ways" from an ordinary data breach case because, even if Plaintiffs could prevail on the question of Article III standing, that still would not "necessarily mean a monetary injury at the end of the day." Dkt. # 57, 1/28/2016 Hr'g Tr. at 29. Claims under the Privacy Act require a showing of "willful or intentional conduct" which typically requires action "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." *In re OPM II*, 928 F.3d at 63 (citation omitted). This Court recognized that the Privacy Act "has a pretty high bar" to recovery and there are questions as to whether OPM's conduct rose to "the kind of willfulness that would support a damage award." Dkt. # 57, 1/28/2016 Hr'g Tr. at 28. OPM has vigorously denied that it engaged in any willful conduct, and, given the sensitive national security and foreign policy implications of this case, OPM likely would have asserted the potent state secrets privilege in litigation. Dkt. # 140 at 9 (OPM stating that "[t]he state secrets privilege . . . would likely be implicated with regards to any classified information about the OPM breach"); *FBI v. Fazaga*, 142 S. Ct. 1051, 1062 (2022); *General Dynamics Corp. v. United States*, 563 U.S. 478, 486 (2011); *In re United States*, 872 F.2d 472, 476 (D.C. Cir. 1989) ("The privilege, it is clear, is absolute" and "[o]nce successfully invoked, the effect of the privilege is completely to remove the evidence from the case."); *In re Sealed Case*, 494 F.3d 139, 153 (D.C. Cir. 2007)

("If the district court determines that the subject matter of a case is so sensitive that there is no way it can be litigated without risking national secrets, then the case must be dismissed.").

Class certification also was by no means assured. Yet the settlement creates a generous individual prove-up process—paying 70% of statutory damages—similar to what would have followed a class verdict in favor of Plaintiffs. Finally, the claims against Peraton were brought on behalf of class members whose information was not shown to have been stored in its systems. The case against Peraton was complicated by its federal preemption defense, the economic loss rule, and causation questions resulting from the many unknowns about how the hackers breached OPM's databases using Peraton security credentials, as reported. Dkts. # 70, 148.

The number of issues and the novelty and complexity of the case made it uniquely challenging such that the Court identified "serious questions about what exactly the Plaintiffs would hope to get out of the case, even if the damages claims move forward and even if they win." Dkt. # 21, 12/17/2015 Hr'g Tr. at 54:1-3. Despite daunting risks, and lengthy delays, Class Counsel held out for an appropriate resolution and applied a steady hand through several cycles of negotiations—valuable attributes in legal work. *See Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) (counsel performed "additional work necessary to achieve a better outcome for the class" by "[h]olding out for nine long years") (citation omitted); *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 80 (S.D.N.Y. 2000) (discussing incentives for "investing additional time and maximizing plaintiffs' recovery.").

### C. *Laffey* Does Not Apply.

Class Counsel work at private law firms and charge billing rates that have been evaluated and approved by federal courts and paid by hourly clients. The *Laffey* matrix's categories fail to capture the market value of the services provided by Class Counsel. With *Laffey*, for example, the value of services does not increase after 20 years of practice—an arbitrary cap—and the rates in

general have not been adequately adjusted for inflation. Furthermore, *Laffey* is intended to apply to public interest firms, not private firms with hourly-paying clients like Class Counsel.

The *Laffey* matrix "is not binding in and of itself"; rather, "[a]n attorney's usual billing rate is . . . often presumptively the reasonable rate and is very persuasive evidence of what is a reasonable rate." *Thomas v. Moreland*, No. CV 18-800 (TJK), 2022 WL 2168109, at *5 (D.D.C. June 16, 2022) (alteration, quotation marks, and citations omitted). Fee matrices are "somewhat crude," *Eley*, 793 F.3d at 101, and even where applicable merely furnish a "starting point." *Al-Quraan v. 4115 8th St. NW, LLC*, 123 F. Supp. 3d 1, 3 (D.D.C. 2015) (awarding rates in excess of *Laffey* in Fair Labor Standards Act case) (quoting *Covington*, 57 F.3d at 1109). Neither the D.C. Circuit nor the D.C. District Court requires use of *Laffey*. Again, the controlling standard is instead that, for purposes of determining a reasonable hourly rate, "an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Rodriguez v. HHS*, 91 Fed. Cl. 453, 469 (2010), *aff'd*, 632 F.3d 1381 (Fed. Cir. 2011) (quoting *Kattan*, 995 F.2d at 278); *see also DL*, 924 F.3d at 589.

