**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: U.S. OFFICE OF PERSONNEL MANAGEMENT DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To:<br>ALL CASES | Misc. Action No. 15-1394 (ABJ)<br>MDL Docket No. 2664 |

**DECLARATION OF DANIEL C. GIRARD IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS**

I, Daniel C. Girard, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am at partner of Girard Sharp LLP and Lead Class Counsel in this action. I submit this declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards. I make this declaration based on my own personal knowledge, and if called upon to do so, could testify competently to the matters set forth herein.

**Overview of Litigation and Legal Services Provided to the Class**

2. This litigation stems from Defendant U.S. Office of Personnel Management's ("OPM") announcements beginning June 4, 2015 that its electronic systems had been breached, resulting in the compromise of personal information of over 21 million current, former, and prospective federal employees and members of their families (the "Data Breaches").

3. After OPM's initial announcement, Girard Sharp filed the first class action in this litigation, on behalf of the American Federation of Government Employees and two individual Plaintiffs. *See AFGE v. U.S. Office of Personnel Management*, No. 1:15-cv-01015 (D.D.C. filed June 29, 2015). To prepare the complaint, we worked closely with AFGE and other clients to develop the factual allegations and ensure their accuracy, in part by examining reports from OPM's Office of Inspector General that identified OPM system vulnerabilities leading up to the Data Breaches. Our complaint pleaded the core claims included in subsequent complaints—for violations of the Privacy Act of 1974, 5 U.S.C. § 552a, against OPM, and for negligence against its contractor, Defendant Peraton Risk Decision Inc. ("Peraton"), then known as KeyPoint Government Solutions.

4. After we filed that complaint, victims of the Data Breaches began contacting Girard Sharp on a daily basis for legal advice. As a result, in 2015 our professionals interviewed, advised,

and otherwise corresponded with more than 450 individuals concerning the breach, the litigation, and their rights and potential remedies.

5. Several other class actions were filed asserting claims against OPM for failing to reasonably safeguard their information in violation of the Privacy Act and against Peraton for negligence, among other allegations.

6. In September 2015 OPM made identity theft protection and credit monitoring and restoration services available to the breach victims at no charge. Congress later extended these services through September 2026. As of March 31, 2022, 3,222,987 people had signed up for these services. By September 2026 the Government will have spent approximately one billion dollars on the services.

7. Girard Sharp supported centralization and transfer of the related cases to this Court; I presented argument to the Judicial Panel on Multidistrict Litigation on October 1, 2015. On October 9, 2015, the Panel ordered centralization of all cases in this litigation. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 138 F. Supp. 3d 1379 (J.P.M.L. 2015).

8. Girard Sharp in November 2015 led preparation of the first draft of the joint case management conference statement pursuant to this Court's initial pretrial Order. (Dkt. # 8.) In November and December 2015, Girard Sharp actively coordinated among all Plaintiffs' counsel and Defendants' counsel to develop common positions in the joint statement and at the December 15, 2015 status conference.

9. After being appointed as Lead Counsel on January 28, 2016 (Dkt. # 58), Girard Sharp continued to investigate the facts learned through interviews and correspondence with breach victims and through consultations with data security experts. We tasked executive committee member John Yanchunis with leading the investigation into the Government's data security failures. Joined by

attorneys at executive committee member firm Cooper & Kirk, we also consulted experts on potential ways of quantifying the mental harm to victims. Further, we monitored continuing reports relating to the Data Breaches and analyzed the sufficiency of the steps taken by Defendants to mitigate the damage caused. We also continued to regularly provide information to AFGE and hundreds of its members regarding the litigation. To better understand the impact of the Data Breaches and the factual circumstances and concerns of class members, we consulted and interviewed a large sampling of AFGE members.

10. Relatedly, in early 2016, Girard Sharp led a sustained effort to interview and vet potential plaintiffs for the Consolidated Amended Complaint, working closely with Stueve Siegel Hanson LLP and other co-counsel firms. Simultaneously, Girard Sharp attorneys researched and prepared the Consolidated Amended Complaint. In doing so, we verified allegations regarding breach victims selected for inclusion as Plaintiffs and incorporated other comments from executive committee firms. Plaintiffs filed their 275-paragraph consolidated amended complaint on March 14, 2016. (Dkt. # 63.)

11. Defendants separately moved to dismiss on May 13, 2016. (Dkt. # 70, 72.) Girard Sharp led and coordinated the research and drafting of a 110-page opposition brief—a substantial project given the number and complexity of arguments to address. (Dkt. # 82.) The Court heard argument on those motions on October 31 and November 10, 2016. Girard Sharp coordinated the allocation of responsibility for oral argument among the members of the Executive Committee, and oversaw the preparation for the hearings.

12. On September 19, 2017, the Court dismissed Plaintiffs' claims without leave to amend. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 266 F. Supp. 3d 1 (D.D.C. 2017). Girard Sharp led the prosecution of Plaintiffs' appeal that followed. We developed an advocacy strategy in

the D.C. Circuit, framed three issues for appeal, and researched and drafted the opening and reply briefs. At Girard Sharp's request, Mr. Patterson of Cooper & Kirk argued the appeal. On June 21, 2019, the Court of Appeals reinstated the claims in part and remanded. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019) (per curiam). After the Court of Appeals issued its decision, Girard Sharp prepared a response to Defendants' petitions for rehearing.