The *Laffey* matrix does not reflect the true market value of Class Counsel's services. The LSI index, for instance, caps rates at $919—even for practitioners with 30-plus years of experience[10]—but hourly clients are paying Class Counsel over $1,000 per hour. Girard Decl. ¶ 52 & Ex. A (Lopez-Castro Decl. ¶ 5 (Girard Sharp's rates judged reasonable by hourly client)). And, as shown above, Class Counsel's rates are consistent with the rates charged by attorneys representing defendants in Class Counsel's cases, including skilled counsel for Peraton in this litigation. *See Roma Landmark Theaters, LLC*, 2021 WL 5174088, at *5-6; *Vista Outdoor Inc.*,

[10] http://www.laffeymatrix.com/see.html.

2018 WL 3104631, at *5-6. The record shows that Class Counsel's "Big Law" counterparts consistently charge in excess of $1,500 per hour. See Girard Decl., Exs. B-D; *supra* Section I.A; *In re Auto. Parts Antitrust Litig.*, 2019 WL 13090127, at *3 & nn.1-2.

*Laffey* has been criticized for failing to keep up with inflation and its other limitations. *See, e.g.*, *DL*, 924 F.3d at 594 (citing district court criticism of *Laffey*'s "grouping of attorneys into just five experience bands."); *Eley*, 793 F.3d at 101-02 (concluding that the LSI index "suffers . . . from its own imprecisions."). Class Counsel's rates are presumptively reasonable, *Kattan*, 995 F.2d at 278, are being paid by litigation clients, and should apply here given the market realities and delayed payment. *See Cobell*, 231 F. Supp. 2d at 302-03 ("no better indication of what the market will bear than what the lawyer in fact charges for his services and what his clients pay."). Importing the matrix rates into this case would be contrary to the guiding principle that a fee award must reflect the market value of the services provided. *See Thomas*, 2022 WL 2168109, at *5; *Kattan*, 995 F.2d at 278; *Cobell*, 231 F. Supp. 2d at 302-03; *see also Swedish Hosp. Corp.*, 1 F.3d at 1270 (adopting percentage approach for common fund settlements "primarily because it is more efficient, easier to administer, and *more closely reflects the marketplace*.") (emphasis added).

Similarly, deviating from market rates would conflict with *Perdue v. Kenny A. ex rel. Winn*, where the Supreme Court held that the lodestar in federal fee-shifting cases may be enhanced only in exceptional circumstances because the unenhanced lodestar that results from applying "the prevailing market rates in the relevant community" has a "strong" presumption of reasonableness. 559 U.S. 542, 551-52 (2010) (citations omitted). The Court accordingly reasoned that superior performance alone does not justify enhancing the lodestar because "considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate." *Id.* at 553 (citation omitted). Using *Laffey* in this case, however, would deny Class

Counsel both a lodestar enhancement *and* their reasonable hourly rates. Nothing in Justice Alito's reasoning for the majority in *Perdue* authorizes the imposition of a rate determined by reference to a fixed "index" rather than the rate a particular attorney's skills, experience, and reputation command in that attorney's relevant community, and even more so where the attorney's higher rate has been repeatedly approved by other federal courts. In fact, *Perdue* cites *Laffey* as an example of "a formula that takes into account only a single factor" that may be *in*appropriate to use without adjustment to "prevailing market rate." *Id*. at 555.

Not only the disparity between Class Counsel's prevailing rates and the *Laffey* rates, but also three other aspects of this case make *Laffey* a poor fit. First, the inordinately long delay in payment—Lead Counsel filed the first action in June 2015—would justify an *upward* adjustment to counsel's *actual* rates. *In re Home Depot*, 931 F.3d at 1082 (citing *Perdue*, 559 U.S. at 556). By extension, the delay also disfavors application of the *Laffey* rates which, overall, are substantially *lower* than Class Counsel's actual rates. *See infra* Section I.E (discussing delay as factor warranting use of current rather than historical rates).

Second, *Laffey* is traditionally centered on the D.C. market yet this is an MDL with actions that were filed across the country and pursued jointly by counsel in many different U.S. legal markets. "No circuit outside the D.C. Circuit has formally adopted the *Laffey* Matrix, and . . . other circuits have expressed concerns about the Matrix's utility outside its circuit of origin." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 649-50 (7th Cir. 2011). Only some—but not all—Class Counsel are regular D.C. Circuit practitioners, and most practice around the country in nationwide class actions. *See id.* (citing *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010) ("[J]ust because the *Laffey* matrix has been accepted in the District of Columbia does not mean that it is a sound basis for determining rates elsewhere"); *Newport News Shipbuilding & Dry*

*Dock Co. v. Holiday*, 591 F.3d 219, 229 (4th Cir. 2009)); *see also Roberts v. City of Honolulu*, 938 F.3d 1020, 1024 (9th Cir. 2019) (criticizing application for attorney fees incurred in non-D.C. market for relying on *Laffey*).