13. On remand, Girard Sharp prepared a discovery plan and requests for production of documents. When the Government expressed an interest in settlement, and with this Court's approval, Plaintiffs agreed to mediate the case before retired federal District Judge Lawrence F. Stengel, an experienced mediator to whom this Court referred the litigation on January 27, 2020. The parties held separate conference calls and video sessions with Judge Stengel to discuss their positions and potential paths forward in the negotiations. While the substance of the negotiations remains confidential, Girard Sharp as assisted by other Plaintiffs' counsel prepared mediation briefs, presentations to the mediator, demand letters, bench memos for Judge Stengel on discrete issues, and detailed charts showing categories of compensable loss under the Privacy Act with corresponding damages. Over the course of the negotiations I spoke with Judge Stengel many times, and Class Counsel participated in an all-day video session with Judge Stengel in March 2020 to discuss Plaintiffs' positions and potential paths forward. We also exchanged information with the Government and examined Peraton's relevant liability insurance policies under Judge Stengel's supervision. The parties were fully informed of the strengths and weaknesses of the case, including through scrutiny of the report issued September 7, 2016 by the House Committee on Oversight and Government Reform.

14. With Judge Stengel's assistance, the parties made progress in negotiating a framework for a potential class-wide resolution. Several factors complicated the negotiations, however,

including OPM's immunity, subject to the Privacy Act exception described in *FAA v. Cooper*, 566 U.S. 284 (2012); agreeing on which factual scenarios would make an individual eligible to recover under the Act; the evidentiary support that would be needed to recover; and whether the Government and Peraton would agree to settle on the basis of a narrowed class.

15. By the middle of 2020, the negotiations had broken down, and the Government allowed the referral to Judge Stengel to expire. Girard Sharp continued to engage directly with counsel for Defendants, and the Court approved extensions of time that allowed these discussions to proceed. Further progress was slow, however. When it became clear that the parties were at an impasse on several issues, including continuing disputes over the scope of the release, the class definition, eligible categories of compensable loss, and the amount of individual payments to claimants, Girard Sharp proposed and the Court in July 2021 granted a joint request for referral to Senior District Judge John D. Bates.

16. After discussions with Judge Bates, the parties were able to agree on a settlement class limited to individuals who incurred objectively-defined forms of pecuniary loss stemming from the Data Breaches, and a settlement release properly limited to the claims of individuals who are eligible to claim a share of the $63 million fund. The parties also reached agreement on the critical settlement agreement term providing for individual payments to claimants of $700. In 2022, we turned to drafting and negotiating the details of settlement documentation, including the agreement as well as the notice and notice plan, proposed approval orders, and claim form. The parties executed their Settlement Agreement ("SA") on May 5, 2022.

17. Also during the spring of 2022, Girard Sharp and defense counsel held a series of joint video conferences with the Claims Administrator, Epiq Class Action & Claims Solutions, Inc.

("EPIQ"), to plan for notice and claims administration. Girard Sharp prepared the preliminary approval motion and supporting papers, and prepared for argument on the motion.

18. On June 3, 2022, the Court conducted its hearing on Plaintiffs' preliminary approval motion, and on June 7 it granted preliminary approval of the Settlement, setting the Fairness Hearing for October 14. (Dkt. # 193.)

19. Since the Court granted preliminary approval, Girard Sharp has supervised the dissemination of the notice in accordance with the Court's Order; communicated directly with dozens of claimants who called or emailed with questions about the settlement or making a claim; audited all time and expense records after providing directions to all co-counsel firms regarding their initial auditing and submission of those records; prepared Plaintiffs' motions for final approval and for attorneys' fees, expenses and service awards; provided detailed time and expense information to the Government, and begun preliminary negotiations in an effort to resolve the attorneys' fee application. In communications with breach victims regarding the settlement, Girard Sharp attorneys have answered their questions about the scope of the settlement, the documentation required to make a claim, including for lost time, and why the settlement is limited to claims of economic loss. Many callers have expressed continuing concern about being exposed to various threats because of the Data Breaches, and many have expressed their gratitude to Class Counsel for their representation of the Class and the result achieved.

**The Settlement, Notice, and Claims Administration**

20. The Settlement Agreement incorporates five exhibits: the proposed Notice (Ex. 1), Claim Form (Ex. 2), Preliminary Approval Order (Ex. 3), Final Approval Order and Judgment (Ex. 4), and Notice Plan (Ex. 5).

21. The Settlement Agreement provides that within seven days after final approval, OPM will provide the U.S. Department of Treasury, Bureau of Fiscal Service Judgment Fund ("Judgment Fund") with all necessary documentation to effect payment of $60,000,000 into the Settlement Account. (SA § III.A.) Within 14 days after the Judgment Fund has deposited OPM's payment, Peraton will pay an additional $3,000,000. (SA § III.B.) Any service payments awarded by the Court to the Named Plaintiffs will be paid out of Peraton's contribution. (SA § VI.B.)