Third, the *Laffey* matrix is intended for public interest attorneys and does not apply in cases brought by attorneys in private practice who are not seeking fees under a federal fee-shifting statute.[11] *Laffey* is designed for "[g]overnment or public interest attorneys who do not have a standard billing rate [and] may utilize the so-called *Laffey* Matrix to establish the prevailing market rate." *Elec. Priv. Info. Ctr. v. DHS*, 218 F. Supp. 3d 27, 47 (D.D.C. 2016); *see Pleitez*, 594 F. Supp. 2d at 53 ("Attorneys *without a customary billing rate* may establish the prevailing market rate for their services with published surveys of prevailing rates, like the *Laffey* matrix.") (emphasis added). The history of the *Laffey* matrix makes clear that it does not set the prevailing rates in a case like this one involving attorneys in private practice with established hourly rates for paying clients.[12] It follows that the Court should decline to use the *Laffey* Matrix to assess the reasonableness of Class Counsel's requested fee. *See Elec. Transaction Sys. Corp. v. Prodigy Partners Ltd., Inc.*, No. CIV. A. 08-1610 (RWR), 2009 WL 3273920, at *2 (D.D.C. Oct. 9, 2009)

---

[11] The parties' Settlement Agreement is the source of authority for awarding the fee. *See In re Home Depot Inc.*, 931 F.3d at 1087.

[12] The *Laffey* matrix grew out of the fee schedule compiled in *Laffey I*. On appeal, the D.C. Circuit was presented with the question of how attorneys who "did not fall neatly into either of the categories 'private counsel' or 'nonprofit legal services organization'" should be compensated under civil rights fee-shifting statutes. *SOCM*, 857 F.2d at 1519. The *Laffey II* court's analysis was guided by the Supreme Court's decision in *Blum*, 465 U.S. at 897, which held that a reasonable attorney fee in a civil rights case need only be sufficient to attract competent counsel to enforce civil rights laws. *Id.* at 1519. The D.C. Circuit distinguished between private law firms and public interest law firms, concluding that "[f]or private law firms, the prevailing market rate for the firm's services is presumptively found in the firm's customary billing rates." *Laffey II*, 746 F.2d at 24; *see Bolden v. J & R Inc.*, 135 F. Supp. 2d 177, 179 (D.D.C. 2001) (clarifying that "[a]ttorneys who do *not* charge a billing rate, such as those employed with non-profit or public interest groups, may be compensated at the hourly rates set forth in *Laffey*") (emphasis added); *Judicial Watch, Inc. v. DOJ*, 774 F. Supp. 2d 225, 232 (D.D.C. 2011) (same).

(explaining that the *Laffey* Matrix "is a reference rather than a controlling standard" and therefore "where the requested rates are higher than the Matrix's figures, this circumstance alone 'does not make the rates unreasonable'") (quoting *Woodland v. Viacom Inc.*, 255 F.R.D. 278, 280-81 (D.D.C. 2008) (that *Laffey* rates were lower than the rates charged by a large national law firm did "not make the [requested] rates unreasonable")).[13]

### D. Even if the *Laffey* Matrix Were to Apply, the Extended Delay and Risks Would Warrant Enhancing Its Rates.

Even under a *Laffey* paradigm[14] the Court should grant the requested fee based on an enhancement to the fixed *Laffey* rates. Enhancing the lodestar is appropriate "where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value"—which "may occur if the hourly rate is determined by a formula that takes into account only a single factor (such as years since admission to the bar) or

[13] *See also, e.g.*, *American Immigration Council v. DHS*, 82 F. Supp. 3d 396, 409 (D.D.C. 2015) (using national law firm's "normal, undiscounted hourly rates" in Freedom of Information Act litigation); *Borum v. Brentwood Vill., LLC*, No. CV 16-1723 (RC), 2020 WL 5291982, at *5 (D.D.C. Sept. 4, 2020) (hourly rates requested by large multinational law firm for work performed on sanctions motion in Fair Housing Act litigation were not unreasonable simply because they sometimes exceeded *Laffey*); *Adolph Coors Co. v. Truck Ins. Exch.*, 383 F. Supp. 2d 93, 98 (D.D.C. 2005) (declining to apply *Laffey* rates and ordering compensation to attorneys "according to their regular billing rates").