22. The Settlement Account will be funded through two accounts, a qualified settlement fund maintained by the Claims Administrator (funded by Peraton's contribution) and an account maintained by the Treasury Department (funded by the Government's contribution). Upon the Effective Date, an amount sufficient to pay all valid claims, less any offsets required by federal law, will be disbursed from the Treasury Department to the qualified settlement fund, from which the Claims Administrator will pay claimants.

23. OPM will pay the costs of notice and claims administration, and attorneys' fees as awarded by the Court, separately from the settlement fund. (SA §§ II.B.12, V.A, VI.A.) OPM and Class Counsel together selected EPIQ to serve as Claims Administrator. EPIQ personnel have specialized knowledge and expertise with managing class action notice and claims processes, including in previous settlements involving the Government. As noted above, EPIQ in this case participated in the final rounds of settlement discussions, advising the parties on administrative matters, such as optimizing class notice and the form and content of the claim form. In addition to managing the notice program and receiving and processing claims, EPIQ has created and will maintain a dedicated Settlement Website—www.opmdatabreach.com—containing links to the Notice, Claim Form, and all other relevant documents.

24. The proposed Notice (SA, Ex. 1) provides all information required by Rule 23(c)(2)(B) and directs potential Class members to the Settlement Website, where they can make a claim and learn more about the Settlement and their rights and options. The Notice Plan includes a multifaceted program for notifying Class members of the Settlement. (SA, Ex. 5.) The Class of breach victims who experienced economic loss is far narrower than the group of all victims, and attempting to mail notice to that full group (many of whose addresses are now outdated) would result in notice expenses significantly out of proportion to the settlement fund. There is no centralized or readily obtainable list of emails for the approximately 22 million breach victims. Faced with the national security and other practical limitations that prevented notifying this entire group—limitations described in more detail in the Glasgow Declaration (Dkt. # 188-10) and the Sorrento Declaration (Dkt. #188-11)—the parties in consultation with EPIQ crafted a comprehensive plan of notice that features a large direct-notice component.

25. The approximately 3.2 million victims who have accepted OPM's offer of free identity protection and credit restoration services demonstrated an interest in protecting themselves from the consequences of the Data Breaches, which makes them comparatively more likely to be Class members than other victims. What's more, according to the Claims Administrator, email addresses for 2,761,698 of these individuals are known and accessible. Thus, after this Court granted preliminary approval, this group received direct notice of the Settlement via email, based on contact information maintained by the vendor for these services, IDX. For emails that bounced back as undeliverable, a postcard version of the notice is being sent via U.S. mail to the corresponding address in IDX's database. Also in July 2022, email notices were sent directly to more than nine hundred thousand potential Class members via the AFGE union membership listserv.

26. The Claims Administrator has implemented a publication campaign tailored to reach the Class that will extend for several weeks. This campaign includes digital ads algorithmically targeted based on the demographic composition of the federal workforce; digital ads on social media platforms and other websites that Class members are likely to visit, such as federalsoup.com; a press release; radio ads; and print ads in such publications as *Stars and Stripes*, which serves the United States Armed Forces. The Claims Administrator's notice expert, Cameron Azari, estimates that this notice campaign will reach at least 80% of the Class.

27. Class Counsel have ensured that the Settlement notice and claim procedures include a series of coordinated measures to facilitate claims. The continuing notice efforts through social media, federal employee unions, and other channels will lead to increased awareness of the Settlement over time. Likewise, the claim period will extend for longer than usual—until December 23, which is 200 days after Preliminary Approval. (SA § V.C.1.) The Claim Form also has been carefully designed for ease of understanding and use. (SA, Ex. 2.) Class members can file online and call live agents toll-free with questions or for help with filing a claim, and Class Counsel are also available to assist claimants and answer their questions directly.

28. Any member of the Class may submit a completed Claim Form for review. (SA § V.) Section V of the Settlement Agreement sets out the criteria that the Claims Administrator will use in evaluating claims. The Recovery Period extends from May 7, 2014 through January 31, 2022. (SA § II.B.20.)

29. As of July 20, 2022, a total of 8,482 claims have been made. While the claims period is ongoing, early claims data indicate the fund will be adequate to compensate all claimants in the agreed amounts. Valid claims will be paid from the Settlement Account after the Effective Date. (SA § V.C.2.) Each valid claim will be paid at $700, except if the actual amount of documented loss

exceeds $700, the claim will be paid in that amount, up to $10,000. (SA § V.C.7.) Valid claims will be paid out of the Peraton Contribution until it is exhausted, and then out of the OPM Contribution. (SA § V.C.7.) If the balance in the Settlement Account does not cover all valid claims, each will be reduced *pro rata* before payment. (SA § V.C.8.) If a balance remains after all valid claims are paid, and the Court finds that the Notice Plan has been implemented in accordance with the Preliminary Approval Order and that Class members had an opportunity to submit claims and participate in Settlement distributions, the remaining amount will be returned to the U.S. Treasury. (SA § V.C.9.)