[14] If *Laffey* were to apply, the Legal Services Index ("LSI") Matrix—which is itself "conservative," *Salazar*, 809 F.3d at 65 (emphasis omitted) (citing district court findings)—would be superior to the alternative of the U.S. Attorney's Office for the District of Columbia's ("USAO") Matrix. *See Makray v. Perez*, 159 F. Supp. 3d 25, 33-35 (D.D.C. 2016) (discussing LSI and USAO matrices); *Mattachine Soc'y of Wash., D.C. v. DOJ*, 406 F. Supp. 3d 64, 71 (D.D.C. 2019) (citing *DL*, 924 F.3d at 592). "The D.C. Circuit recently ushered in the extinction of USAO Matrix rates for complex federal litigation[.]" *B.J. v. D.C.*, No. 19-CV-2163-TSC-ZMF, 2020 WL 8512639, at *2 (D.D.C. Nov. 9, 2020) (citing *DL*, 924 F.3d at 592). For purposes of LSI application, "courts in this district have identified certain elements that tend to make a case 'complex,' such as procedural complexity, time-consuming delays, and multiple in-court hearings." *Thomas*, 2022 WL 2168109, at *4 (quotation marks and citation omitted); *Feld v. Fireman's Fund Ins. Co.*, No. CV 12-1789 (JDB), 2020 WL 1140673, at *6 (D.D.C. Mar. 9, 2020). This case has involved challenging legal issues, several hearings, lengthy delays, and "matter[s] of national public interest." *Citizens for Responsibility & Ethics in Wash. v. DOJ*, 80 F. Supp. 3d 1, 5 (D.D.C. 2015).

perhaps only a few similar factors." *Perdue*, 559 U.S. at 554-55 & n.6 (citing *Laffey*). Therefore, "[a]n enhancement may be necessary if the lodestar does not reflect the true value of counsel's work." *In re Home Depot*, 931 F.3d at 1082 (citing *Perdue*, 559 U.S. at 553-54).

Class Counsel's fee request corresponds to their lodestar at market rates, and as a result, *Laffey* rates would need to be enhanced to account for the actual value of their services. *See In re Home Depot*, 931 F.3d at 1082 (enhancement is justified "where the method used in determining the hourly rate . . . does not adequately measure the attorney's true market value.") (citing *Perdue*, 559 U.S. at 553-54). Class Counsel's evidence shows that the *Laffey* rates have not kept up with the market. *See supra* Section I.A; Girard Decl. ¶¶ 52-56 & Exs. A-D. As such, the Court should apply counsel's customary hourly rates being paid by clients.

**E. The Court Should Use Class Counsel's Current Rates to Compensate for the Lengthy Delay in Payment.**

Class Counsel have pursued this case for seven years through motions to dismiss, an appeal, and a lengthy and deliberative settlement process, and respectfully submit that the Court should compensate for the delay in their payment by using their current rates. Class Counsel will "not [be] paid until long after services are rendered, and payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable." *West v. Potter*, 717 F.3d 1030, 1034 (D.C. Cir. 2013) (quotation marks and citation omitted). "Compensation for this delay is generally made either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value." *Perdue*, 559 U.S. at 556 (quotation marks and citation omitted). Thus "the Supreme Court has held that 'an enhancement for delay in payment is, where appropriate, part

of a reasonable attorney's fee.'" *West*, 717 F.3d at 1034 (quoting *Missouri v. Jenkins*, 491 U.S. 274, 282 (1989)).[15]

The slow pace of negotiations, extended delay in payment, and time-value of money all favor use of Class Counsel's current rates. *See West*, 717 F.3d at 1031 ("Compensation received years after services are rendered is less valuable than the same dollar amount received promptly.") *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C. Cir. 1980) (an adjustment for delay may be appropriate as "payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable.").[16] Compensating for a delay in payment is not limited to situations where the delay was "unusually long" or "attributable to the defendant's dilatory or stalling conduct." *West*, 717 F.3d at 1034 (reversing ruling that appeared to require these factors). Class Counsel in this case have gone without payment for over seven years, which is sufficient time to warrant applying their current rates to their past work on behalf of the class. *See Action on Smoking & Health v. C.A.B.*, 724 F.2d 211, 219 (D.C. Cir. 1984) (delay of four years qualified as a "long delay" supporting upward adjustment of lodestar). The delay also is attributable, in part, to the Government's assertion of defenses and deliberative decision-making process. *E.g.*, Dkt. # 181 (February 18, 2022 status report noting issues with comporting with "appropriate regulatory requirements"); 182 (April 18, 2022 status report attributing delay to "the requirements of a third-party U.S.

---

[15] *See also LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (holding that "current rates, rather than historical rates, should be applied in order to compensate for the delay in payment"); *Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006) (same); *Planned Parenthood Sw. Ohio Region v. Dewine*, 931 F.3d 530, 545 (6th Cir. 2019) (district court can award fees based on current rates to account for delay in payment).