30. Any Class member may opt out of the Class or object to the Settlement or to Plaintiffs' request for attorneys' fees, reimbursement of expenses, and service awards. (SA §§ IX.C, IX.E.) Any person who opts out or objects must provide information sufficient for the Claims Administrator to verify that the person is a Class member. (SA §§ IX.C.1, IX.E.1.) Opt-outs and objections are due no later than September 9, 2022, which is 35 days before the Court's final fairness hearing. (SA §§ IX.C.1, IX.E.1.) Opt-out requests must be submitted by the same date in writing to the Claims Administrator, which will compile a list of valid opt-outs for submission to the Court. (SA § IX.C.1.)

31. Plaintiffs are applying for an award of reasonable attorneys' fees, reimbursement of litigation expenses, and approval of service awards. (SA § VI.A-B.) Defendants may oppose this motion. (SA § VI.A-B.) OPM will submit to the Judgment Fund for payment—separate from the Settlement Claims Amount—attorneys' fees and expenses as awarded by the Court. (SA § VI.A.) Peraton will have no obligation with respect to an award of attorneys' fees and expenses, but any service awards approved by the Court will be paid out of the Peraton Contribution. (SA § VI.A-B.)

32. The Settlement has been carefully negotiated by the parties over a period of more than two years. Class Counsel believe, based on claim levels in similar cases and the rate of claims

to date, that the Settlement Claims Amount will be adequate, and that the Settlement adequately accounts for the risks and unique aspects of this litigation and is reasonable and fair in all respects. The Settlement is supported by each Named Plaintiff and Class Representative regardless of whether they are eligible to make a claim or the Court approves any service awards.

**Overview of Girard Sharp**

33. Girard Sharp LLP is a national litigation firm that serves individuals, institutions and business clients in cases involving antitrust, securities, consumer protection, privacy, and whistleblower laws. Girard Sharp is distinguished as a Tier 1 law firm for plaintiffs' mass tort and class action litigation by *U.S. News & World Report* and has been included on its list of "Best Law Firms" from 2013 to 2022. *The National Law Journal (NLJ)* also named Girard Sharp to its elite "Plaintiffs' Hot List," a selection of top U.S. plaintiffs' firms recognized for wins in high-profile cases. Girard Sharp has been selected as counsel following competitive application processes by such clients as the California Teachers' Retirement System, the California Public Employees' Retirement System, and the Kansas Public Employees' Retirement System. Girard Sharp's past clients include Allianz Life Insurance Company and Fireman's Fund Insurance Company.

34. Girard Sharp specializes in class action litigation in courts throughout the United States. The firm brought to this case many years of experience in complex litigation, and specialized knowledge of data privacy cases that was critical to obtaining the Settlement before the Court. Girard Sharp has led cases in a range of subject matter areas, including securities, antitrust, products liability, consumer finance, predatory lending, life sciences, sexual abuse, and civil rights. Some representative cases illustrating the scope of Girard Sharp's experience are:

- *In re USC Student Health Center Litigation*, No. 2:18-cv-04258-SVW (C.D. Cal.). Girard Sharp served as co-lead class counsel in an action brought by women alleging Dr. George Tyndall sexually assaulted them and that USC and the Board of Trustees of USC failed to respond appropriately to Dr. Tyndall's misconduct. Along with co-

lead counsel, Girard Sharp negotiated a settlement finally approved in 2020 that created a $215 million fund and required USC to adopt and implement procedures to identify and prevent sexual misconduct.

- *In re Lenovo Adware Litigation*, MDL No. 2624 (N.D. Cal.). Girard Sharp is co-lead counsel for a class of computer purchasers whose online activities were surreptitiously monitored by pre-installed software that degraded the computers' performance, operating continuously in the background as it analyzed browsing activity and injected ads into visited webpages. The court certified a nationwide indirect purchaser class for trial, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016), and the case then settled favorably for class members.

- *Corona v. Sony Pictures Entertainment*, No. 2:14-cv-09600-RGK-SH (C.D. Cal.). Girard Sharp served as co-lead counsel in a class action brought on behalf of current and former employees of Sony Pictures Entertainment following a cyberattack attributed to North Korean intelligence as retaliation for release of the film *The Interview*. In April 2016, the court approved a class settlement that reimbursed losses and provided extended credit monitoring—a structure adopted in many subsequent data breach settlements.

- *In re Lehman Brothers Holdings Securities & ERISA Litigation*, No. 09-MD-2017 (S.D.N.Y.). I was appointed to the executive committee charged with managing MDL proceedings arising out of the collapse of Lehman Brothers Holdings, Inc., the largest bankruptcy in American history. Girard Sharp also served as class counsel for a certified class of retail investors in Lehman-issued principal protection notes sold by UBS Financial Services, Inc. The *Lehman* litigation yielded recoveries of $735 million.

- *Billitteri v. Securities Am., Inc.*, No. 3:09-cv-01568-F (N.D. Tex.). I served as lead counsel in an action brought by investors in a failed investment scheme. Girard Sharp coordinated settlement negotiations with bankruptcy trustees and competing plaintiff groups, securing a global $150 million settlement. In approving the settlement, the court wrote that "Class counsel in this case possess great competence and experience, and the result reached in this case perfectly exemplifies their abilities. The Court has been extremely impressed with the conduct, skill, and accomplishment of class counsel throughout this litigation." 2011 WL 3585983, at *8 (N.D. Tex. Aug. 4, 2011).