[16] Since this litigation began in 2015, the dollar has experienced cumulative inflation of 25%. https://www.in2013dollars.com/us/inflation/2015?amount=1009.46#:~:text=Value%20of%20%241%2C009.46%20from%202015%20to%202022&text=The%20dollar%20had%20an%20average,Labor%20Statistics%20consumer%20price%20index.

government entity implicated in funding the settlement" that were only identified "recently"); Dkt. # 196 (OPM moved for another extension of time on May 3, 2022); *cf. Perdue*, 559 U.S. at 556 (allowing that "an enhancement may be appropriate where an attorney assumes these costs in the face of unanticipated delay, particularly where the delay is unjustifiably caused by the defense.").

Class Counsel should be rewarded for their commitment to reinstating and fairly resolving class members' claims. The parties engaged in protracted settlement negotiations throughout 2020 and into 2021. When it became clear that the parties were at an impasse over several complex issues, Lead Counsel proposed and the Court granted a joint request for referral to Judge Bates, which marked a turning point. Girard Decl. ¶¶ 15-16. The long delay, the creativity and skill displayed by counsel, and the course of litigation well justify the use of Class Counsel's current rates. *See, e.g.*, *James v. D.C.*, 302 F. Supp. 3d 213, 226 (D.D.C. 2018) (applying current rates to compensate for "delay in payment [of] over five years"); *Craig v. D.C.*, 197 F. Supp. 3d 268, 277 n.6 (D.D.C. 2016) (applying current rates to compensate for delayed payment in Title VII case).[17]

**F. The Number of Hours Class Counsel Devoted to This Litigation Is Reasonable.**

To establish that the number of hours expended in this litigation is reasonable, Class Counsel "need not present the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." *Concerned Veterans*, F.2d at 1327 (citation omitted). Lead Counsel managed the litigation efficiently and effectively, matching projects to the appropriate level of experience and taking care to avoid duplication. Girard Decl.

[17] *See also, e.g.*, *Rodriguez ex rel. Fogel v. City of Chicago*, No. 08 C 4710, 2013 WL 5348307, at *3 (N.D. Ill. Sept. 24, 2013) ("Using the current market rates for [plaintiff's] attorneys . . . fairly compensates her attorneys for the time spent litigating the case over the past six years.") (citation omitted); *Doe v. Prudential Ins. Co. of Am.*, 258 F. Supp. 3d 1089, 1095 (C.D. Cal. 2017) (awarding plaintiff's counsel "their current hourly rate . . . rather than the historical rate to account for the delay in receipt of payment.").

¶¶ 36, 60. In audit parameters given to co-counsel firms and in calculating the lodestar, Lead Counsel limited the compensable hours for work conducted by other firms before Lead Counsel was appointed that did not confer a substantial benefit on the class, such as drafting duplicative complaints, and all post-appointment time included in the lodestar was spent on work approved in advance by Lead Counsel. *Id.* ¶ 61. Lead Counsel also carefully audited the daily timesheets of each co-counsel firm, exercising billing judgment to eliminate any unnecessary or excessive time and expenses. *Id.* Altogether, this process removed hundreds of thousands of dollars in attorney time and expenses. *Id.*; *see In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 384 (D.D.C. 2002) (finding time spent reasonable in part because class counsel "reduced the time submitted to account for possible inefficiencies and duplication of effort"); *Copeland*, 641 F.2d at 891 (noting that counsel should apply their "billing judgment" to a fee request). Each of the firms representing Plaintiffs has prepared and submitted a declaration in support of this application, describing their work and listing cases in which courts have approved their billing rates. *See* Girard Decl., Ex. E.

Class Counsel's total hours and lodestar reflect efficient performance in the context of this lengthy multiparty litigation—particularly where Lead Counsel continue performing legal services on behalf of class members. Girard Decl. ¶¶ 19, 53. The Government put forward a skilled and tenacious defense in this case, increasing the time and work needed to bring the case to a successful conclusion. "The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *City of Riverside v. Rivera*, 477 U.S. 561, 580-81 n.11 (1986) (citation omitted); *see also Craig v. Mnuchin*, No. CV 14-1340 (RC), 2018 WL 6079512, at *22 (D.D.C. Nov. 21, 2018); *Hawkins v. Ctr. for Spinal Surgery*, No. 3:12-CV-01125, 2017 WL 6389679, at *8 (M.D. Tenn. June 21, 2017) ("Defendant has thoroughly defended itself

throughout this case and should not now complain about opposing counsel's time expenditure."); *Willson v. City of Bel-Nor, Mo.*, No. 4:18-CV-003 RLW, 2021 WL 2255003, at *5 (E.D. Mo. June 3, 2021) (applying same principle in rejecting local government's challenge to fees as excessive).