- *Paeste v. Government of Guam*, No. 1:11-cv-00008 (D. Guam). Girard Sharp obtained a permanent injunction against the government of Guam requiring the timely payment of refunds of the Guam Territorial Income Tax. The plaintiffs challenged the government's refund program, pursuant to 42 U.S.C. § 1983, as a violation of equal protection and asserted claims under the Organic Act of Guam. The Ninth Circuit affirmed the district court's orders, rejecting Guam's sovereign immunity and subject matter jurisdiction arguments. 798 F.3d 1228 (9th Cir.), *cert. denied*, 579 U.S. 928 (2016).

35. Girard Sharp is representing Plaintiffs and class members in this case on a pure contingency basis. In pursuing these claims, the firm risked the outlay of substantial time and out-of-pocket expenses with no guarantee of recovery. We recognized that the litigation against the U.S. government would be lengthy and hard fought, and defended by sophisticated and experienced counsel, heightening the risk of being uncompensated. Professional time that Girard Sharp devoted to this case would otherwise have been spent on other matters.

**Attorney Staffing and Fees**

36. Girard Sharp has staffed projects necessary to the successful outcome of this matter with attorneys and staff according to their skills and expertise, and sought to avoid duplication and other efficiencies in prosecuting the case. All work reflected in the lodestar was performed for the benefit of the class.

37. I lead the team working on this case. I founded Girard Sharp in 1995 and have led the firm since then, serving as lead or co-lead counsel in numerous cases. I have specialized in class actions since 1988 and have served as lead counsel in a wide range of class actions during my 34 years of advocacy for plaintiffs. From 2015 to 2021 I served on the United States Judicial Conference Standing Committee on Rules of Practice and Procedure. From 2004 to 2010 I served on the United States Judicial Conference Advisory Committee on Civil Rules. I am a member of the Council of the American Law Institute, currently serving as Chair of Audit Committee, and a Life Fellow of the American Bar Foundation, and from 2007 to 2016 I served on the Advisory Board of the Institute for the Advancement of the American Legal System.

38. I supervised all aspects of case prosecution and strategy in this litigation. I led the settlement negotiations and ensured that our clients and class members were kept apprised of material developments in the case. I also regularly conferred with and supervised the work of co-

counsel firms, participated in all hearings, and reviewed and ensured the accuracy of all pleadings filed with the Court.

39. **Jordan Elias** is a partner of Girard Sharp who has worked on this litigation since October 2015, when he joined the firm. He is the author of *Course Correction—Data Breach as Invasion of Privacy*, 69 Baylor L. Rev. 574 (2018), among other legal articles. Mr. Elias formulated legal strategies in consultation with me throughout the case, provided essential support during the negotiations with the Defendants, and was responsible for the Consolidated Amended Complaint and all briefing for the Plaintiffs, including in the appeal. Mr. Elias also coordinated the preparation of the settlement documentation and briefing to the Court in connection with the settlement.

40. **Simon Grille**, a Girard Sharp partner, was the primary attorney responsible for preparing Plaintiffs' presentations to Judge Stengel on the facts and issues in dispute in this litigation. Mr. Grille also took the lead in preparing fact sheets related to each Plaintiff for use in the mediation and in communicating with Plaintiffs and, where applicable, their individually retained counsel regarding the parties' negotiations and eventual settlement.

41. **Adam E. Polk** is a Girard Sharp partner who specializes in new matter origination. Mr. Polk researched and drafted the first-filed complaint in this litigation.

42. **Richard Gordin**, formerly Of Counsel to the firm, provided strategic advice and drafted pleadings on behalf of the Plaintiffs in 2016.

43. **Linh Vuong**, a former Girard Sharp associate, communicated extensively with breach victims, as well as drafting pleadings in the case, among other services performed from 2015 to early 2017.

44. **Christopher Hikida**, a former Girard Sharp associate, also communicated extensively with breach victims, and monitored news reports and otherwise researched issues relating to the Data Breaches and this litigation, from 2015 through 2017.

45. **Esfand Nafisi** is a former Girard Sharp associate who researched and drafted portions of the Consolidated Amended Complaint.

46. **Trevor Tan** is a senior associate at Girard Sharp specializing in legal research and writing who assisted in drafting briefs concerning Peraton's preemption defense and the parties' settlement.

47. **Jessica Cook**, a Girard Sharp associate (and a former litigation assistant at the firm), communicated with many of the breach victims who contacted the firm during the post-remand phase of the case.

48. **Steven Pong** is a former Girard Sharp associate who assisted with researching and drafting portions of Plaintiffs' motion to dismiss opposition.

49. **Kimberly Macey** is a Girard Sharp associate who researched and drafted pleadings in the case.

50. In performing work on this case, Girard Sharp's attorneys and staff expended 5,061.3 hours for a total lodestar of $4,236,392. In accordance with the Court's direction concerning time and expense reporting (Dkt. # 58 at 2), the firm's attorneys and staff kept detailed contemporaneous records of the time they spent on this litigation. In auditing our time, Girard Sharp exercised billing judgment to eliminate any inefficiency or duplication.