The 10,750 hours expended by Class Counsel in this data breach MDL were reasonable and necessary to bring it to a successful result. Girard Decl. ¶ 63; *compare, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *3 (N.D. Cal. Aug. 17, 2018) (class counsel expended nearly 80,000 hours of professional time to obtain a $115 million data breach settlement); *In re Capital One Consumer Data Sec. Breach Litig.*, No. 1:19-md-02915-AJT-JFA, Dkt. # 2231 (64,739 hours); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 WL 3341200, at *10 (W.D. Ky. Aug. 23, 2010) (finding 11,453 hours reasonable). Class Counsel investigated the facts, prepared the master complaint, communicated with interested clients and other class members, often on a daily basis, analyzed potential causes of actions and damages, briefed and argued the motions to dismiss, briefed and argued the appeal, engaged in protracted mediation efforts, and documented and supervised administration of the settlement, among other work. Girard Decl. ¶¶ 3-19; *see Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 206 (D.D.C. 2011) (approving, as reasonable, hours spent on "research into [defendant] and its practices; analyses of potential damages; engaging in formal and informal discovery; the filing of the class action complaint; settlement negotiations; the process of obtaining preliminary approval of the proposed settlement, including responding to objections and revising the settlement agreement" as well as time attending the fairness hearing and responding to objections); *Rogers v. Lumina Solar, Inc.*, No. 18-CV-2128 (KBJ), 2020 WL 3402360, at *12 (D.D.C. June 19, 2020) (approving time spent on researching defendant and legal questions); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 97 (D.D.C. 2013) (time spent assisting

class members, including with claims, is compensable). And the work of Class Counsel continues. Girard Decl. ¶¶ 19, 53; *see, e.g.*, *Hausfeld v. Cohen Milstein Sellers & Toll, PLLC*, No. 06-cv-826, 2009 WL 4798155, at *17 (E.D. Penn. Nov. 30, 2009) ("[W]here attorneys provide additional services post-settlement . . . courts should award fees for those services."); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 746 F. App'x 655, 659 (9th Cir. 2018) (projected future work included in lodestar cross-check calculation); *see also In re Home Depot Inc.*, 931 F.3d at 1093 (under a lodestar approach, attorney time spent on fee-related proceedings is compensable) (citing Rubenstein, Newberg on Class Actions § 15:93).

**G. A Percentage Cross-Check Confirms That the Requested Fee is Reasonable.**

Although not required, a percentage cross-check further demonstrates that the requested fee is reasonable. *See In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d at 101 (noting "courts are free to employ such a cross-check at their discretion to confirm the reasonableness of an award"); *Stephens v. U.S. Airways Grp., Inc.*, 102 F. Supp. 3d 222, 230 (D.D.C. 2015) (cross-check confirmed reasonableness of fee request). While the amount of the fee is not agreed upon in the settlement, OPM will pay the fee separately from the settlement fund for class members. The "rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995); *see also Glasser v. Volkswagen of Am., Inc.*, 645 F.3d 1084, 1088 (9th Cir. 2011) ("[W]e consider the independent fee award and class recovery as a 'constructive common fund.'") (citation omitted).

A percentage cross-check shows that Class Counsel's fee request of $8,545,537.35 represents only 12% of the $71,545,537.35 "constructive" fund—consisting of the class's settlement fund plus the fee. *See Boeing v. Van Gemert*, 444 U.S. 472, 479-81 (1980) (explaining

that attorneys' fees awarded in connection with a reversionary common fund should be based on the total potential recovery made available). This percentage is low compared with the one-third fee provided for in standard contingency contracts,[18] and with the D.C. Circuit's benchmark percentage range "between twenty and thirty percent." *Swedish Hosp. Corp.*, 1 F.3d at 1272.[19]

## II. THE LITIGATION EXPENSES ARE REASONABLE AND SHOULD BE REIMBURSED.

Class Counsel also seek reimbursement of the litigation expenses they have advanced in this case of $174,481.88. Girard Decl. ¶¶ 62-63. Class Counsel should be reimbursed for these out-of-pocket costs reasonably incurred in investigating, prosecuting, and settling the action. *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391-92 (1970). Under the settlement, OPM has agreed to reimburse Class Counsel for these reasonable litigation expenses. SA § VI.A-B.