51. Below is a chart showing the professionals who worked on this matter for Girard Sharp, their positions at the firm (e.g., Partner, Of Counsel, Associate, Litigation Assistant), the total number of hours they worked, their hourly billing rates, and the resulting lodestar. These

figures reflect efficient staffing and work that the firm reasonably performed for the benefit of the class.

| Timekeeper | Role | Rate | Hours | Lodestar |
|---|---|---|---|---|
| Daniel C. Girard | Partner | $1,195 | 954.6 | $1,140,747.00 |
| Jordan Elias | Partner | $1,050 | 1,677.5 | $1,761,375.00 |
| Simon Grille | Partner | $875 | 381.3 | $333,637.50 |
| Adam E. Polk | Partner | $975 | 133.1 | $129,772.50 |
| Richard Gordin | Of Counsel | $650 | 75.7 | $49,205.00 |
| Linh Vuong | Associate | $450 | 497.9 | $224,055.00 |
| Christopher Hikida | Associate | $425 | 513.4 | $218,195.00 |
| Esfand Nafisi | Associate | $550 | 194.4 | $106,920.00 |
| Trevor T. Tan | Associate | $850 | 123.6 | $105,060.00 |
| Jessica Cook | Associate | $500 | 134.4 | $67,200.00 |
| Steven Pong | Associate | $350 | 44.8 | $15,680.00 |
| Kimberly Macey | Associate | $500 | 25 | $12,500.00 |
| Schuyler Sandeen | Litigation Assistant | $225 | 122.6 | $27,585.00 |
| Cole Limbach | Litigation Assistant | $225 | 117.3 | $26,392.50 |
| Natalie Attar | Litigation Assistant | $275 | 57 | $15,675.00 |
| Jessica Cook | Litigation Assistant | $275 | 8.7 | $2,392.50 |
| | | TOTALS: | 5,061.3 | $4,236,392.00 |

52. The rates set forth above are these professionals' customary rates that Girard Sharp currently charges in similar matters for which the firm is paid on a contingent basis, as well as in complex litigation and arbitration matters in which the firm's clients pay by the hour. (Attached

as **Exhibit A** is a declaration from our co-counsel, Corali Lopez-Castro, in one such hourly billing matter.) For former employees, the rate applied is the rate that Girard Sharp charged for the professional at the time they left the firm.

53. Girard Sharp's lodestar will increase in the months to come as a result of our ongoing work responding to class member inquiries, preparing the reply in support of Plaintiffs' motions for final approval and for attorneys' fees, expenses, and service awards, and supervising the administration of the settlement. Based on my experience in analogous circumstances, I believe these services will add several hundred thousand dollars to Girard Sharp's total lodestar in the case. Girard Sharp reserves the right to apply for reimbursement of attorneys' fees and expenses attributable to services provided after the date of this application.

54. Based on my relevant experience and my knowledge of the type and quality of work performed on this case, I believe Girard Sharp's rates are commensurate with the rates charged by other firms with similar experience and expertise in our legal market. Our rates are based on the years of experience of our various practitioners, their standing in their respective fields, the prevailing rates charged by comparable firms, the legal markets where services are rendered, and the complexity of the work undertaken for our clients. Girard Sharp sets its hourly rates based on arm's length negotiations with sophisticated in-house counsel; peer law firm surveys published in *The National Law Journal*; and our independent review of the hourly rates charged by other attorneys in comparable litigation.

55. In addition to being paid by clients invoiced on a monthly basis, Girard Sharp's rates have been approved by courts in other, similar matters. Most recently, in a case involving manipulation of commodities markets in which Girard Sharp served on the plaintiffs' executive committee, the court during its final fairness hearing on July 7, 2022 approved Girard Sharp's

hourly rates, and rates for comparable professionals of up to $1,295 per hour. *In re JPMorgan Precious Metals Spoofing Litig.*, No. 1:18-cv-10356-GHW (S.D.N.Y.). Other representative cases in which courts approved Girard Sharp's rates include:

- *In re Capacitors Antitrust Litig.*, No. 3:14-CV-03264-JD, 2020 WL 6813220, at *4 (N.D. Cal. Sept. 15, 2020), *report and recommendation adopted*, 2020 WL 6544472 (N.D. Cal. Nov. 7, 2020);
- *In re Nexus 6P Products Liab. Litig.*, No. 17-cv-02185-BLF, Dkt. # 225 (N.D. Cal. Nov. 12, 2019);
- *Weeks v. Google LLC*, No. 18-cv-00801, Dkt. #184 (N.D. Cal. Aug. 30, 2019);
- *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2018 WL 4620695, at *2 (N.D. Cal. Sept. 20, 2018);
- *In re Yahoo Mail Litig.*, No. 5:13-cv-04980-LHK, Dkt. # 42 (N.D. Cal. Aug. 25, 2016);
- *In re High Tech Employee Antitrust Litig.*, No. 11-cv-02509, 2015 WL 5158730, at *9 (N.D. Cal. Sept 2, 2015).