Lead Counsel took "steps . . . to reduce, standardize, and audit costs across all plaintiffs' counsel firms" and had "the inherent incentive in contingency-fee litigation to minimize expenses due to the risk of failing to secure any recovery." *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 113 (D.D.C. 2013); Girard Decl. ¶ 61. Class Counsel's advances include the costs of the private mediator, filing fees, travel, computer research, and other typical and customary litigation expenses. Girard Decl. ¶¶ 58-59 & Ex. E; *see In re Domestic*

[18] *See* Charles Silver, *Due Process and the Lodestar Method: You Can't Get There from Here*, 74 Tul. L. Rev. 1809, 1842-43 (2000); *Blum*, 465 U.S. at 903-04 n.* (Brennan, J., concurring) (quoting *Copeland*, 641 F.2d at 893).

[19] *See also, e.g.*, *Jackson v. Wells Fargo Bank, N.A.*, 136 F. Supp. 3d 687, 713 (W.D. Pa. 2015) (awarding 25.6% of constructive common fund in attorneys' fees); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (25% of settlement is benchmark for attorneys' fees); *Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 5:16-CV-125, 2021 WL 1851404, at *4 (D. Vt. May 10, 2021) ("One-third falls well within the range of awards in other class actions within the Second Circuit."); *Woburn Ret. Sys. v. Salix Pharms., Ltd.*, No. 14-CV-8925 (KMW), 2017 WL 3579892, at *6 (S.D.N.Y. Aug. 18, 2017) (approving award of 21.24% of $210 million fund); *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 653 (E.D. Pa. 2015) (noting that awards in the district generally ranged between 19 to 45% of a common fund).

*Airline Travel Antitrust Litig.,* No. MC 15-1404 (CKK), 2019 WL 5135424, at *1 (D.D.C. May 14, 2019) (approving expenses for, among other things, hearing transcripts, conference call servicing, and legal research). "These expenses are the types of expenses that are necessarily incurred in complex commercial litigation and routinely charged to clients billed by the hour." *Howard v. Liquidity Servs. Inc.*, No. CV 14-1183 (BAH), 2018 WL 4853898, at *8-9 (D.D.C. Oct. 5, 2018) (quotation marks and citation omitted). Class Counsel's expenses are reflected on the books and records of the respective firms, and were reasonable and necessary to the successful resolution of this case. Girard Decl. ¶ 62. The Court should approve their reimbursement.

## III. THE COURT SHOULD GRANT SERVICE AWARDS TO PLAINTIFFS FOR THEIR YEARS OF SERVICE TO THE CLASS.

Plaintiffs also respectfully ask that the Court approve service awards in recognition of their contributions. "[C]ourts in this District routinely grant service awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Scott v. JPMorgan Chase Bank, N.A.*, No. 17-CV-00249 (APM), 2018 WL 11409985, at *2 (D.D.C. Aug. 17, 2018) (citing *In re Lorazepam & Clorazepate Antitrust Litig.*, No. 99MS276(TFH), 2003 WL 22037741, at *10 (D.D.C. June 16, 2003)).[20] Plaintiffs seek $5,000 individual service awards in light of their significant efforts for the class over several years. *See*

[20] Service or "incentive awards have often been used to compensate a class representative for incurring expenses or taking on financial risk." *Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015) (citing *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 CIV. 5587(PKL), 2003 WL 21136726, at *2 (S.D.N.Y. May 15, 2003)); *Keepseagle v. Perdue*, 856 F.3d 1039, 1056 (D.C. Cir. 2017) (similar). The Eleventh Circuit is an outlier in its rejection of incentive payments, *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244 (11th Cir. 2020), as other Circuits—including the D.C. Circuit—have upheld the use of such payments. *See, e.g.*, *Cobell*, 802 F.3d at 25; *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019); *Berry v. Schulman*, 807 F.3d 600, 613-14 (4th Cir. 2015); *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080-81 (7th Cir. 2013); *In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015); *Brady v. Air Line Pilots Ass'n*, 627 F. App'x 142, 146 (3d Cir. 2015).

*Kinard v. E. Capitol Fam. Rental, L.P.*, 331 F.R.D. 206, 217 (D.D.C. 2019) (approving $5,000 service awards to plaintiffs who "participate[d] in a lengthy mediation process").

In determining whether to grant a service award and its amount, "courts consider factors such as the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 207 (D.D.C. 2011) (quotation marks and citation omitted); *see also Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998); *McGee v. Ann's Choice, Inc.*, No. CIV.A. 12-2664, 2014 WL 2514582, at *3 (E.D. Pa. June 4, 2014) (considering the "duration of the litigation" in deciding to grant service award). All of the Plaintiffs have made valuable contributions to the settlement and risked adverse consequences by filing suit following the theft of their sensitive personal information. *See Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 412 (S.D.N.Y. 2019) (granting service award in light of the risk the plaintiff took in lending his name to the case); *Willner v. Manpower Inc.*, No. 11-CV-02846-JST, 2015 WL 3863625, at *9 (N.D. Cal. June 22, 2015) (noting "the risk to her reputation" in approving a plaintiff's service award).