56. Since this litigation began—and particularly since 2017—hourly rates in the market for legal services in the national litigation matters for which Class Counsel are responsible have increased substantially. *See, e.g.*, *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2019 WL 13090127, at *3 & nn.1-2 (E.D. Mich. Dec. 29, 2019) (MDL court discussing this trend and citing sources, including an ABA survey). In support of their fee application, Class Counsel provide three other recent reports of the significant increases in hourly rates for legal services performed by law firms specializing in such high-stakes matters:

- Attached as **Exhibit B** is a true and correct copy of an article by Roy Strom entitled *Big Law Rates Topping $2000 Leave Value "In Eye of Beholder"* and published by Bloomberg on June 9, 2022.
- Attached as **Exhibit C** is a true and correct copy of an article by Andrew Maloney entitled *Aggressive Billing Rate Increases Appear Likely, but Can Clients Stomach It?* and published by The American Lawyer on January 24, 2022.
- Attached as **Exhibit D** is a true and correct copy of an article entitled *David Boies Bills $1,950 Hourly in Google Case, Court Filing Shows* and published in Bankruptcy Court Decisions Weekly News & Comments on June 20, 2022.

57. If the rates set forth in *Laffey* legal services index ("LSI") were applied to Girard Sharp's work in this litigation, the firm's lodestar summary would be as follows:

| **Timekeeper** | **Years Out of Law School** | **LSI Rate** | **Hours** | **Lodestar** |
|---|---|---|---|---|
| Daniel C. Girard | 38 | $919 | 954.6 | $877,277.40 |
| Jordan Elias | 19 | $764 | 1,677.5 | $1,281,610.00 |
| Simon Grille | 9 | $676 | 381.3 | $257,758.80 |
| Adam E. Polk | 12 | $764 | 133.1 | $101,688.40 |
| Richard Gordin | 45 | $826 | 75.7 | $62,528.20 |
| Chris Hikida | 9 | $440 | 497.9 | $219,076.00 |
| Linh Vuong | 10 | $421 | 513.4 | $216,141.40 |
| Esfand Nafisi | 12 | $608 | 194.4 | $118,195.20 |
| Trevor T. Tan | 11 | $764 | 123.6 | $94,430.40 |
| Jessica Cook | 1 | $381 | 134.4 | $51,206.40 |
| Steven Pong | 6 | $343 | 44.8 | $15,366.40 |
| Kimberly Macey | 1 | $381 | 25 | $9,525.00 |
| Schuyler Sandeen | N/A | $206 | 122.6 | $25,255.60 |
| Cole Limbach | N/A | $208 | 117.3 | $24,398.40 |
| Natalie Attar | N/A | $208 | 57 | $11,856.00 |
| Jessica Cook | 1 | $206 | 8.7 | $1,792.20 |
| | | TOTALS: | 5,061.30 | $3,368,105.80 |

**Expenses Incurred in Prosecuting the Litigation**

58. Girard Sharp's billing rates do not reflect charges for litigation expenses. Expense items are billed separately; such charges are not duplicated in the firm's lodestar.

59. Girard Sharp advanced a variety of out-of-pocket expenses in furtherance of the prosecution of this litigation. The expenses set forth below are reflected in my firm's books and records that are regularly maintained in the ordinary course of the firm's business. These books and records are prepared using invoices, receipts, check records, and other source materials and are an accurate record of the expenses incurred. Third-party expenses are not marked up, meaning that the firm requests reimbursement only for the amount actually billed by the third party. Below is an itemized list of the unreimbursed expenses that Girard Sharp incurred in this litigation.

| **Expense Category** | **Amount** |
|---|---|
| Copying / Printing | $5,043.90 |
| Court Fees (Filing Fees, etc.) | $1,428.20 |
| Court Reporters / Transcripts | $700.90 |
| Computer Research | $20,898.15 |
| Telephone / Fax | $830.29 |
| Postage / Express Delivery / Messenger | $2,361.29 |
| Mediator Fees | $49,699.88 |
| Expert Fees | N/A |
| Air and Ground Transportation | $9,395.10 |
| Meals | $172.98 |
| Lodging | $9,040.67 |
| Miscellaneous / Other (Survey Monkey Subscription) | $300.00 |
| TOTAL: | $99,871.36 |

**Time and Expenses of All Plaintiffs' Counsel**

60. Girard Sharp has sought to carry out the Court's directive to "call upon the talent and expertise of the many other extremely well-qualified attorneys in the case . . . to aid in the many important tasks . . . ." (Dkt. # 58.) To that end, throughout this litigation, Girard Sharp turned for advice and assistance to some of the most experienced privacy-law attorneys in the country, including Tina Wolfson, Norman E. Siegel, and John A. Yanchunis, who have served as lead or co-lead counsel in most of the largest data breach class actions—Equifax, Yahoo, Capital One, Marriott, Premera, Home Depot, Experian, etc.—resulting in hundreds of millions of dollars in recoveries for consumers. Together, these attorneys brought decades of experience from litigating data and privacy-related matters. Class members also benefitted from the considerable skill and experience of the attorneys from Cooper & Kirk, PLLC. Without limiting the scope of work performed by supporting counsel, in the interests of efficiency, throughout the litigation and negotiations, Ms. Wolfson was tasked with responsibility for class certification issues, Mr. Yanchunis assisted in developing models for damage recovery, Mr. Thompson and Mr. Patterson were charged with briefing and advising on issues surrounding litigation against the Government, Gary Mason performed various administrative duties in his role as Liaison Counsel, and Mr. Siegel provided continuing support on issues surrounding negotiation strategy and mediation preparation.