Among other contributions, each Plaintiff communicated with Class Counsel over the span of six or seven years, searched for and preserved their records, provided confidential information and documents related to the breach, reviewed and approved the pleadings, stayed apprised of case progress and settlement negotiations, and approved the settlement with OPM and Peraton. Girard Decl. ¶ 65; *see Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 79 (D.D.C. 2011) (approving service awards for plaintiffs whose work included "providing information about their experiences to Class Counsel, reviewing the legal filings, providing informal discovery, and reviewing and endorsing the settlement terms."). Each Plaintiff also assisted with the mediation efforts by

providing detailed information in follow-up interviews with Class Counsel and in written questionnaires in response to OPM's information requests. *See Kinard*, 331 F.R.D. at 217 (noting plaintiffs "participate[d] in a lengthy mediation process").

The Named Plaintiffs requesting service awards include both the designated class representatives in the First Amended Consolidated Complaint (Dkt. # 189) and an additional nine Plaintiffs in the earlier Consolidated Amended Complaint who are not members of the settlement class. *See* SA § II.B.14. OPM has contended in negotiations that Named Plaintiffs who are not settlement class representatives cannot receive a service award because they did not sustain actual damages that would allow them to make a claim under the settlement. But, in the context of this case, these additional Named Plaintiffs have standing to sue Peraton and any service awards will be paid from *Peraton's* contribution to the settlement, which aligns with their standing. Moreover, receiving a service award is different in nature from recovering damages out of a judgment, *see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021), such that Plaintiffs ineligible for cash relief can receive service awards by virtue of their efforts to help bring about the settlement benefitting the class. *See, e.g.*, *Karraker v. Rent-A-Ctr., Inc.*, 492 F.3d 896, 900 (7th Cir. 2007) (plaintiff in fee-shifting case who obtained class-wide injunctive relief, but no monetary recovery, was awarded a $5,000 service award payment from the defendant). Recognizing such efforts, courts in approving the settlement of class actions have granted such payments to former plaintiffs. *See, e.g.*, *In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig.*, No. CV 12-711 (AET) (LHG), 2018 WL 2722458, at *2 (D.N.J. May 10, 2018) (awarding service award payments to "[t]he current and former proposed class representatives"); *Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1312-16 (S.D. Cal. 2017) (granting service awards to class representatives whose efforts benefitted the class, including a former plaintiff). Similarly, the Named Plaintiffs

are identically situated with respect to the purposes of service awards—to compensate plaintiffs for their work on behalf of an aggrieved class and for the risks they assumed by bringing the case, and to encourage socially beneficial litigation. *See Cobell*, 802 F.3d at 25; *Cook*, 142 F.3d at 1016. These policies apply in the same way to all Named Plaintiffs, each of whom was a proposed class representative from 2016 (at the latest) to May 2022, when the Court granted leave to amend the complaint in conjunction with the settlement. Dkt. # 189.

The Court should therefore grant the requested awards because each Plaintiff contributed to the settlement and the "class has benefitted from the filing of the class action and from the time [Plaintiffs] expended" to assist in bringing about this successful outcome. *In re Lorazepam*, 2003 WL 22037741, at *11 (citation omitted).

## CONCLUSION

For the foregoing reasons, Class Counsel respectfully request that the Court award attorneys' fees in the amount of $8,545,537.35, reimbursement of litigation expenses in the amount of $174,481.88, and service awards of $5,000 to each of the Named Plaintiffs.

DATED: July 21, 2022

Respectfully submitted,

**GIRARD SHARP LLP**

/s/ *Daniel C. Girard*

Daniel C. Girard
Jordan Elias
Simon S. Grille
601 California Street
Suite 1400
San Francisco, CA 94108
(415) 981-4800
dgirard@girardsharp.com

*Lead Class Counsel*

David H. Thompson
Peter A. Patterson
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036

Tina Wolfson
Theodore Maya
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue
Suite 500
Burbank, CA 91505

John Yanchunis
Marcio W. Valladares
Patrick A. Barthle II
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 North Franklin Street
7th Floor
Tampa, FL 33602

*Plaintiffs' Steering Committee*

Gary E. Mason
**MASON LLP**
5101 Wisconsin Avenue, N.W.
Suite 305
Washington, D.C. 20016

*Liaison Counsel*

Norman E. Siegel
Austin Moore
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road
Suite 200
Kansas City, MO 64112

*Additional Plaintiffs' Counsel*