61. The team effort by all Plaintiffs' counsel in this case was apparent in our review of the timesheets of each co-counsel firm. In audit parameters provided to co-counsel firms and in calculating the total lodestar, Girard Sharp excluded work performed by other firms prior to appointment of Lead Counsel that did not provide a benefit to the class—such as drafting duplicative complaints—and all post-appointment time included in the lodestar was spent on work approved in advance by Girard Sharp. As with our firm's records, we carefully audited the daily

timesheets and the expense records of each of the co-counsel firms, exercising billing judgment to eliminate any unnecessary, excessive, or duplicative time and expense entries. This process removed hundreds of thousands of dollars in attorney time and expenses. After completion of our audit, we submitted all firms' detailed time and expense records to the Government for further review and audit. As a result, the Government has full transparency into the work performed by Plaintiffs' counsel in this litigation. Upon request, we will also provide these detailed records to the Court for *in camera* review.

62. Class Counsel's expenses are reflected on the books and records of the respective firms, and were reasonable and necessary to the successful resolution of this case.

63. **Exhibit E** to this declaration is a composite exhibit that contains supporting declarations from each of the Plaintiffs' firms whose professional time is included in the lodestar. A summary chart showing the time and expenses incurred by each firm in this litigation appears below.

| **Firm** | **Hours** | **Lodestar at Market Rates** | **Lodestar at LSI Rate** | **Expenses** |
|---|---|---|---|---|
| Girard Sharp | 5,061.3 | $ 4,236,392.00 | $ 3,368,105.80 | $ 99,871.36 |
| Cooper & Kirk | 1,337.3 | $ 1,127,912.50 | $ 1,045,507.50 | $ 716.00 |
| Stueve Siegel Hanson | 1,079.2 | $ 864,165.00 | $ 755,879.10 | $ 25,532.75 |
| Ahdoot & Wolfson | 726.8 | $ 627,269.00 | $ 626,942.10 | $ 5,890.11 |
| Mason | 679.3 | $ 318,507.20 | $ 370,593.75 | $ 3,516.54 |
| Kohn Swift & Graf | 661.2 | $ 396,596.50 | $ 551,899.00 | $ 5,046.21 |
| Morgan & Morgan | 494 | $ 475,720.00 | $ 391,241.10 | $ 21,681.76 |
| Koluncich | 228.5 | $ 131,387.50 | $ 209,991.50 | $ 3,092.69 |
| LippSmith | 102.8 | $ 75,030.00 | $ 86,816.20 | $ 3,945.02 |
| Rosenthal | 93.3 | $ 79,305.00 | $ 85,742.70 | N/A |
| Cuneo Gilbert | 88.5 | $ 71,201.25 | $ 70,588.75 | $ 2,278.07 |
| Barrack Rodos Bacine | 76 | $ 55,770.00 | $ 58,458.00 | $ 2,265.06 |
| Webb, Klase & Lemond | 58.3 | $ 39,757.50 | $ 45,169.90 | N/A |
| Mandelbaum Barrett | 41.4 | $ 30,570.00 | $ 36,588.60 | N/A |
| Tycko & Zavareei | 21.9 | $ 15,953.90 | $ 16,060.30 | $ 646.31 |
| **TOTALS:** | **10,749.8** | **$ 8,545,537.35** | **$ 7,719,584.30** | **$ 174,481.88** |

64. Consistent with the Court's recommendation that the parties explore resolution of the attorneys' fee application, Plaintiffs provided the Government with detailed time entries and support for their expense reimbursement requests, and received initial feedback from the Government. Plaintiffs will continue these efforts to reach agreement with Government.

**Service Awards for the Plaintiffs**

65. All of the Named Plaintiffs made significant contributions to the litigation and settlement and took a risk by standing up to serve the class after the breach of their sensitive information. Each Plaintiff retained counsel, communicated with Class Counsel over the course of the litigation, searched for and preserved their records, provided confidential information and documents related to the breach, reviewed and approved the pleadings, were kept apprised of case progress and the negotiations, and approved the settlement. Each Plaintiff also assisted with the mediation efforts by providing detailed information in follow-up interviews with Class Counsel and in written questionnaires in response to OPM's information requests.

66. Based on the time and effort the Named Plaintiffs dedicated to the class over the course of this litigation, I believe that a $5,000 service award to each of them is fair and reasonable, and respectfully request these awards be approved.

* * *

67. Based on the facts stated above and the points and authorities set forth in their accompanying motions, Plaintiffs respectfully request that the Court grant final approval of the Settlement and approve the requested awards.

I declare under penalty of perjury that the foregoing is true and correct. Executed July 21, 2022.

By: /s/ *Daniel C. Girard*
Daniel C. Girard